**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SASA TANASKOVIC, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Case No.: |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| REALOGY HOLDINGS CORP., RICHARD A. SMITH, RYAN M. SCHNEIDER, ANTHONY E. HULL, AND TIMOTHY B. GUSTAVSON, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff Sasa Tanaskovic, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through

Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Realogy Holdings Corp. ("Realogy" or the "Company"), as well as media and reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased the securities of Realogy during the period of February 24, 2017 through May 22, 2019, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company's headquarters are located in this District and a substantial part of the conduct complained of herein occurred in this District.

5.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Realogy securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Realogy, through its subsidiaries, provides real estate and relocation services. The Company operates through four segments: Real Estate Franchise Services, Company Owned Real Estate Brokerage Services, Relocation Services, and title and Settlement Services. Realogy is incorporated in Delaware and its headquarters are located at 175 Park Avenue, Madison, NJ 07940. During the

Class Period, Realogy's securities was actively traded on New York Stock Exchange ("NYSE"), under the ticker "RLGY."

8.      Defendant Richard A. Smith ("Smith") served as the Company's Chairman of the Board of Directors and Chief Executive Officer ("CEO") from the beginning of the Class Period until December 31, 2017.

9.      Defendant Ryan M. Schneider ("Schneider") has been the Company's CEO since December 31, 2017.

10.     Defendant Anthony E. Hull ("Hull") served as the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until his retirement on November 5, 2018.

11.     Defendant Timothy B. Gustavson ("Gustavson") has been the Company's Interim CFO since November 5, 2018. Prior to that role, Gustavson was the Company's Senior Vice President, Chief Accounting Officers and Controller.

12.     Collectively Defendants Smith, Schneider, Hull, and Gustavson are collectively the "Individual Defendants."

13.     Collectively, Defendant Realogy and Individual Defendants are herein referred to as "Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     Realogy is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

16.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Realogy under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Defendants' False and Misleading Class Period Statements

17.    On February 24, 2017, the Company filed its annual report on Form 10-K with the SEC for the year ending December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Smith, Hull, and Gustavson. Attached to the 2016 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Smith and Hull attesting to the disclosure of all fraud.

18.    The 2016 10-K discussed competition, stating in relevant part:

*Real Estate Brokerage Industry***.** The residential real estate brokerage industry is highly competitive with low barriers to entry for new participants. Recruitment and retention of independent sales associates and independent sales associate teams are critical to the business and financial results of a brokerage—whether or not they are affiliated with a franchisor. Most of a brokerage's real estate listings are sourced through the sphere of influence of their independent sales associates, notwithstanding the growing influence of internet-generated leads. Competition for independent sales associates in our industry is high and has intensified particularly with respect to more productive independent sales associates. Competition for independent sales associates is generally subject to numerous factors, including remuneration (such as sales commission percentage and other financial incentives paid to independent sales associates), other expenses charged to independent sales associates, leads or business opportunities

- 6 -

generated for the independent sales associate from the brokerage, independent sales associates' perception of the value of the broker's brand affiliation, marketing and advertising efforts by the brokerage, the office manager, staff and fellow independent sales associates with whom they collaborate daily and technology, continuing professional education, and other services provided by the brokerage. See "Item 7.—Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Drivers" for a discussion of the various compensation models being utilized by real estate brokerages to compensate their independent sales associates.

According to NAR, approximately 41% of individual brokers and independent sales associates are affiliated with a franchisor. Competition among the national real estate brokerage brand franchisors to grow their franchise systems is intense. We believe that competition for the sale of franchises in the real estate brokerage industry is based principally upon the perceived value that the franchisor provides to enhance the franchisee's ability to grow its business and improve the recruitment, retention and productivity of its independent sales associates. The value provided by a franchisor encompasses many different aspects including the quality of the brand, tools, technology, marketing and other services, such as the availability of financing, provided to the franchisees, and the fees the franchisees must pay. Our largest national competitors in this industry include, but are not limited to, three large franchisors: Keller Williams Realty, Inc.; HSF Affiliates LLC (a joint venture controlled by HomeServices of America that operates Berkshire Hathaway HomeServices, Prudential Real Estate and Real Living Real Estate); and RE/MAX International, Inc.

19.    The 2016 10-K discussed government regulations, stating in relevant

part:

**Real Estate Regulation.** RESPA and state real estate brokerage laws restrict payments which real estate brokers, title agencies, mortgage bankers, mortgage brokers and other settlement service providers may receive or pay in connection with the sales of residences and referral of

settlement services (e.g., mortgages, homeowners insurance and title insurance). Such laws may to some extent impose limitations on preferred alliance and other arrangements involving our real estate franchise, real estate brokerage, settlement services and relocation businesses or the business of our mortgage origination joint venture. In addition, with respect to our company owned real estate brokerage, relocation and title and settlement services businesses as well as our mortgage origination joint venture, RESPA and similar state laws require timely disclosure of certain relationships or financial interests with providers of real estate settlement services.

RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between brokers and agents and market-based fees for the provision of actual goods or services. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA compliance, however, has become a greater challenge in recent years for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretation of RESPA or similar state statutes by certain courts.

Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), administration of RESPA has been moved from the Department of Housing and Urban Development ("HUD") to the Consumer Financial Protection Bureau (the "CFPB"). The CFPB has taken a much stricter approach toward interpretation of RESPA and related regulations than HUD and has significantly increased the use of enforcement proceedings. In the face of this changing regulatory landscape, various industry participants, while disagreeing with the CFPB's narrow interpretation of RESPA, have nevertheless decided to modify or terminate long-standing business arrangements to avoid the risk of protracted and costly litigation defending such arrangements. Beyond the CFPB enforcement practices, the new practices have triggered private RESPA

litigation, including an action filed against us, our joint venture and PHH that is described in Note 14, "Commitments and Contingencies—Litigation", to our consolidated financial statements included elsewhere in this Annual Report, and narrower interpretations of state statutes similar to RESPA and enforcement proceedings of those statutes by state regulatory authorities.

Our company owned real estate brokerage business is also subject to numerous federal, state and local laws and regulations that contain general standards for and limitations on the conduct of real estate brokers and sales associates, including those relating to the licensing of brokers and sales associates, fiduciary and agency duties, administration of trust funds, collection of commissions, restrictions on information sharing with affiliates, fair housing standards and advertising and consumer disclosures. Under state law, our company owned real estate brokers have certain duties to supervise and are responsible for the conduct of their brokerage businesses. Although real estate sales associates historically have been classified as independent contractors, newer rules and interpretations of state and federal employment laws and regulations, including those governing employee classification and wage and hour regulations, may impact industry practices and our company owned brokerage operations. Real estate licensing laws generally permit brokers to engage sales associates as independent contractors but require that the broker supervise their activities.

20.    The 2016 10-K also discussed compliance with applicable regulations,

stating in relevant part:

> ***Several of our businesses are highly regulated and any failure to comply with such regulations or any changes in such regulations could adversely affect our business.***
>
> *The sale of franchises is regulated by various state laws as well as by the FTC*. The FTC requires that franchisors make extensive disclosure to prospective franchisees but does not require registration. A number of states require registration and/or disclosure in connection

with franchise offers and sales. In addition, several states have "franchise relationship laws" or "business opportunity laws" that limit the ability of franchisors to terminate franchise agreements or to withhold consent to the renewal or transfer of these agreements.

*Our company owned real estate brokerage business must comply with the requirements governing the licensing and conduct of real estate brokerage and brokerage-related businesses in the jurisdictions in which we do business*. These laws and regulations contain general standards for and limitations on the conduct of real estate brokers and sales associates, including those relating to licensing of brokers and sales associates, fiduciary and agency duties, administration of trust funds, collection of commissions, advertising and consumer disclosures. Under state law, our real estate brokers have certain duties and are responsible for the conduct of their brokerage business.

*Our company owned real estate brokerage business, our relocation business, our mortgage origination joint venture, our title and settlement service business and the businesses of our franchisees (excluding commercial brokerage transactions) must comply with the Real Estate Settlement Procedures Act ("RESPA")*. RESPA and comparable state statutes prohibit providing or receiving payments, or other things of value, for the referral of business to settlement service providers in connection with the closing of real estate transactions involving federally-backed mortgages. RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between brokers and agents, fees splits between brokers, and market-based fees for the provision of actual goods or services. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA, however, has become a greater challenge in recent years for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretation of RESPA or similar state statutes by certain courts. With the passage of Dodd-Frank in 2010, primary responsibility

for enforcement of RESPA has shifted to the CFPB. The CFPB has taken a much stricter approach toward interpretation of RESPA and related regulations than the prior regulatory authority (the Department of Housing and Urban Development) and has become significantly more active in the use of enforcement proceedings. In the face of this changing regulatory landscape, various industry participants, while disagreeing with the CFPB's narrow interpretation of RESPA, have nevertheless decided to modify or terminate long-standing business arrangements to avoid the risk of protracted and costly litigation defending such arrangements. RESPA also has been invoked by plaintiffs in private litigation for various purposes, including an action filed against us, our joint venture and PHH that is described in Note 14, "Commitments and Contingencies—Litigation" to our consolidated financial statements included elsewhere in this Annual Report, and narrower interpretations of state statutes similar to RESPA and enforcement proceedings of those statutes by state regulatory authorities.

21.    On February 27, 2018, the Company filed its annual report on Form 10-K with the SEC for the year ending December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Schneider, Hull, and Gustavson. Attached to the 2017 10-K were SOX certifications signed by Defendants Schneider and Hull attesting to the disclosure of all fraud.

22.    The 2017 10-K discussed competition, stating in relevant part:

***Real Estate Brokerage Industry.*** The residential real estate brokerage industry is highly competitive with low barriers to entry for new participants. Recruitment and retention of independent sales agents and independent sales agent teams are critical to the business and financial results of a brokerage—whether or not they are affiliated with a franchisor. Most of a brokerage's real estate listings are sourced through the sphere of influence of their independent sales agents,

- 11 -

notwithstanding the growing influence of internet-generated leads. Competition for independent sales agents in our industry is high and has intensified particularly with respect to more productive independent sales agents. Competition for independent sales agents is generally subject to numerous factors, including remuneration (such as sales commission percentage and other financial incentives paid to independent sales agents), other expenses borne by independent sales agents, leads or business opportunities generated for the independent sales agent from the brokerage, independent sales agents' perception of the value of the broker's brand affiliation, marketing and advertising efforts by the brokerage or franchisor, the office manager, staff and fellow independent sales agents with whom they collaborate daily, as well as technology, continuing professional education, and other services provided by the brokerage or franchisor. See "Item 7.—Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Drivers" for a discussion of the various compensation models being utilized by real estate brokerages to compensate their independent sales agents.

According to NAR, approximately 43% of individual brokers and independent sales agents are affiliated with a franchisor. Competition among the national real estate brokerage brand franchisors to grow their franchise systems is intense. We believe that competition for the sale of franchises in the real estate brokerage industry is based principally upon the perceived value that the franchisor provides to enhance the franchisee's ability to grow its business and improve the recruitment, retention and productivity of its independent sales agents. The value provided by a franchisor encompasses many different aspects including the quality of the brand, tools, technology, marketing and other services, the availability of financing provided to the franchisees, and the fees the franchisees must pay. Our largest national competitors in this industry include, but are not limited to, three large franchisors: Keller Williams Realty, Inc.; HSF Affiliates LLC (a joint venture controlled by HomeServices of America that operates Berkshire Hathaway HomeServices and Real Living Real Estate); and RE/MAX International, Inc.

23.    The 2017 10-K discussed government regulations, stating in relevant

part:

> ***Real Estate Regulation.*** RESPA, state real estate brokerage laws and
> similar laws in countries in which we do business restrict payments
> which real estate brokers, title agencies, mortgage bankers, mortgage
> brokers and other settlement service providers may receive or pay in
> connection with the sales of residences and referral of settlement
> services (e.g., mortgages, homeowners insurance and title insurance).
> Such laws may to some extent impose limitations on preferred alliance
> and other arrangements involving our real estate franchise, real estate
> brokerage, settlement services and relocation businesses or the
> business of our mortgage origination joint venture. In addition, with
> respect to our company owned real estate brokerage, relocation and
> title and settlement services businesses as well as our mortgage
> origination joint venture, RESPA and similar state laws require timely
> disclosure of certain relationships or financial interests with providers
> of real estate settlement services.
>
> RESPA and related regulations do, however, contain a number of
> provisions that allow for payments or fee splits between providers,
> including fee splits between brokers and agents and market-based fees
> for the provision of actual goods or services.  In addition, RESPA
> allows for referrals to affiliated entities, including joint ventures, when
> specific requirements have been met.  We rely on these provisions in
> conducting our business activities and believe our arrangements
> comply with RESPA.  RESPA compliance, however, has become a
> greater challenge in recent years for most industry participants offering
> settlement services, including mortgage companies, title companies
> and brokerages, because of changes in the regulatory environment and
> expansive interpretations of RESPA or similar state statutes by certain
> courts.
>
> Pursuant to the Dodd-Frank Wall Street Reform and Consumer
> Protection Act ("Dodd-Frank"), administration of RESPA has been
> moved from the Department of Housing and Urban Development
> ("HUD") to the Consumer Financial Protection Bureau (the "CFPB").

- 13 -

The CFPB has taken, in the recent past, a much stricter approach toward interpretation of RESPA and related regulations than HUD and has significantly increased the use of enforcement proceedings. In the face of this changing regulatory landscape, various industry participants, while disagreeing with the CFPB's narrow interpretation of RESPA, have nevertheless decided to modify or terminate long-standing business arrangements to avoid the risk of protracted and costly litigation defending such arrangements. At present, leadership at the CFPB is in transition, with a new acting director. In the message accompanying the new five-year Strategic Plan published by the CFPB in February 2018, the acting director summarized the changes at the CFPB -- to fulfill its statutory responsibilities, but to go no further. The Strategic Plan notes that the CFPB will focus on protecting the legal rights of consumers while engaging in rulemaking where appropriate to address unwarranted regulatory burdens. Beyond the CFPB enforcement practices, private RESPA litigation may also be pursued, including an action settled by us, our former joint venture and PHH that is described in Note 13, "Commitments and Contingencies—Litigation", to our consolidated financial statements included elsewhere in this Annual Report. In addition, permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory authorities may also be aggressively pursued.

Our company owned real estate brokerage business is also subject to numerous federal, state and local laws and regulations that contain general standards for and limitations on the conduct of real estate brokers and sales agents, including those relating to the licensing of brokers and sales agents, fiduciary and agency duties, consumer disclosure obligations, administration of trust funds, collection of commissions, restrictions on information sharing with affiliates, fair housing standards and advertising and consumer disclosures. Under state law, our company owned real estate brokers have certain duties to supervise and are responsible for the conduct of their brokerage businesses. Although real estate sales agents historically have been classified as independent contractors, newer rules and interpretations of state and federal employment laws and regulations, including those governing employee classification and wage and hour regulations, may

impact industry practices and our company owned brokerage operations. Real estate licensing laws generally permit brokers to engage sales agents as independent contractors but require that the broker supervise their activities.

24.    The 2017 10-K also discussed compliance with applicable regulations,

stating in relevant part:

**Several of our businesses are highly regulated and any failure to comply with such regulations or any changes in such regulations could adversely affect our business.**

*The sale of franchises is regulated by various state laws as well as by the Federal Trade Commission (the "FTC")*. The FTC requires that franchisors make extensive disclosure to prospective franchisees but does not require registration. A number of states require registration and/or disclosure in connection with franchise offers and sales. In addition, several states have "franchise relationship laws" or "business opportunity laws" that limit the ability of franchisors to terminate franchise agreements or to withhold consent to the renewal or transfer of these agreements.

*Our company owned real estate brokerage business must comply with the requirements governing the licensing and conduct of real estate brokerage and brokerage-related businesses in the jurisdictions in which we do business*. These laws and regulations contain general standards for and limitations on the conduct of real estate brokers and sales agents, including those relating to licensing of brokers and sales agents, fiduciary, agency and statutory duties, administration of trust funds, collection of commissions, advertising and consumer disclosures. Under state law, our real estate brokers have certain duties and are responsible for the conduct of their brokerage business.

*Our company owned real estate brokerage business, our relocation business, our mortgage origination joint venture, our title and settlement service business and the businesses of our franchisees (excluding commercial brokerage transactions) must comply with the*

- 15 -

*Real Estate Settlement Procedures Act ("RESPA")*. RESPA and comparable state statutes prohibit providing or receiving payments, or other things of value, for the referral of business to settlement service providers in connection with the closing of real estate transactions involving federally-backed mortgages. RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between brokers and agents, fees splits between brokers, and market-based fees for the provision of actual goods or services. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA, however, has become a greater challenge in recent years for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretations of RESPA or similar state statutes by certain courts. With the passage of Dodd-Frank in 2010, primary responsibility for enforcement of RESPA has shifted to the CFPB. The CFPB has, in the recent past, taken a much stricter approach toward interpretation of RESPA and related regulations than the prior regulatory authority (the Department of Housing and Urban Development) and has become significantly more active in the use of enforcement proceedings. In the face of this changing regulatory landscape, various industry participants, while disagreeing with the CFPB's narrow interpretation of RESPA, have nevertheless decided to modify or terminate long-standing business arrangements to avoid the risk of protracted and costly litigation defending such arrangements. RESPA also has been invoked by plaintiffs in private litigation for various purposes. Moreover, a recent change in leadership at the CFPB, which is currently subject to legal challenge, has contributed further uncertainty with respect to RESPA interpretation and compliance. However, permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory authorities may also be aggressively pursued.

25.     On February 26, 2019, the Company filed its annual report on Form 10-K with the SEC for the year ending December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Schneider and Gustavson. Attached to the 2018 10-K were SOX certifications signed by Defendants Schneider and Gustavson attesting to the disclosure of all fraud.

26.     The 2018 10-K discussed competition, stating in relevant part:

> ***Real Estate Brokerage Industry.*** The ability of our real estate brokerage franchisees and our company owned brokerage businesses to successfully compete is important to our prospects for growth. Their ability to compete may be affected by the recruitment, retention and performance of independent sales agents, the location of offices and target markets, the services provided to independent sales agents, the economic relationship between the broker and the agent (including the share of commission income retained by the agent and fees charged to or paid by the agent for services provided by the broker), the number and nature of competing offices in the vicinity, affiliation with a recognized brand name, community reputation, technology and other factors, including macro-economic factors such as national, regional and local economic conditions.
>
> We and our franchisees compete for consumer business as well as for independent sales agents with national and regional independent real estate brokerages and franchisors, discount and limited service brokerages, and with franchisees of our brands. Our largest national competitors in this industry include, but are not limited to, HomeServices of America (a Berkshire Hathaway affiliate), Howard Hanna Holdings, Compass and Weichert, Realtors and several large franchisors: RE/MAX International, Inc., Keller Williams Realty, Inc. and HSF Affiliates LLC (a joint venture controlled by HomeServices of America that operates Berkshire Hathaway HomeServices and Real Living Real Estate).

\*      \*      \*

**Commission Plan Competition Among Real Estate Brokerages.** Some of the firms competing for sales agents use different commission plans, which may be appealing to certain sales agents. There are several different commission plan variations that have been historically utilized by real estate brokerages to compensate their independent sales agents. One of the most common variations has been the traditional graduated commission model where the independent sales agent receives a percentage of the brokerage commission that increases as the independent sales agent increases his or her volume of homesale transactions, and the brokerage frequently provides independent sales agents with a broad set of support offerings and promotion of properties. Other common plans include a desk rental or 100% commission plan, a fixed transaction fee commission plan, and a capped commission plan. A capped commission plan generally blends aspects of the traditional graduated commission model with the 100% commission plan.

Although less common, some real estate brokerages employ their sales agents and, in such instances, employee agents may earn smaller brokerage commissions in exchange for other employee benefits or bonuses. Most brokerages focus primarily on one type of commission plan though some may offer one or more of commission plan variations to their sales agents.

Our company owned brokerage service has historically compensated affiliated independent sales agents using a traditional graduated commission model that emphasizes the value proposition offered to independent sales agents and independent sales agent teams, although we have utilized elements of other commission plans in certain geographic markets and have recently begun to expand our use of alternative commission plans at our company owned brokerages in certain territories.

27.    The 2018 10-K discussed government regulations, stating in relevant part:

***RESPA.*** RESPA, state real estate brokerage laws and similar laws in countries in which we do business restrict payments which real estate brokers, title agencies, mortgage bankers, mortgage brokers and other settlement service providers may receive or pay in connection with the sales of residences and referral of settlement services (e.g., mortgages, homeowners insurance and title insurance). Such laws may to some extent impose limitations on arrangements involving our real estate franchise, real estate brokerage, settlement services and relocation businesses or the business of our mortgage origination joint venture. In addition, with respect to our company owned real estate brokerage, relocation and title and settlement services businesses as well as our mortgage origination joint venture, RESPA and similar state laws generally require timely disclosure of certain relationships or financial interests with providers of real estate settlement services. Pursuant to the Dodd-Frank Act, the Consumer Financial Protection Bureau (the "CFPB") administers RESPA. Some state authorities have also asserted enforcement rights.

RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between title underwriters and agents, real estate brokers and agents and market-based fees for the provision of goods or services and marketing arrangements. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA compliance, however, has become a greater challenge under certain administrations for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretations of RESPA or similar state statutes by certain courts. Permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory

authorities may also be aggressively pursued. RESPA also has been invoked by plaintiffs in private litigation for various purposes.

28.    The 2018 10-K also discussed compliance with applicable regulations, stating in relevant part:

> ***Several of our businesses are highly regulated and any failure to comply with such regulations or any changes in such regulations could adversely affect our business.***
>
> *Our company owned real estate brokerage business, our relocation business, our mortgage origination joint venture, our title and settlement service business and the businesses of our franchisees (excluding commercial brokerage transactions) must comply with the Real Estate Settlement Procedures Act ("RESPA").* RESPA and comparable state statutes prohibit providing or receiving payments, or other things of value, for the referral of business to settlement service providers in connection with the closing of real estate transactions involving federally-backed mortgages. RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between title underwriters and agents, brokers and agents, and market-based fees for the provision of goods or services and marketing arrangements. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA compliance, however, has become a greater challenge under certain administrations for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretations of RESPA or similar state statutes by certain courts. Permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory authorities may also be aggressively pursued. RESPA also has been invoked by plaintiffs in private litigation for various purposes and some

state authorities have also asserted enforcement rights. Similar laws exist in other countries where we do business.

\*    \*    \*

*Our company owned real estate brokerage business must comply with the requirements governing the licensing and conduct of real estate brokerage and brokerage-related businesses in the jurisdictions in which we do business.* These laws and regulations contain general standards for and limitations on the conduct of real estate brokers and sales agents, including those relating to licensing of brokers and sales agents, fiduciary, agency and statutory duties, administration of trust funds, collection of commissions, advertising and consumer disclosures. Under state law, our real estate brokers have certain duties and are responsible for the conduct of their brokerage business.

29.    The statement referenced in ¶¶ 17-28 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Realogy was engaged in anticompetitive behavior by requiring property sellers to pay the commissions of a buyer's broker at an inflated rate; (2) Realogy's anticompetitive actions would prompt the U.S. Department of Justice ("DOJ") to open an antitrust investigation into the real estate industry's practices regarding brokers' commissions; and (3) as a result, Defendants' statements about the Realogy's

business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The Truth Begins to Emerge

30.     On March 11, 2019, the article "A new class action lawsuit could upend the real estate business as we know it" was published on *The Real Deal*. The article revealed that a lawsuit was filed against several realtors, including Realogy, which alleged that Realogy and others were violating antitrust laws. The article stated in relevant part:

> It takes aim at some of the central tenets of the U.S. real estate business: Multiple Listing Services and buyer's broker's commissions.
>
> ***A new class action lawsuit alleges that the National Association of Realtors, along with the "Big Four" — Realogy, HomeServices of America, RE/MAX and Keller Williams — violated federal antitrust law by conspiring to require home sellers to pay buyer's broker's commissions at inflated rates.*** The suit was first reported by Inman.
>
> ***The complaint, filed March 6, takes aims at NAR rules that require all brokers to offer buyer broker compensation when listing a property on a MLS, saying this has driven up costs to the seller and stifled competition.***
>
> "Because most buyer brokers will not show homes to their clients where the seller is offering a lower buyer broker commission, or will show homes with higher commission offers first, sellers are incentivized when making the required blanket, non-negotiable offer to procure the buyer brokers' cooperation by offering a high commission," the complaint reads, "Absent this rule, buyer brokers would be paid by their clients and would compete to be retained by offering a lower commission."

Filed on behalf of Christopher Moehrl, a homeseller from Minnesota, the lawsuit also says it will represent any home sellers who sold property and paid a broker commission in the last four years in specific geographic areas covered by different regional MLSs.

This includes areas in Texas, Maryland, North Carolina, Ohio, Colorado, Michigan, Florida, Nevada, Wisconsin, Minnesota, Pennsylvania, Arizona, Virginia, Utah and the District of Columbia.

(Emphasis added).

31.    On this news, shares of Realogy fell $0.21, or over 1.7%, to close at $12.07 on March 12, 2019, damaging investors.

32.    On April 18, 2019, *Housingwire* reported in the article "NAR slapped with second class-action lawsuit to end buyer broker compensation" which stated in relevant part:

A second class-action lawsuit has been filed in protest of the buyer broker compensation rules set forth by the National Association of Realtors.

The suit, filed in the Northern District of Illinois on Monday by Minnesota-based corporation Sawbill Strategic, alleges that NAR, Realogy, HomeServices of America, RE/MAX and Keller Williams violated federal antitrust laws by requiring property sellers to pay the buyer's broker an inflated fee.

The suit is nearly identical to one filed last month by a Minnesota home seller, which NAR called "baseless" and filled with "an abundance of false claims."

The suit alleges that the defendants conspired to drive up seller costs and reduce competition by requiring a home seller to pay compensation

to the buyer's broker, even though their involvement in the transaction is minimal.

According to the suit, NAR's Commission Rule maintains a commission requirement for buyer's brokers of 2.5-3% of the home's sale price. This has not changed in recent years, even as buyers increasingly turn to online listing sites to find their homes and often only retain a broker once a property has been selected.

The suit alleges that buyer broker compensation rules have remained intact despite their changing role in the home purchase transaction because of a conspiracy among the defendants.

It also notes that in markets abroad – like the U.K., Germany, Israel, Australia, and New Zealand – buyer broker fees are paid by the buyer rather than the seller and that buyers pay brokers less than half the rate paid in the U.S.

"Defendants and their co-conspirators possess market power through control local MLSs, which are databases of properties listed for sale in a particular geographic region," the complaint states. "A majority of homes in the United States are sold on such MLSs. Through their control of the MLSs, Defendants and their co-conspirators have market power in the local markets for real estate broker services."

33.     On this news, shares of Realogy fell $0.57, or over 4.4%, to close at $12.327 on April 22, 2019, damaging investors.

34.     On May 22, 2019, media reports revealed that the DOJ opened an investigation regarding antitrust practices of the real estate industry, which included Realogy. That day, *Bloomberg* published the article, "U.S. Opens Antitrust Probe of Real Estate Brokerage Industry" which discussed the investigation, stating in relevant part:

*U.S. antitrust officials are investigating potentially anti-competitive practices in the residential real estate brokerage business, with a focus on compensation to brokers and restrictions on their access to listings.*

The probe was detailed in a civil investigative demand, which is akin to a subpoena, issued by the Justice Department to CoreLogic Inc., which provides real estate data to government agencies, lenders and other housing-market participants.

The U.S. residential real estate industry has long faced criticism that it stifles competition among brokerages, protecting agent commissions that are higher than those paid by sellers in many other countries. In 2008, the Justice Department reached a settlement with the National Association of Realtors, a trade group, that was designed to lower commissions paid by consumers by opening the industry to internet-based brokers.

*The investigative demand to CoreLogic, dated last month, follows a lawsuit filed against the Realtors association and real estate broker franchisors, including Realogy Holdings Corp., claiming they conspired to prevent home sellers from negotiating commissions they pay to buyers' agents.*

\*      \*      \*

In June 2018, the Justice Department and Federal Trade Commission, which share antitrust jurisdiction in the U.S., held a workshop on the residential real estate brokerage industry that touched on the possible barriers to competition and the impact of past regulatory actions, among other issues.

According to the investigative demand sent to CoreLogic, the Justice Department is seeking information about the ability to search real estate listings on multiple listings services based on compensation offered to buyer brokers as well as practices that restrict CoreLogic's distribution of listings data.

- 25 -

News of the investigation was cheered by REX, an online brokerage that charges flat fees that it says are lower than those charged by traditional brokers.

"Any effort to shed light on these practices is good for the American consumer," REX Chief Executive Office Jack Ryan said in a statement. "Now is the time to drive change in the industry."

(Emphasis added).

35.     On this news, shares of Realogy fell $0.71, or over 9%, over the next two trading days to close at $7.13 on May 23, 2019, further damaging investors.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

36.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Realogy securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Realogy securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff

at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Realogy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

40.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.        whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Realogy;

c.        whether the Individual Defendants caused Realogy to issue false and misleading financial statements during the Class Period;

d.        whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.        whether the prices of Realogy securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.        whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

42.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.    the omissions and misrepresentations were material;

c.    Realogy securities are traded in an efficient market;

d.    the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.    the Company traded on the NYSE;

f.    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.    Plaintiff and members of the Class purchased, acquired and/or sold Realogy securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

43.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

44.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CAUSE OF ACTION

### Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     This cause of action is asserted against all Defendants.

47.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Realogy's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

48.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Realogy as specified herein.

49.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Realogy's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Realogy and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers Realogy securities during the Class Period.

50.    Each of the Defendants' primary liability, and controlling person liability, arises from the following: (a) Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company,

were privy to and participated in the creation, development and reporting of the Company's plans, projections and/or reports; (c) Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's, operations, and (d) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

51. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Realogy's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

52.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Realogy's securities was artificially inflated during the Class Period.

53.    In ignorance of the fact that market prices of Realogy's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Realogy's securities during the Class Period at artificially high prices and were damaged thereby.

54.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Realogy's financial results and condition, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Realogy securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

- 33 -

55.     By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

56.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

57.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

<u>**SECOND CAUSE OF ACTION**</u>

**Violation of Section 20(a) of The Exchange Act**
<u>**Against the Individual Defendants**</u>

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     This second cause of action is asserted against each of the Individual Defendants.

60.     The Individual Defendants acted as controlling persons of Realogy within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate

- 34 -

knowledge of aspects of the Company's dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

61.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.    As set forth above, Realogy and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

63.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of

Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

64.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.    Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

b.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Awarding such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: July 11, 2019                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff