SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
CHRISTOPHER L. AYERS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
cayers@seegerweiss.com

Local Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| SASA TANASKOVIC, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>REALOGY HOLDINGS CORP., et al.,<br><br>Defendants. | No. 2:19-cv-15053-SRC-CLW<br><br><br><br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

**LEAD PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**


I. NATURE OF THE ACTION ....................2

II. JURISDICTION AND VENUE ....................9

III. PARTIES ....................10

A. Plaintiff ....................10

B. Defendants ....................10

1. Corporate Defendant ....................10

2. Individual Defendants ....................11

IV. SUBSTANTIVE ALLEGATIONS ....................15

A. Background ....................15

B. Leading Up to the Class Period, Realogy Faced Increased Competition and Agent Attrition, Resulting in Decreased Market Share ....................19

C. Defendants Embark on Two Recruitment Initiatives ....................24

1. Defendants Dramatically Increased Commission Splits, Resulting in a Negative Long-Term Impact on Earnings and EBITDA ....................24

2. Defendants Pivot to Focus on Technology Based Product and Services Offerings, but Continue to Be Negatively Impacted by Rising Commission Splits ....................30

D. Defendants' Growth by Acquisition Strategy Disguised the Company's Decreasing Market Share and Riddled the Company with Undisclosed Inefficiencies ....................33

E. Defendants Engaged in Anti-Competitive Behavior to Maintain an Artificially Inflated ABCR ....................35

**Page**


F. Realogy Suffers Multiple Significant Stock Price Declines as Its True Financial Condition Is Revealed Through a Series of Disclosures ....................37

G. Post-Class Period Revelations ....................42

V. MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ....................43

A. Full Year 2016 Financial Results ....................44

B. First Quarter 2017 Financial Results ....................52

C. Second Quarter 2017 Financial Results ....................58

D. Investor Day 2017 ....................66

E. Disappointing Third Quarter 2017 Financial Results Partially Reveal the Impact of High Commission Splits on Realogy's Operating EBITDA ....................69

F. Realogy Announces a Shift in Focus to Technology and Agent Productivity ....................78

G. Full Year 2017 Financial Results and Continued Pressure on Margins Results in the Company's Second Strategic Initiative ....................79

H. First Quarter 2018 Financial Results Start to Show Revenue and Transaction Volume Growth ....................86

I. Second Quarter 2018 Financial Results ....................92

J. Third Quarter 2018 Results Show Poor Performance and a Decline in EBITDA ....................99

K. Realogy Reports Disappointing Full Year 2018 Results ....................104

L. Litigation Involving Realogy Reveals Antitrust Violations Relating to Broker Commissions ....................110

**Page**


M. Disappointing First Quarter 2019 Results Reveal that NRT Continued to Underperform the Market....113

N. The DOJ Announces an Investigation into Anticompetitive Practices in the Real Estate Industry Implicating Realogy's Business....118

VI. POST-CLASS PERIOD REVELATIONS....119

VII. BY FAILING TO DISCLOSE THE TRUE IMPACT OF THE COMPANY'S AGGRESSIVE AGENT RECRUITMENT INITIATIVES, DEFENDANTS VIOLATED SEC DISCLOSURE RULES....123

VIII. ADDITIONAL SCIENTER ALLEGATIONS....127

A. The Importance of NRT and Agent Retention and Recruitment to the Company's Operations....127

B. Defendants' Substantial Experience, Significant Access to Data, and Monitoring of Test Markets....129

C. Post-Class Period Admissions Support an Inference of Scienter....132

D. Smith, Hull, and Numerous Other Executives Depart....133

E. Defendants' Monitoring of the Regulatory Environment Related to the ABCR....135

IX. LOSS CAUSATION/ECONOMIC LOSS....137

A. November 3, 2017....138

B. November 2, 2018....139

C. February 26, 2019....140

D. March 6, 2019....141

**Page**

E. May 2, 2019 .......... 142

F. May 22, 2019 .......... 144

X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE .......... 147

XI. NO SAFE HARBOR .......... 149

XII. CLASS ACTION ALLEGATIONS .......... 152

COUNT I: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST DEFENDANTS .......... 154

COUNT II: VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS .......... 156

PRAYER FOR RELIEF .......... 157

JURY DEMAND .......... 158

By and through its undersigned counsel, Lead Plaintiff Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust ("Plaintiff") alleges the following against Realogy Holdings Corp., ("Realogy" or "Company"), Richard A. Smith ("Smith"), Ryan M. Schneider ("Schneider"), Anthony E. Hull ("Hull"), and Timothy B. Gustavson ("Gustavson") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Realogy with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning the Defendants; (e) investigation of factual sources; and (f) information readily obtainable on the Internet. Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I. NATURE OF THE ACTION

1. Plaintiff brings this federal securities class action on behalf of itself and all other similarly situated persons or entities ("Class") who purchased or otherwise acquired the publicly traded common stock of Realogy between February 24, 2017, and May 22, 2019, inclusive ("Class Period"), seeking to pursue remedies for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 15 C.F.R. §240.10-5.

2. Realogy is a leading provider of residential real estate services in the United States, and is the largest residential real estate brokerage in the country. Throughout the Class Period, Realogy operated through four segments: (a) Company Owned Real Estate Brokerage Services ("NRT"); (b) Real Estate Franchise Services ("RFG"); (c) Relocation Services ("Cartus"); and (d) Title and Settlement Services ("TRG"). Realogy derives a substantial portion of its revenue from its NRT segment, which accounted for 76% of Realogy's total revenue in 2017 and 2018.

3. Although Realogy had historically enjoyed significant market share in the industry, leading up to the Class Period, and under the leadership of Chief Executive Officer ("CEO") Smith, the Company's business model was suffering from significant inadequacies, stemming from the Company's failure to update and innovate. For example, Realogy's "traditional" compensation model to its agents

intentionally offered below-market commission splits[1] that purposefully favored a greater percentage of the commission going to Realogy and a smaller percentage being paid to the agent. In addition, Realogy failed to sufficiently take advantage of technological improvements in the industry, resulting in antiquated products and services being offered to agents. Essentially, and as ultimately admitted by Smith's replacement CEO Schneider, the Company was running like an outdated "diesel engine" and needed to "get[] up to a very fast speed."

4. At the same time, Realogy faced increased competition from brokerages pursuing non-traditional methods of marketing real estate, such as Internet-based brokerage or brokers who discount their commissions. As a result, and due to its antiquated model, Realogy began losing its most productive agents, and consequently market share. Because most of a brokerage's real estate listings are sourced through agents, Realogy's ability to recruit and retain agents was critical to its business and financial results. In fact, these agents generated the "lion's share" of Realogy's revenue.

5. Faced with this increased competition, and as a means to maintain its market share, immediately leading up to the Class Period Realogy embarked on a purposeful "financial incentive" based initiative focused on increased commission

---

[1] A commission split refers to the division of commissions between brokers and real estate agents on home sale transactions.

splits to recruit and retain new agents. The Class Period starts on February 24, 2017, when the initiative was in full swing and Defendants assured investors that any negative impact on the Company's financial position stemming from increasingly less favorable (to Realogy) commission splits would be limited to the "near-term" with offset that would be realized by "immediate[]" benefits felt by the Company's other segments. Defendants further issued "right-sized" and "competitive" full year 2017 ("FY17") commission split guidance of 69.5%-70% for NRT. Defendants repeated these assurances throughout the next two quarters (first quarter 2017 ("1Q17") and second quarter 2017 ("2Q17")), and reaffirmed NRT 2017 commission split guidance on numerous occasions, despite continued commission split increases. During 2Q17 Defendants announced the Company's FY17 operating EBITDA[2] guidance, a critical metric, and assured investors that the forecast already factored in increased commission splits. Defendants further downplayed the impact that more tech-savvy and consumer focused competition would have on the Company's business and agent retention efforts going forward.

6. Early on, it appeared that Defendants' plan was effective, resulting in increased homesale transaction volume and the recruitment and retention of

---

[2] EBITDA, or earnings before interest, taxes, depreciation, and amortization, is a measure of a company's overall financial performance and is used as an alternative to simple earnings or net income in some circumstances.

productive agents. As a result, Realogy's stock price was artificially inflated, climbing to a Class Period peak of $34.98 per share on August 7, 2017. However, the ever increasing commission splits, and their associated expenses and profit margin squeeze, were having a dramatically increased negative impact on Realogy's operating EBITDA.

7. A little over a week later, on November 3, 2017, Defendants surprised investors by announcing negative third quarter 2017 ("3Q17") financial results. The Company reported decreased EBITDA resulting from "higher" commission splits and was forced to revise its 2017 EBITDA guidance down due to the Company's "recruiting and retention efforts." The Company further increased 2017 NRT commission splits guidance, despite previous assurances that it was "right-sized." Defendants assuaged market concerns by confirming that the "balancing act" between market share gains and commission splits had "been accomplished" and that the Company would "stabiliz[e]" commission splits in 2018. In response to this surprising news, the price of Realogy stock fell 12% to close at $26.77 per share on November 3, 2017.

8. By the end of 2017, the negative effects of the Company's rising commission splits had not subsided, and Defendants, now under the steerage of new CEO Schneider, were forced to alter Realogy's financial based recruitment strategy, pivoting the Company to a strategy that favored "data-driven" technology. Starting

in early 2018, Defendants began to heavily tout Realogy's "serious investment" in technology and "strong product and services offerings." This also resulted in a shift in focus to sustainable organic growth instead of Realogy's traditional reliance on "tuck-in" acquisitions for growth in new markets, which had resulted in operational inefficiencies due to Defendants' inability to streamline operations upon consolidation.

9. Throughout the next two quarters (first quarter 2018 ("1Q18") and second quarter 2018 ("2Q18")) Defendants touted the benefits of the Company's new technology and product-driven initiatives and the positive impacts on Realogy's profitability. To combat fears of ongoing financial pressure from ever increasing commission splits, Defendants also repeatedly downplayed the long-term impact of increasing commission splits, asserting that any upward pressure would "substantially moderate" and the Company's operating EBITDA would be equal to what it was in 2017.

10. Unbeknownst to investors, however, from the start of the Class Period, Defendants knowingly concealed or recklessly disregarded the severity of the Company's outdated business model and the amount of time and financial resources it would take to regain lost market share in the face of competitors willing to drive commission splits to higher and higher levels. For example, Defendants falsely assured investors that Realogy's recruitment initiatives would correct the problem,

while failing to reveal that: (1) the Company was unable to generate sustainable (*i.e.*, profitable) organic earnings or EBITDA growth at commission split levels necessary to increase agent recruitment and retention, as well as transaction volume and market share; and (2) the Company's technology and product offerings were outdated and, therefore, it would take a significant amount of time to "get[] up" to "speed" with competitors' offerings to make up for agent attrition. Defendants could only conceal the truth for so long, as Realogy's operating EBITDA began to rapidly decline due to operational inefficiencies from tuck-in acquisitions and the costs associated with ever-higher commission splits.

11. More of the truth about Realogy's financial condition was partially disclosed on November 2, 2018, when Realogy revealed information concerning the Company's inability to sustain organic agent growth at commission split levels sufficient to drive sustainable EBITDA, and the Company revised its full year 2018 ("FY18") EBITDA guidance down as NRT – a critical part of the Company's overall financial performance – performed below the market and Realogy's competitors. In response to this partial disclosure, the price of Realogy stock declined 11.5% to a close of $17.76 per share on November 2, 2018.

12. Then, on February 26, 2019, Realogy once again shocked investors when the Company reported negative financial results for 2018, including a year-over-year decline in EBITDA resulting from increased agent commission split costs.

On this news, the price of Realogy's stock dropped another 21% to close at $14.14 per share on February 26, 2019.

13. Additional negative news was partially revealed to the market on March 6, 2019, when Realogy, the National Association of Realtors ("NAR"), and several of the largest real estate brokerage firms were sued in a class action for violating federal antitrust laws. The lawsuit revealed that Defendants also knew or recklessly disregarded that they were engaged in anti-competitive behavior designed to maintain an artificially inflated Average Broker Commission Rate ("ABCR").[3] A second class action alleging substantially similar facts was filed on April 15, 2019. In response to this additional negative news, the price of Realogy stock declined more than 6% on March 6, 2019, to close at $12.46 per share.

14. On May 2, 2019, Realogy again surprised investors when it reported its first quarter 2019 ("1Q19") financial results and revealed that the Company's homesale transaction volume for the quarter had decreased by more than double that of NAR, and the Company admitted that despite the touted benefits of the recruitment initiatives, EBITDA had decreased and agent count was "flat" on a net basis. It was further revealed that Realogy's "tuck-in" acquisitions had inhibited the Company's financial performance as a result of disparate systems and operating

[3] The ABCR is the historically stable, market driven, commission rate payable from both "sides" of a homesale transaction.

inefficiencies that failed to enhance the Company's bottom line. On this additional negative news, Realogy stock plummeted ***23%***, to close at $10.11 per share on May 2, 2019. The following day, the stock fell another 8.7% to close at $9.23 per share on May 3, 2019.

15. Finally, on May 22, 2019, media reports disclosed that the Department of Justice ("DOJ") had initiated an investigation into anticompetitive practices in the residential real estate brokerage industry, giving significant credence to allegations in the two class actions pending against Realogy and other real estate brokerages. In response to this surprising news, the price of Realogy stock fell 5% to close at $7.43 per share on May 22, 2019. The following day, the stock dropped another 4%, to close at $7.13 per share.

16. All told, Realogy stock fell nearly ***80%*** from its Class Period high, causing substantial damages to Plaintiff and members of the Class as the artificial inflation was removed from the price of Realogy stock.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

18. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

19. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c) and Section 27 of the Exchange Act. Realogy's principal executive offices are located in this District, many of the acts and practices complained of herein occurred in substantial part in this District, and Defendants disseminated materially false and misleading statements complained of herein to Realogy shareholders from this District.

20. In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiff

21. Plaintiff Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust, as set forth in the certification on file [ECF No. 13-4], incorporated by reference herein, purchased Realogy shares at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein. *See also* ECF No. 13-5.

### B. Defendants

#### 1. Corporate Defendant

22. Defendant Realogy Holdings Corp. is a Delaware corporation with its headquarters located at 175 Park Avenue, Madison, New Jersey 07940. Realogy's

common stock trades on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "RLGY."

**2. Individual Defendants**

23. Defendant Richard A. Smith served as the Company's Chairman of the Board of Directors, and CEO from the beginning of the Class Period until December 31, 2017. Smith also served as the Company's President from the beginning of the Class Period until October 2017. Specifically, Smith served as the Company's President and CEO since November of 2007, as Chairman of the Board since 2012, and as a Director of the Company since Realogy's separation from Cendant Corporation ("Cendant") in July 2006. Prior to that, Smith served in various executive roles at Cendant dating back to 1992.

24. Defendant Ryan M. Schneider has been the Company's CEO since December 31, 2017, when he replaced Smith. Schneider joined the Company as President, Chief Operating Officer ("COO"), and a Director in October 2017, after nearly 15 years of senior leadership experience at Capital One Financial Corporation. According to Realogy, Schneider also "has substantial experience in public policy and regulatory affairs." Schneider also has a Ph.D. in Economics.

25. Defendant Anthony E. Hull served as the Company's Executive Vice President ("VP"), Chief Financial Officer ("CFO"), and Treasurer from the beginning of the Class Period until his retirement on November 5, 2018. After

stepping down, Hull continued to serve Realogy until March 31, 2019, working as a senior advisor to Schneider. Hull was "a 15-year veteran" of Realogy and its former parent organization, Cendant.

26. Defendant Timothy B. Gustavson was the Company's Interim CFO and Treasurer from November 5, 2018 until March 25, 2019, when Charlotte Simonelli ("Simonelli") was named as the Company's Executive VP and CFO. Prior to and in addition to those roles, Gustavson served as the Company's Senior VP, Chief Accounting Officer, and Controller throughout the Class Period and since March of 2015. Prior to that Gustavson, a certified public accountant, previously served as Realogy's assistant corporate controller and vice president of finance from 2008 to 2015, where he was responsible for financial reporting – including all periodic SEC filings – as well as corporate consolidation and technical accounting matters. Gustavson joined Realogy in 2006 as vice president of external reporting. Prior to Realogy, Gustavson spent 16 years in public accounting.

27. Defendants Smith, Schneider, Hull, and Gustavson are referred to herein as the "Individual Defendants."

28. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Realogy, were privy to confidential and proprietary information concerning Realogy's financials and operations, strategic recruitment initiatives, commissions policies, and plans and acquisitions. Because of their

positions with Realogy, the Individual Defendants had access to non-public information about the Company's business and growth prospects through access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

29. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Realogy's business.

30. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Realogy's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, and, through them, to the investing

public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false and misleading statements pleaded herein.

31. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was registered with the SEC, traded on the NYSE, and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Realogy's business, including the negative financial impact that would result from the Company's strategic recruitment initiatives, the inefficiencies from the Company's growth by acquisition strategy, the Company's anti-competitive behavior to maintain an artificially inflated ABCR practices, and Realogy's future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Realogy stock would be

based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

32. Officially formed in 2006, when Cendant spun off its realty business, Realogy describes itself as "the leading and most integrated provider of residential real estate services in the U.S." Specifically, Realogy is the world's largest franchisor of residential real estate brokerages, the leading residential real estate brokerage in the U.S. (based upon transaction volume), and a provider of relocation services and title and settlement services. The Company owns, operates, and franchises a portfolio of well-known realty brands including Century 21®, Coldwell Banker®, Coldwell Banker Commercial®, ERA®, Sotheby's International Realty®, Better Homes and Gardens® Real Estate, and Corcoran®.

33. As of December 31, 2018, the Company had approximately 11,400 employees, the vast majority of which were in the U.S., and its franchise and proprietary brands had approximately 16,600 offices worldwide in 113 countries and territories in North and South America, Europe, Asia, Africa, the Middle East, and Australia, including approximately 6,000 brokerage offices in the U.S. (which included approximately 760 Company-owned brokerage offices). For 2018,

Realogy was responsible for 16% of the total volume of all existing home transactions in the U.S.

34. Realogy derives a substantial portion of its revenue from commissions earned on home sale transactions. In the real estate industry, licensed brokers like Realogy are the only entities permitted by law to be paid to represent buyers or sellers in real estate transactions. As a result, all payments, *i.e.*, commissions, to real estate agents must pass through brokers. The standard practice in the residential real estate industry is to compensate brokers, like Realogy, with commissions calculated as a percentage of a home's sale or purchase price, payable when the transaction is completed. This market-driven ABCR, is very stable, having declined by only one basis point or .01% every year since 2014.

35. In a real estate transaction, the broker earns sales commissions at the ABCR from both "sides" of the closed home sale (either the buy side or the sell side), which is referred to as gross commission income. After the broker collects the gross commission income, the broker uses those funds to compensate the agents, through commission splits. The higher the commission split, the higher the percentage of the commission is paid to the agent, with less remaining for the broker to keep. Consequently, commission split percentages directly impact the broker profit margin. Commission splits are more variable than ABCRs and are agreed to between the broker and the agent and usually reflect the level of service and support

the broker provides. Commission splits can also vary based on the volume of business the agent brings in, with highly productive agents negotiating more favorable splits, and by region.

36. Realogy derives a substantial portion of its revenues from existing home residential real estate transaction commissions. For 2018, Realogy's company owned and franchised brokerages accounted for approximately $13 billion – or 18% – of the $70 billion in gross commission income generated by all U.S. residential home sale transactions involving a broker.

37. As a result, the Company's financial performance relies heavily on Realogy's relationship with its agents. Realogy attempts to distinguish itself from its competitors by offering Realogy-specific products and services that are intended to provide advantages to Realogy agents, and their customers, in all aspects of real estate transactions. Throughout the Class Period, Realogy stated the "core" of its integrated business strategy was to "grow the base of productive independent sales agents" and provide them with "compelling data and technology products and services to make them more productive and their businesses more profitable."

38. Throughout the Class Period, the Company operated through four segments: (a) NRT; (b) RFG; (c) Cartus; and (d) TRG. NRT is most relevant to this case. NRT owns and operates a full-service real estate brokerage business in many of the largest metropolitan areas in the U.S. NRT accounted for a material portion

of the Company's business throughout the Class Period. For example, in 2017 and 2018, the NRT segment produced 76% of Realogy's total revenue. NRT operates under the Coldwell Banker, Sotheby's International Realty, and Corcoran® franchised brands, as well as proprietary brands that the Company owns but does not franchise. NRT was created through the acquisition of over 500 companies and (under Realogy and its predecessor company) and has ranked first nationally in real estate sales volume and transaction sides for 21 consecutive years. As of December 31, 2018, NRT had approximately 760 company owned brokerage offices, approximately 4,900 employees, and approximately 50,200 independent sales agents.

39. NRT's business is significantly concentrated on the U.S. east and west coast markets, where home prices are generally higher and brokers face more increased competition. Not only does NRT account for a significant portion of the Company's revenue, but NRT's performance and profitability also have an impact on the Company's other segments, including RFG[4] because RFG derives a royalty percentage from NRT-based franchises. While the Company credits its multiple

[4] Realogy's RFG segment franchises its residential and real estate brokers under a number of well-known brand names including: Century 21 Real Estate, Coldwell Banker and Sotheby's International Realty, in exchange for a fee, or royalty, for the right to operate under one of the Company's trademarks and have access to the Company's proprietary data systems and business tools.

brands and operations as permitting it to derive revenue from various segments of the residential real estate market, the most material segment by far is NRT.

40. Realogy grew to its size through a strategy that historically focused heavily on both acquisitions and organic growth. On the one hand, the Company engaged in what Defendants described as "tuck-in" acquisitions, where Realogy folded newly acquired businesses into its existing operations, intending to reduce or eliminate duplicate costs and thus generate profitable growth. Realogy's strategy was to enhance the profitability of the independent sales associates – or agents – obtained from the acquired operations by providing them with Realogy-specific brokerage services, including technology and marketing support, which was supposed to, in turn, increase the agent's productivity. On the other hand, the Company's organic growth strategy focused on recruiting and retaining agents who would then engage in and promote transactions from new and existing clients. But, at the end of 2017, as alleged herein, the Company transitioned its growth focus away from acquisitions, to a "core" growth strategy focused on "serv[ing] agents."

### B. Leading Up to the Class Period, Realogy Faced Increased Competition and Agent Attrition, Resulting in Decreased Market Share

41. Leading up to the Class Period, Realogy faced intense competition for customer business and agents from national and regional independent real estate brokerages and franchisors, as well as discount and limited service brokerages. The

Company also faced competition from leading online listing aggregators and web-based estate service providers such as Zillow, Inc. ("Zillow"), Realtor.com, and Redfin that offer technologies and consumer friendly experiences that minimize the roles that brokers and sales agents play in the homesale transaction process.

42. Because most of a brokerage's real estate listings are sourced through agents, Realogy's ability to recruit and retain agents in the face of growing competition was "critical" to its business and financial results. Notably, the Company's most productive agents – known as Tier 1 and Tier 2 agents – generated the "lion's share" of the Company's revenue and approximately 90% of NRT's revenue.

43. Leading up to the Class Period, competition for agents intensified particularly with respect to more productive agents in the metropolitan areas where Realogy operated, putting "upward" pressure on commission splits that favored agents instead of brokerages like Realogy. This was because competing brokerages were offering substantially higher commission splits to agents and an increasing number of agents were looking to purchase services from third parties outside of their affiliated broker. For example, the real estate industry, and Realogy specifically, faced increased competition from Urban Compass Inc. ("Compass"), which was known for aggressively recruiting sales agents through, among other

means, offering grossly inflated compensation, including commission splits as high as 95% to even 100% in favor of the agent.[5]

44. Because agent recruitment and retention had the potential to materially impact Realogy's financial results and operations, Defendants closely monitored and routinely discussed agent commission plans and the competitive market for agents throughout the Class Period both on conference calls and in the Company's public filings.

45. The Company historically compensated its agents based on a graduated commission plan, sometimes referred to as the "traditional model," where agents receive a percentage of the brokerage commission that increases as the independent sales agent increases his or her homesale transaction volume. So, top performing agents stood to receive a higher commission split. Agents agreed to this framework in exchange for Realogy providing them with traditional support offerings and promotion of properties.

46. Notably, leading up the Class Period, and under the leadership of CEO Smith, the Company's "traditional model" had become just that – traditional. Faced with nimble Internet-based competitors and well-funded brokerages like Compass,

---

[5] Realogy sued Compass in 2015 and again after the Class Period. The market's reaction to Realogy's 2019 litigation against Compass was decidedly negative, and it was viewed as a signal that Realogy was losing the battle to compete with entities like Compass.

Realogy's traditional model, which offered below-market commission splits designed to benefit Realogy more than agents, negatively impacted its agent recruitment and retention initiatives. In fact, despite the growing and intensifying competition in the real estate industry, Realogy failed to increase its commission splits. Specifically, for the three-year period leading up to the start of the Class Period, Realogy's commission split percentage stood at or below 69.5%. Also, in the face of increased Internet-based competition from the likes of Zillow and Redfin, Realogy failed to sufficiently update its products or technology offerings to increase agent productivity. To that end, and as ultimately disclosed by Schneider after the Class Period, the Company was essentially operating like an outdated "diesel engine" in the face of cutting-edge technology-based competition.

47. One byproduct of increasing competition in the real estate industry was that agents wielded much more bargaining power, giving them the ability to demand higher commission splits and increased technology-based product offerings. As a result, leading up the Class Period, Realogy faced significant top tier agent attrition. Not only was Realogy unable to retain its most productive and most valuable agents, but it was unable to recruit new agents to take their place. This essentially left the Company with a larger percentage of less experienced, less productive, and less profitable agents. As a result, in 2016, NRT lost market share and its homesale transaction volume declined 1%, excluding acquisitions, for 2016 compared to 2015.

This was significant, because NAR reported that existing homesale transactions ***increased*** 4% in 2016, meaning that Realogy significantly underperformed the market despite its market-leading size. Also, while NAR reported increased homesale transactions, Realogy's U.S. market share of all existing U.S. homesale transaction volume declined from 16.7% in 2014 to 15.7% in 2016.

48. Leading up to and during the Class Period, the Company engaged in numerous acts in an attempt to counteract its declining market share, agent attrition, and maintain its overall profitability. *First*, Defendants undertook an aggressive recruitment campaign orchestrated to attract and retain productive agents by offering increased commission splits and new product and technology offerings. Although Defendants disclosed this strategy, they knew and/or recklessly disregarded and failed to disclose that: (a) the Company was unable to generate sustainable (*i.e.*, profitable) organic earnings or EBITDA growth at commission split levels necessary to increase agent recruitment and retention, as well as transaction volume and market share; and (b) the Company's technology and product offerings were outdated and, therefore, it would take a significant amount of time to "get[] up" to "speed" with its competitors' offerings to make up for and counteract agent attrition.

49. *Second*, in order to mask declining market share the Company relied on a growth by acquisition strategy that resulted in known and/or recklessly disregarded inefficiencies that negatively impacted the Company's operations. By the end of

2017, under the stewardship of new CEO Schneider, Defendants began to transition away from the Company's long-standing growth by acquisition strategy in favor of a strictly organic growth strategy, but gave investors the false impression that the Company was only pivoting away from the strategy due to market share or pricing concerns.

50. *Third*, throughout the Class Period, Defendants knew and/or recklessly disregarded that they were engaging in anti-competitive behavior designed to maintain an artificially inflated ABCR, and that, as a result, Realogy was subject to an increased risk of government scrutiny and intervention that would threaten its profitability and financial performance.

### C. Defendants Embark on Two Recruitment Initiatives

51. Throughout the Class Period, Defendants engaged in two aggressive recruitment and retention initiatives, but concealed that any commission split increases were unsustainable and the Company's technology and product offerings were antiquated.

#### 1. Defendants Dramatically Increased Commission Splits, Resulting in a Negative Long-Term Impact on Earnings and EBITDA

52. Starting in late 2016, the Company abandoned its longstanding traditional compensation model in favor of a "financial incentives" based recruitment initiative, which focused on targeting, recruiting, and retaining top tier,

*i.e.*, Tier 1 and Tier 2, agents at NRT by, among other things, dramatically increasing commission splits in order to "catch up" with those of its competitors. By the time the Company reported its third quarter 2016 ("3Q16") results on November 4, 2016, NRT had created a role of Chief Recruiting Officer to assist in the initiative, and NRT's commission splits had increased by 30 basis points on a year to date basis. This was a paradigm shift because Realogy's commission splits at NRT had remained stagnant for approximately three years.

53. On February 24, 2017, the first day of the Class Period, the Company reported positive FY16 financial results, and the commissions initiative was in full swing. During the FY16 conference call, Defendants were more than happy to tout the initiative's success. For example, the Company described the commissions initiative as the gateway to "sustaining or growing market share in various markets" and Smith noted that based on numerous "metrics" the Company was already "seeing encouraging signs of improvement at NRT."

54. Discussing the increased commission splits and any negative impact that they would have on the Company's financial performance, Smith and Hull assured the market that NRT, and thus Realogy, would face only "***near-term*** moderate pressure on margins" that would be "mitigated" by increased revenue and earnings at NRT, with "immediate[]" benefits to the Company's RFG segment, due to higher royalty returns. More specifically, Defendants assured the market that the

Company's increased commission split guidance for 2017 of 69.5%-70% (an increase from end of 2016 splits of 68.9%) was "right-sized" and "competitive" and that the Company had already factored any increased negative "pressure on splits" into the Company's forecasts.

55. Analysts were quick to comment on the success of the commissions initiative. For example, on February 24, 2017, PiperJaffray raised its price target on Realogy stock from $35 to $40 and noted that "downside risks have lessened" following the Company's "stronger-than-consensus 4Q results" driven by "improving agent retention trends."

56. Throughout the next two quarters, Defendants reiterated their positive statements about the commissions initiative and continued to give investors that false impression that any resultant negative impact on Realogy's financial performance would be limited to the short term. For example, during the Company's May 4, 2017 1Q17 conference call, Smith attributed NRT's 7% increase in year-over-year transaction volume to the "successful recruiting and retention efforts" of the commissions initiative. Hull and Smith further tempered any negative sentiment surrounding the decreased profitability from higher commission splits by repeating previous assurances that any negative financial impact stemming from the commissions initiative would be constrained to "near-term pressure on NRT's margins," and "short term" higher commission expense counteracted with

"immediate[]" benefits to the Company's other segments, and "a positive impact on revenue and EBITDA levels" in the long term.

57. As the Class Period continued, Defendants reaffirmed the Company's 2017 69.5%-70% commission split guidance. For example, by the time of the Company's 2Q17 conference call on August 3, 2017, NRT's commission splits had already reached 70.6% (which was above the amount previously forecasted for 2017). Rather than reveal to the market that Realogy's commission splits still needed substantial increases in order to retain and recruit productive agents, resulting in a negative impact on NRT and the Company's financial performance, Hull doubled-down on his previous commission split guidance for 2017, stating, "splits will be . . . 70% for the full year 2017" and that any commission split "increases in Q3 are expected to be less than the increases we saw in Q2 year-over-year" with splits "drop[ing] off in Q4." Hull further assured investors that "we're just not seeing signs" of "extreme pressure" on commission splits "anymore."

58. Defendants also downplayed the impact that more tech-savvy and consumer focused competition would have on the Company's business and agent retention efforts going forward. Notably, when asked about online-based brokerage Redfin during the 2Q17 conference call, Smith noted that Realogy's "absolute focus" on agent and franchisee productivity and Realogy's "fairly substantial

investment in technology," positioned Realogy to "capitalize on the market in ways small startups just cannot possibly capitalize."

59. Defendants' misstatements and omissions had their intended effect, as the price of Realogy common stock was artificially inflated during the Class Period, reaching as high as $34.98 per share on August 7, 2017.

60. On October 23, 2017, the Company announced that CEO Smith, the Company's leader of 21 years, and the mastermind behind the Company's commission split strategy, was being replaced by Schneider, effective December 31, 2017. The leadership succession plan had been in development since 2016, and the Company was in desperate need of a fresh, strategic pair of eyes.

61. A little more than a week later, on November 3, 2017, the Company surprised investors by announcing negative financial results for 3Q17 and reduced 2017 guidance. The Company reported decreased EBITDA for the year resulting from "higher commission splits" and reported it was lowering its 2017 EBITDA guidance as a result of "recruiting and retention efforts." Defendants further noted that despite their previous assurances over the past two quarters that 2017 NRT commission split guidance was "right-sized" and that any "negative pressure" from competition would be limited to 1Q17 and 2Q17, that commission splits had substantially increased in 3Q17, forcing the Company to increase 2017 NRT commission splits guidance of 70.25% to 70.5%, a substantial increase. Smith

explained Realogy was intentionally playing "catch up" with its commission splits after previously "underperforming the market" and "keep[ing] the agent splits as favorable to us as possible for about 3 years."

62. But, Defendants tempered this negative news by assuring the market that the "balancing act" between market share gains and commission splits "has been accomplished." Smith commented that because Realogy reached its market share goals, in 2018 the Company would "slow[] the rate of growth and "stabiliz[e] the agent split" and focus on "increasing the productivity of the agents in the third and fourth quartile." In doing so, Defendants gave investors the false impression that the Company had reached a commission split level sufficient to sustain profitable organic agent growth and that the Company would no longer face any negative financial impact from rising splits. Defendants further concealed that in order to sustain organic agent growth, commission splits would continue to rise substantially, resulting in a long-term negative impact on the Company's EBITDA.

63. On this news, the price of Realogy common stock fell 12%, or $3.62 per share to close at $26.77 on November 3, 2017. In response, PiperJaffray issued an analyst report attributing the negative 3Q17 financial results to "disappointing execution on agent recruitment strategy costs."

### 2. Defendants Pivot to Focus on Technology Based Product and Services Offerings, but Continue to Be Negatively Impacted by Rising Commission Splits

64. By the end of 2017, the negative effects of the Company's rising commission splits had not subsided, but instead increased 173 basis points year-over-year and 204 basis points year-over-year for fourth quarter 2017 ("4Q17"). The Company had spent almost $300 million on increased commission expenses paid to agents in 2017, and rising splits had so heavily and negatively impacted the Company's EBITDA that the Company expected 1Q18 to be half of 1Q17 operating EBITDA.

65. Schneider began his tenure as CEO on December 31, 2017. Under his stewardship, the Company underwent immediate changes. Within the first two weeks of January 2018, NRT's and Cartus' long-standing Presidents and CEOs Bruce Zipf ("Zipf") and Kevin Kelleher ("Kelleher"), respectively, were replaced and transitioned to "executive advisor" roles. Senior VP and Chief Information Officer ("CIO") Stephen Fraser ("Fraser"), was also replaced, and the Company announced the hiring of a new Chief Technology Officer ("CTO"), Dave Gordon ("Gordon").

66. In addition, starting in 2018, Realogy would pivot away from its commissions initiative strategy in favor of a new technology and "data-driven strategy" that focused on recruiting and retaining agents through the Company's

"strong product and services offerings." In support of this new recruitment strategy, Defendants concealed that the Company's technology and data were antiquated, and therefore, insufficient to counteract agent attrition.

67. For example, during the Company's February 27, 2018 FY18 conference call, Schneider noted that Realogy was "enhancing our value proposition for agents by producing new technology and data products."

68. Defendants also continued to give investors the false impression that any ongoing financial pressure from increased commission splits would significantly subside. For example, on the FY18 conference call, Schneider stated that the Company was effectively "caught up" with its competitors on commission splits and that any negative financial impact stemming from upward pressure on commission splits would be limited to 1Q18, where after upward pressure on commission splits would "substantially moderate" and operating EBITDA would be equal to the prior year. Hull further assured the market that the Company's agent retention and productivity initiatives would result in "improved EBITDA growth for the company as a whole."

69. On February 27, 2018, PiperJaffray praised Realogy's "pivot in strategic direction" to "focus[] on leveraging its technology and data platforms to improve agent productivity, retention and recruitment." PiperJaffray further stated,

"[w]e are encouraged" by Schneider's plan "for how RLGY can deliver better results."

70. Over the next two quarters, Defendants continued to tout the benefits of the Company's new data-driven initiative and its positive impact on profitability. During the 1Q18 conference call, Schneider noted that Realogy was "quickly producing multiple technology and data beta products to enhance our value proposition." In the Company's 2Q18 earnings release, Schneider stated that Realogy was "moving quickly to make strategic changes to improve profitability over time, anchored in growing our base of independent sales agents at both NRT and RFG and providing agents compelling service, data and technology products to allow them to increase their productivity." The Company also continued to actively test pricing variations on new products in various markets. By third quarter 2018 ("3Q18"), the Company had launched numerous live data-based test products that were available for agents for purchase, including two programs called Listing Concierge and iBuyer.

71. In addition, throughout the first half of 2018, Defendants continued to assure the market that any negative pressure from increasing commission splits would "substantial[ly]" moderate and not negatively impact the Company's EBITDA going forward. The Company's 1Q18 Press Release provided 2Q18 EBITDA guidance and reiterated that that Company expected aggregate 2Q18

through the fourth quarter 2018 ("4Q18") Operating EBITDA to be equal to or better than 2017 results. By 2Q18, the Company's commission splits had reached an astounding 72.7%, yet Schneider reiterated the Company's 2018 EBITDA guidance. In fact, when asked specifically on the 2Q18 conference call about the how to track the Company's new strategic direction and the commissions split strategy, Schneider told investors "to focus most on the EBITDA growth."

### D. Defendants' Growth by Acquisition Strategy Disguised the Company's Decreasing Market Share and Riddled the Company with Undisclosed Inefficiencies

72. Realogy's historical growth strategy was rooted in both tuck-in acquisitions and organic growth through agent recruitment and retention. Leading up to and during the Class Period the Company's growth by acquisition strategy helped the Company to mask its declining market share by constantly bringing in new operations and agents. However, the Company was also struggling to integrate the systems and operations of the many newly acquired companies that had helped Realogy reach its leading market share status. Unbeknownst to investors, Realogy's growth by acquisition strategy had significant adverse effects on the Company's operational and financial condition, including saddling the Company with multiple different operating systems that resulted in overlap of responsibilities and the Company's failure to be able to prioritize value propositions to its agents when compared to its competitors. The failure to appropriately integrate acquisitions

created a significant, undisclosed risk to the Company's future financial performance and profitability.

73. Throughout the Class Period, Defendants consistently touted the positive effects of Realogy's tuck-in acquisitions, including as a driver of Realogy's growth and overall profitability. For example, the Company's 2016 Form 10-K ("2016 10-K") discussed the Company's tuck-in acquisitions and the Company's "ability to reduce or eliminate duplicative costs" and incorporate these new acquisitions with the Company's "existing infrastructure" "to enhance the profitability" of Realogy's operations. During the Company's 3Q17 conference call Smith commented on the "synergistic" nature of the Company's recent tuck-in acquisitions. During the Company's August 2017 Investor Day, CEO and President of NRT, Zipf described how NRT's acquisition of over 500 companies over the years, resulted in "the most diverse and, I'd say, incredible population of talent and operations in the industry."

74. Moreover, at the start of 2018, Defendants gave investors the false impression that the Company was moving away from its growth by acquisition strategy for non-controversial reasons, such as "pricing" for newly acquired companies, as opposed to the fact that the Company's acquisition resulted in significant adverse effects on the Company's operational and financial condition.

### E. Defendants Engaged in Anti-Competitive Behavior to Maintain an Artificially Inflated ABCR

75. Throughout the Class Period, and as a further means to combat competition in real estate industry from start-ups, or disrupters offering significantly lower broker commissions, Defendants and other titans of the industry engaged in anti-competitive behavior orchestrated to maintain and artificially inflate the market-driven ABCR.

76. Realogy is governed by numerous state and federal laws, written for the purpose of protecting homeowners. For example, the Real Estate Settlement Procedures Act, or RESPA, was enacted in 1974 to eliminate abusive practices in the real estate settlement process and to reduce the costs of closings by restricting payments, which real estate brokers, among others, may receive in connection with the sales of residences.

77. The vast majority of homes sold in the United States are listed on the Multiple Listing Service, or MLS, which is a database of properties listed for sale in a particular geographic region and the marketplace. Brokers, like Realogy, must list a property for sale on an MLS to effectively market that property to prospective buyers, and in any event, Realogy – as an MLS member – is required to list all properties on the MLS. Most MLSs are controlled by local NAR associations and access to such MLSs is conditioned on a broker following all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy.

78. Realogy's anti-competitive behavior centered around NAR's adoption and implementation of the requirement that when listing a property on the MLS, a broker (or agent) must make a blanket, non-negotiable offer of buyer broker compensation. Because most agents will not show homes to their clients where the seller is offering a lower broker commission, or will show homes with higher commission offers first, sellers are incentivized when making the required blanket, non-negotiable offer to procure the buyer brokers' cooperation by offering a high commission. Absent this rule, brokers would be paid by their clients and would compete to be retained by offering a lower commission. However, the current rule restrains broker's price competition because the person retaining the broker, the buyer, does not negotiate or pay his or her broker's commission.

79. This anti-competitive behavior has kept the ABCR stable, despite the clearly diminishing role of brokers. In fact, a majority of home buyers no longer locate prospective homes with the assistance of a broker or agent, but rather do so on their own through consumer friendly online services offered by Realogy's competitors like Zillow and Redfin. As a result, both the Federal Trade Commission ("FTC") and the DOJ have scrutinized the buyer broker commission rule throughout the years.

80. Throughout the Class Period, Defendants routinely commented on the stability of the ABCR, but knew and/or recklessly disregarded and failed to disclose

that the Company was engaged in anti-competitive behavior to keep the ABCR artificially inflated, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation. For example during the FY16 conference call, Hull commented that the ABCR was "remarkably strong and stable over time" and assured the market that any decline in the future would be limited to "a few basis points per year." Moreover, during the Company's 2Q17 conference call, Hull dismissed any market concern over outlier competitors attempting to undercut the industry's ABCR, noting that Realogy's competed with 99.5% of the market and in that "world" the ABCR was "stable and sustainable." Notably, during the FY17 conference call, Schneider stated he was "encouraged by how little traction disrupters have gotten by attacking the [ABCR] over the year."

### F. Realogy Suffers Multiple Significant Stock Price Declines as Its True Financial Condition Is Revealed Through a Series of Disclosures

81. The truth about Realogy's inability to sustain organic agent growth at commission split levels sufficient to drive sustainable (*i.e.*, profitable) organic earnings or EBITDA necessary to increase agent recruitment and retention, as well as transaction volume and market share was partially revealed to investors before the market opened on November 2, 2018, when the Company issued its 3Q18 financial results, and revealed that the Company withdrew its previous guidance of in line with or better than 2017, and revealed operating EBITDA would decline

substantially and transaction volume would be flat in 4Q18. The Company further noted that for 3Q18, NRT was performing below the market and its competitors, and that the Company's $16 million decline in EBITDA was attributed, in part to higher "commission split increases."

82. On the 3Q18 conference call, Schneider tempered any negative sentiment and reassured the market that any commission split increases were "moderating" and would moderate "further" in 4Q18, and that Realogy was better "positioned to weather" market shifts than its competitors. Schneider also commented on the successes of the Company's data-driven recruitment strategy and noted it was creating multiple new products to enhance value to agents and using technology and data to improve the Company's results.

83. Immediately after the Company issued its 3Q18 press release, Realogy abruptly announced that Hull would retire, effective almost immediately on November 5, 2018, but would remain as a "senior advisor" to Schneider.

84. On the Company's negative financial news, the price of Realogy common stock fell 11.5%, or $2.31 per share, on unusually heavy trading volume, closing at $17.76 on November 2, 2018.

85. Then, before the market opened on February 26, 2019, the Company again shocked investors by reporting negative financial results for FY18, including an operating EBITDA decrease of $74 million compared with 2017, and below the

Company's 2018 guidance, which Defendants largely attributed to "higher agent commission rates." Realogy also reported a 65% decline in earnings per share compared to 2017. Despite these negative results, Schneider stated that Realogy's strategic and recruitment initiatives would continue to "drive growth" and minimize any continued negative financial performance going forward. Specifically, the FY18 earnings release quoted Schneider as stating, "the strategic changes we are driving for agents across products, technology, data and talent are beginning to get traction, giving me early confidence that these initiatives will lead to better company performance."

86. During the FY18 conference call, Defendants made additional positive statements regarding commission splits, market growth, and increasing ABCR, which all served to minimize any negative impact from the Company's financial results. For example, Schneider stated that Realogy was "actually now over" playing catch-up with its competitors and that 2019 commission split pressures "won't look anything like that pressure in '17, '18." Schneider further assured investors of "early evidence" of above market growth, sufficient to counteract the negative financial impact from increased commission splits. Gustavson reiterated Realogy's "substantial changes" being made to drive "organic growth." Finally, Schneider credited the underlying value created by the Company's data-driven initiatives and new products for positively impacting an increased ABCR.

87. On this news, the price of Realogy common stock plummeted another 20% on February 26, 2019, to close at $14.14 per share, on unusually heavy trading volume.

88. More negative news reached the market on March 6, 2019, when the truth about the Company's anticompetitive behavior to artificially inflate the ABCR was partially revealed when a class-action lawsuit was filed against NAR and several real estate brokerages, including Realogy, alleging that Realogy and others were violating federal antitrust laws by requiring home sellers to pay buyer's broker's commissions at inflated rates. Realogy, NAR, and other real estate brokers were slapped with a second class-action lawsuit making similar allegations on April 15, 2019. On this news, the price of Realogy common stock declined more than 6% on March 6, 2019, to close at $12.47 per share.

89. Then, before the market opened on May 2, 2019, Realogy reported its 1Q19 financial results and revealed additional truth regarding the Company's: (a) inability to sustain organic agent growth at commission split levels sufficient to drive sustainable EBITDA growth; (b) antiquated technology and product offerings that could not make up for agent attrition; and (c) acquisition strategy inefficiencies that inhibited Realogy's financial performance. The Company reported a 9% decline in revenue "largely due to lower transaction volume at NRT" and operating EBITDA of negative $4 million, due to "lower transaction volume." Combined homesale

transaction volume for the quarter decreased 9% compared with the 1Q18, which was ***more than double*** NAR's reported homesale transaction decline of only 4%. The Company attributed the declines, in part to, "an increase in the competitive environment."

90. During the 1Q18 conference call, Schneider admitted that in contrast to the Company' prior statements throughout the Class Period that the Company was "leveraging its technology and data platforms to improve agent productivity, retention and recruitment," the Company needed to do "more" to increase investments in technology and "we need to do it rapidly."

91. Schneider also commented that the Company's various recruitment initiatives had not worked because "on a net basis we are flat on agent count." To add on, Schneider admitted the Company's poor financial position leading up to the Class Period forced the Company to take on aggressive commission splits, stating, "we were on a negative trajectory" and "we're probably better off being on market on commissions."

92. Schneider further revealed additional facts to investors when he disclosed that despite the Company's assurances to the market of the Company's "synergistic" tuck-in acquisitions that "reduce or eliminate duplicative costs," the Company needed to move more "aggressively in our strategy execution and on streamlining our operations." Schneider further explained that the Company's

purposeful transition at away from acquisitions stemmed from the Company's acquisitions' failure to profitable, or "change the bottom line."

93. In response to Defendants' revelations, the price of Realogy stock plummeted 23% on May 2, 2019, to close at $10.11. The stock fell another 9% on May 3, 2019, closing at $9.23, on unusually heavy trading volume. In total, the Company's stock price declined 30% over the two days.

94. On May 22, 2019, additional truth regarding the Company's anticompetitive behavior was revealed when media reports disclosed that the DOJ had initiated an investigation into potentially anti-competitive practices in the residential real estate brokerage business, focused on buyer broker compensation, providing further credence to the allegations against Realogy noted in the April and May 2019 lawsuits. On this news, Realogy common stock fell 5% on May 22, 2019, and another 4% on May 23, 2019, to close at $7.13 per share, bringing it down 80% from its Class Period high.

**G. Post-Class Period Revelations**

95. On May 30, 2019, Schneider and newly appointed CFO Simonelli presented at the KBW Mortgage Finance & Asset Management Conference, where Schneider confirmed that Realogy had been recklessly disregarding technological product improvements, stating, "We are a big company, but I feel like we're a diesel engine kind of building momentum with these things" despite the fact that Realogy

needed to quickly "get[] up to a very fast speed." Simonelli further stated that the Company did not take advantage of "low-hanging fruit" that had been available to the industry for "20 years" and needed to "prioritize" costs savings and "better value proposition[s] to the agents." Simonelli noted that Realogy was just "now . . . finally catching up" to the efficiencies of its competitors due to being built "through acquisition" which resulted in "multiple different systems and how businesses operate."

96. On July 10, 2019, Realogy sued Compass for unfair business practices and illegal schemes to gain market share and to damage, and eliminate, competition. Analysts, like Barclays, were quick to comment that the lawsuit raised questions about Realogy's financial capabilities going forward, noting it "view[ed] the timing of this lawsuit as a worrisome indicator around near-terms trends" and noted "Realogy's "intention to curtail split inflation manifest in lost market share with significant underperformance . . . on the NRT side."

## V. MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

97. Throughout the Class Period, Defendants misrepresented and concealed the true extent of the negative financial impact that the Company's commission split initiatives, including Realogy's ability to attract and retain agents at commission split levels that would generate sustainable operating EBITDA growth, as well as Realogy's outdated technological services and product offerings,

and inefficient and non-integrated systems from acquisitions, were having and would have on the Company's financial performance and outlook. Defendants' false or misleading statements and/or omissions, individually and collectively, gave investors the false impression that the Company's ongoing adjustments to commission splits would have only a near term negative effect on the Company's profitability and EBITDA. Similarly, Defendants concealed the Company's anti-competitive behavior, and the risks resulting from it, designed to stifle innovation and competition in the real estate market and secure the ABCR, which posed an increased risk of legal liability and regulatory scrutiny to Realogy. When Defendants elected to make such false statements and material omissions, they were under a duty to disclose the additional negative information about Realogy and the true impact of increased commission splits, outdated technology, acquisition inefficiencies, and increased risk of liability and scrutiny would have on Realogy's profitability that would have made such statements and omissions not misleading. However, Defendants failed to reveal this material information and, instead, omitted and concealed it from investors.

**A. Full Year 2016 Financial Results**

98. The Class Period begins on February 24, 2017. On that day, before the market opened, Realogy issued a press release announcing its financial results for the year ended December 31, 2016 ("FY16"). In the release, Smith highlighted the

Company's "strategic priorities" stating that Realogy would "continue strengthening our core businesses while further investing capital to drive future growth." Smith stressed, "[w]e are confident that over the long term we are well-positioned to capitalize on favorable demand conditions and existing homesale volume growth within the industry." As to the commissions initiative, the release also stated that:

> ***NRT is executing on an aggressive campaign to increase the Company's recruitment of productive independent sales agents and agent teams, and continues to enhance its existing agent retention and productivity programs***.

99. Also on February 24, 2017, Realogy hosted a conference call with analysts and investors to discuss the Company's FY16 financial results and outlook. During the call, Smith, discussed the commissions initiative as a new program in Realogy's NRT business that was "***designed to increase our recruitment of productive, independent sales agents and to increase the productivity of its existing agents***." Smith described the agent recruiting campaign as "aggressive" and that Realogy was adding "productive, independent sales agents and agent teams." Discussing the positives of Realogy's agent recruitment program, Smith labeled the program "very smart" with "terrific access to data" and touted the Company's data-driven approach, stating, "we literally recruit individual agents we know . . . [we] know her production, we know how long she's been in the business." Smith also assured that "[b]ased on the metrics we monitor to evaluate the effectiveness of these initiatives, we are seeing encouraging signs of improvement at NRT" with

"stabilization of the first and second quartile agent retention rate, which increased to 93%, an increase of 100 basis points through 2016."

100. As the FY16 call continued, Smith acknowledged that the agent-centered commissions initiative would result in "***near-term moderate pressure on margins***," but reassured investors that such pressure would be "***mitigated by revenue and earnings at NRT as well as other Realty business units that benefit directly from NRT's transaction volume***." To that end, Hull added that Realogy's 1Q17 results would "***not [be] indicative of our full-year earnings*** . . . ."

101. Towards the end of his remarks, Hull stated that Realogy's NRT commission splits for 2016 "increased 48 basis points," which was "about 10 basis points higher than we expected," but assured investors the increase was "due to our ongoing campaign to more aggressively recruit and retain a select group of strong agents." For 2017, Hull stated the "aggregate splits" would be "higher than the 68.9% for the full year in 2016" and that the "***current estimate***" for 2017 "***is that splits will be in the range of 69.5% to 70%***." Hull described the increase as creating only "***near-term pressure on NRT's margins***" because "***benefit of these growth initiatives will be immediately realized in RFG's results due to the expected higher resulting royalty revenue it will learn from NRT***."

102. Hull further assured investors that the "69.5% to 70%" estimate for commission splits, in 2017 was "***right-sized***" and had made Realogy "***competitive***

***in the markets that we serve . . . in terms of the recruiting efforts***," and that the "***little bit of pressure on splits***" had already been "***built into [Realogy's] forecast***."

103. As the call continued, Hull stated that Realogy was positioned to be "much more of a sales focused organization" with a goal of "up[ping] the number of agents and up[ping] the productivity of [Realogy's] agents" while "invest[ing] whatever it takes to do that." Hull added that the Company was poised to become more profitable stating that:

> We take – well, we're always managing costs carefully so – and I think the optimization programs – there are still some things that we have on the docket for that. ***I think they will be less significant than what we did in 2016 going forward and I think where we're positioning the Company is much more of a sales focused organization where we want to up the number of agents and up the productivity of our agents and invest whatever it takes to do that. So that overall our profitability will improve because of revenue not because of cost savings in the future***.

104. Hull also commented on the Company's ABCR which was "down one basis point" at RFG to 2.5% and "flat" at 2.46% for NRT, and added that the Company's "***ABCR has been remarkably strong and stable over time and, given the valuations provided to their customers, we continue to believe that any decline will be limited to a few basis points per year***."

105. The same day, February 24, 2017, Realogy filed its 2016 10-K with the SEC, which was signed by Smith and Hull and included Sarbanes Oxley Act of 2002 ("SOX") certifications signed by Defendants Smith and Hull. The 2016 10-K

confirmed the Company's previously announced financial results and financial position. The 2016 10-K addressed Realogy's initiatives and changes to its NRT compensation model, which would now focus more on "financial incentives" to boost "recruiting and retention." The 2016 10-K stated this "more aggressive strategy" would "***improv[e] NRT's overall profitability***" with the Company experiencing, "***near-term moderate pressure*** on costs and margin from these initiatives."

106. The 2016 10-K discussed the emerging trend of independent sale agents becoming less reliant on brokerages that offer services and instead favoring a higher commission splits. In the 2016 10-K, Realogy discussed its "greater focus" on the quality of its services but repeated that such focus would result only in "***near-term moderate pressure***," stating:

> ***[W]e are placing an even greater focus on the quality of our services and use of financial incentives to strengthen our recruiting and retention of independent sales associates and teams***. These actions include a more aggressive strategy to recruit and retain top performing sales associates with the overall goal of sustaining or growing market share in various markets, improving NRT's overall profitability. In addition, there will be an enhanced focus on the value proposition offered to independent sales associate teams . . . ***We expect near-term moderate pressure on costs and margin from these initiatives.***

107. The 2016 10-K also highlighted the benefits of the Company's tuck-in acquisitions to expand that Company, and stated:

> We are continuously evaluating acquisitions that will allow us to enter into new markets and to profitably expand our existing markets through

> "tuck-in" acquisitions. ***Following the completion of an acquisition, we tend to consolidate the newly acquired operations with our existing operations. By consolidating operations, we reduce or eliminate duplicative costs, such as advertising, rent and administrative support. By utilizing our existing infrastructure to coordinate with a broader network of independent sales associates and revenue base, we can enhance the profitability of our operations. We also seek to enhance the profitability of newly acquired operations by strategies that increase the productivity of the newly affiliated independent sales associates***.

108. Commenting on the Company's ABCR, the 2016 10-K stated, in part:

> From 2007 through December 2013, the average homesale broker commission rate remained fairly stable; however, over the last several years we experienced a modest decline in the average broker commission rate. ***We expect that over the long term the average brokerage commission rates could modestly decline as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee***.

109. Analysts reacted positively to Defendants' February 24, 2017, statements and the Company's execution of its agent recruitment and retention initiatives. For example, on February 24, 2017, PiperJaffray issued a report raising its price target for Realogy stock from $35 to $40 per share because "downside risks have lessened" following the Company's "stronger-than-consensus 4Q results," which were "driven by stabilizing high-end/cost market trends and improving agent retention trends."

110. The statements identified in ¶¶98-108 above were materially false and misleading or omitted material information when made. The true facts, which were known to or recklessly disregarded by Defendants, were:

(a) Defendants' statements misrepresented and concealed that the Company's "campaign" to increase "recruitment of productive independent sales agents," and aimed at "enhanc[ing] agent retention," would result in a long term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA at commission split levels necessary to increase agent recruitment and retention, transaction volume, and market share. For example, Defendants labeled the commissions initiative as "very smart" and a means to "sustain[] or grow[] market share in various markets" while failing to disclose that the commission split increases required to attract new agents would result in significantly higher expenses that could not be offset through volume and would, in fact, decrease the Company's operating EBITDA.

(b) Defendants' statements that any negative impact the commissions initiative would have on the Company's financial performance would be limited to only "near term moderate pressure" on margins that would be "mitigated by revenue and earnings at NRT," and that the commissions initiative would "improve[] NRT's overall profitability," gave investors the false impression that any negative impact on the Company's financial performance would be limited to the short term if at all, when the truth was that the Company would continue to suffer the negative impact of increasing commission splits through the end of the

Class Period. In addition, Defendants also gave investors the false impression that Defendants had "right-sized" full year 2017 commission split guidance of 69.5% to 70% and that any "little bit of pressure on splits" for the rest of the year was already "built into [Realogy's] forecast." In truth, commission splits were continuing to climb and Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve commission splits in the range of 69.5%-70% for 2017.

(c) Defendants concealed that NRT's ABCR remained "flat" at 2.46% for 2016, and "remarkably strong and stable," with any decline expected to be "limited to a few basis points per year," despite the diminishing role of brokers, because Defendants were engaged in undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(d) The Company's "tuck-in" acquisitions masked the full extent of the Company's decline in transaction volume market share by increasing new operations and agents that, unbeknownst to investors, were not effectively consolidated with the Company's existing operations, resulting in inefficiencies that negatively impacted the Company's operations and financial performance.

(e) The Company's 2016 10-K was false and misleading because it failed to disclose to the market (in violation of Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303")) the known trends and uncertainties described in this

paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

**B. First Quarter 2017 Financial Results**

111. On May 4, 2017, before the market opened, Realogy issued a release announcing its financial results for 1Q17. The Company reported a 9% increase in "combined homesale transaction volume (transaction sides multiplied by average sale price) of approximately $96 billion," which "exceeded the Company's guidance range based on stronger than expected results in March." More specifically, NRT had a 7% volume gain, with a reported homesale transaction sides increasing of 4% and average homesale prices increasing 3%.

112. In the release, Smith highlighted the "good progress" that Realogy made on "recruiting initiatives intended to increase the number of productive sales agents at NRT and retain a higher percentage of our top-quartile agents." He further stated, "[w]hile these actions will result in ***near-term moderate pressure*** on margins, we anticipate that ***over the medium term they will be additive to revenue and earnings at NRT as well as other Realogy business units that benefit from NRT's transaction volume***."

113. Also, on May 4, 2017, Realogy hosted a conference call with analysts and investors to discuss the Company's operations and 1Q17 financial results. During the call, Smith and Hull spoke positively about the progress of the

Company's "strategic initiatives," and "stabilization in the high end [market] with transaction volume in NRT." Smith attributed NRT's 7% increase in year-over-year transaction volume to the Company's "successful recruiting and retention efforts."

114. Smith highlighted the "great progress" of its NRT "***recruiting programs and strengthening the agent value proposition***, despite a very competitive market for sales agents," stating, in relevant part:

> We've also seen further gains in the retention rate of NRT's first and second-quartile sales agents, which is now approaching 94%. ***While these recruiting and retention initiatives have increased our commission expenses as expected and will result in near-term moderate pressure on NRT margins, we are improving our market share trends compared with last year.***

115. Similarly, Hull touted the Company's "***successful recruiting and retention efforts***" as a "factor[] driving growth in the quarter." He further stated, "***We continue to invest in NRT sales agents, which, as a short term, results in higher commission expense, but over the longer term, is expected to be a positive impact on revenue and EBITDA levels***."

116. Commenting on commission splits and resulting 2Q17 margin expectations, Hull stated:

> We indicated that we think EBITDA is going to be down year-over-year in the second quarter. And I think a lot of the things you saw in the first quarter are going to be continued in the second quarter. And as I said, the split gap is probably highest in the first quarter. It comes down in the second quarter. ***And then in the third and fourth quarter, it brings you down to get to that 69.50% to 70% split***, as we start lapping

the higher splits we started to pay in the third and fourth quarter of last year.

117. Commenting on commission split range for 2017, Hull stated:

> ***Our current estimate for 2017 is that splits will increase to between 69.5% and 70%, as we continue to strategically invest in strong sales agents. While we expect this increase will put near-term pressure on NRT's margins, the benefit of these and other growth initiatives will be immediately realized in RFG's results due to the expected higher resulting revenue – royalty revenue at NRT***.

118. Hull reiterated that the commission split range would "taper off in the back half, as we sort of start to lap some of these initiatives that we've – and investments we have made."

119. When asked if higher commission splits "are . . . now at a level that NRT can hit and maintain the agent retention and recruiting targets," Smith reassured investors that "[w]e believe we're pretty comfortable with the guidance we have given on the split. It's going to be necessary to achieve our goals this year." He stated that, "***we see no reason to think it's any higher than that***." Smith continued, "***the early indications are that the guidance we've given on the split is appropriate and correct***."

120. Smith stated the Company "will continue to selectively pursue" tuck-in acquisitions to the extent that they are "***accretive to earnings***."

121. On the same day, May 4, 2017, Realogy filed its 1Q17 Form 10-Q ("1Q17 10-Q") with the SEC, which was signed by Smith and Hull and included

SOX certifications signed by both of them. The 1Q17 10-Q confirmed the Company's previously announced financial results and financial position. The 1Q17 10-Q discussed Realogy's "NRT initiatives," reiterating statements from the 2016 10-K about changes made to NRT's agent compensation model and the "more aggressive" strategy to recruit and retain top performing sales associates. The 1Q17 10-Q against stated that the Company expected only "***near-term moderate pressure on costs and margin from these initiatives*** as the benefits from recruiting new independent sales associates relate mainly to new listings and not pending listings."

122. In the 1Q17 10-Q, the Company further reiterated previous assurances that any negative impact stemming from the initiatives would be "near term" and "moderate":

> ***We expect near-term moderate pressure on costs and margin from these initiatives as the benefits from recruiting new independent sales associates relate mainly to new listings and not pending listings.***

123. The 1Q17 10-Q also commented on the "modest decline" ABCR, stating:

> Over the last several years we experienced a modest decline in the average broker commission rate and ***we expect that over the long term the average brokerage commission rates will continue modestly declining as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee.***

124. The statements identified in ¶¶111-123 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statements misrepresented and concealed that NRT's "great progress" in its agent "recruiting programs" that were designed to "strengthen[] the agent value proposition" would result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA, at commission split levels necessary to increase agent recruitment and retention, transaction volume, and market share growth. For example, Defendants highlighted "gains in retention of NRT's first and second-quartile sales agents," while failing to disclose that the commission split increases required to attract new agents would result in significantly higher expenses that could not be offset through volume and would, in fact, decrease the Company's operating EBITDA.

(b) Defendants' statements that any negative impact the commissions initiative would have on the Company's financial performance would be limited to only "near-term moderate pressure" on margins with "immediate[]" benefits that "over the longer term," will "be a positive impact on revenue and EBITDA levels" gave investors the false impression that any negative impact on the Company's financial performance would be limited to the short term if at all, when the truth was that the Company would continue to suffer the negative impact of the commissions initiative through the end of the Class Period. In addition, Defendants also gave investors the false impression that 2017 commission split guidance was

"appropriate and correct" and that there is "no reason to think" it would go "higher." Defendants even stated that commission splits for 3Q17 and 4Q17 would go "down" to "69.50% to 70%." In truth, commission splits were continuing to climb and Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve commission splits in the range of 69.5%-70% for 2017.

(c) Defendants' statements touting NRT's increased homesale transaction volume and the successes of Realogy's recruitment initiatives concealed that any volume increases, or new agents, resulted from unsustainably increasing commission splits that would negatively impact EBITDA and the Company's profitability.

(d) Defendants concealed that NRT's ABCR "experienced a modest decline" over the past several years, that ABCR will only decline "modestly" in the "long term," despite the diminishing role of brokers, because Defendants were engaged in undisclosed anti-competitive behavior designed to artificially inflate and prevent the disruption of the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(e) The Company's "tuck-in" acquisitions masked the full extent of the Company's decline in transaction volume market share by increasing new operations and agents that, unbeknownst to investors, were not effectively

consolidated with the Company's existing operations, resulting in inefficiencies that negatively impacted the Company's operations and financial performance.

(f) The Company's 1Q17 10-Q was false and misleading because it failed to disclose to the market (in violation of Item 303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

**C. Second Quarter 2017 Financial Results**

125. On August 3, 2017, before the market opened, Realogy issued a release announcing "strong" 2Q17 financial results. The release reported revenue of $1.8 billion, "an increase of 8% as compared with the second quarter in 2016, driven by increases in homesale transaction volume" at NRT and RFG. The release announced that "homesale transaction volume increased 9% year-over-year, consisting of a 12% volume gain at NRT and a 7% volume gain at RFG," which "exceeded the Company's guidance range based on stronger than expected average sales price at both business units." Specifically, "NRT reported a homesale transaction sides increase of 3% and an average homesale price increase of 9% while RFG reported a homesale transaction sides increase of 1% and an average homesale price increase of 6%."

126. The 2Q17 earnings release also reiterated the Company's 2017 guidance, including regarding operating EBITDA and commission splits, stating:

> For the full year 2017, Realogy expects to generate revenue of between $6.1 billion and $6.2 billion, driven by transaction volume gains of between 5% to 7% year-over-year. ***Realogy expects full year 2017 Operating EBITDA of between $760 million and $770 million***, net of the $8 million legal reserve for the litigation matter, and ***reflects management's current view on commission splits for the year***, modest investment in growth initiatives and the transition to our new mortgage joint venture. Based on the expected Operating EBITDA range noted above, this is expected to result in the Company generating Free Cash Flow of between $500 million and $530 million in 2017.

127. In the press release, Smith commented on the Company's financial results, stating, "We are pleased with the progress we are making on our strategic initiatives, the most important of which are designed to strengthen the recruitment and retention of sales agents at NRT" and that Realogy would "remain focused on maintaining our business momentum and ***continuing to generate sustainable organic growth***."

128. Also, on August 3, 2017, before the market opened, Realogy hosted a conference call with analysts and investors to discuss the Company's operations and 2Q17 financial results. During the call, Hull and Smith highlighted volume growth and once again touted the Company's agent recruitment and retention initiatives. For example, Smith further stated, in relevant part:

> Our retention rate of NRT's first and second quartile sales agents has returned to levels approaching 94%, our historical high watermark. ***While these recruiting and retention initiatives have increased our***

> ***commission expense as expected and will result in near-term moderate pressure on margins, we're starting to see the positive impact on overall revenue and increases in EBITDA at RFG from royalties it receives from NRT.***

129. In his prepared remarks, Hull commented on strong 2Q17 results and attributed "***successful recruiting and retention efforts***" as a "***factor[] driving that growth in the quarter***."

130. Commenting on the increase in commission splits at NRT, Hull reiterated Defendants' 2017 commission split guidance of 70% and stated:

> NRT commission splits increased approximately 150 basis points year-over-year to 70.6%. The increase in Q2 commission rate was a result of several factors, higher transaction volume was one, the change to the geographical mix of business and the impact of heightened retention recruiting efforts. ***We expect that splits will be approximately 70% for the full year 2017 as we continue to strategically invest in productive sales agents***.
>
> ***While we expect these recruiting efforts will put near-term pressure on NRT's margins, the benefit of these and other growth initiatives is being immediately realized in RFG's results due to the higher resulting royalty revenue it earns from NRT***.

131. During the question and answer portion of the conference call, when asked about estimates for commission splits for the remainder of 2017, Hull indicated that the rate of commission splits increases would decline and then "drop off," stating:

> Well, ***for the year, we expected to be 70%***. So that depends on how your model works. ***But certainly, the increases in Q3 are expected to be less than the increases we saw in Q2 year-over-year. And then they really drop off – the increase really drops off in Q4 because we started to have some of the higher split numbers start showing in our***

> ***numbers in Q4 of last year from some of our targeted recruiting efforts and retention efforts. So it sort of trails off pretty significantly in Q4***.

132. Commenting on increased commission splits and the outlook for 2018 compared to 2016-2017, Hull attributed the increase to California and indicated the increased splits would be offset by benefits in other areas of Realogy's business, such as TRG, and that Defendants were "not seeing . . . extreme pressure anymore." On that point, Hull stated:

> ***It so happens that the pressure we saw in '16 – '15 and '16 was extreme, and we're not seeing that right now as much. It's still – it's sort of a normal pressure that we see, but it's not the extreme competitive pressures that we saw in '15 and '16 from a couple of people coming into the market on economic levels. So we expect that to continue now because we don't see – we're just not seeing signs of that kind of extreme pressure anymore. So I think that's going to – so I think will splits be under pressure? Yes. But do we have ways to offset that through more companies enter business? Yes. But certainly, the rate of increase is going to be nowhere near what we saw in '15 and '16 and so far this year.***

133. As the call continued, Defendants were asked whether volume gains would "outstrip" higher commission split costs and Realogy would experience margin expansion. Hull responded that the focus has been on "absolute levels of revenue and EBITDA" with "less focus on the margin," but over time it "should ***be beneficial to the margins of [RFG and NRT] combined***."

134. Commenting on Realogy's growth strategy going forward, Smith stated, "we'll continue tuck-in acquisitions," but "[w]e're being far more selective" because "agent recruiting is extraordinarily attractive."

135. Discussing the impact of competitors like Redfin trying to undercut the stable ABCR, Hull highlighted the sustainability of Realogy's business, stating, "the real world we play in is ***very stable and sustainable for the foreseeable future***."

136. Smith specifically negated any concerns stemming from Redfin's business model and its impact on Realogy, stating, "[w]ell, ***certainly there is no pressure***" and noted that Realogy's "absolute focus" on agent productivity, in addition to Realogy's "fairly substantial investment in technology," positioned Realogy to "capitalize on the market in ways small startups just cannot possibly capitalize."

137. On the same day, August 3, 2017, Realogy filed its 2Q17 quarterly report on Form 10-Q ("2Q17 10-Q") with the SEC, which was signed by Smith and Hull, included SOX certifications signed by each of them, and confirmed the Company's previously announced financial results and financial position. The 2Q17 10-Q discussed the Company's "strategic initiatives," reiterating statements from the Company's 2016 10-K about changes made to Realogy's agent compensation model and the "more aggressive strategy to recruit top performing sales associates," stating:

> Consistent with this strategy, NRT has been placing, and will continue to place, an even greater focus on the quality of our services, including

> the development of tools to increase sales associate productivity, and ***the use of financial incentives to strengthen our recruiting and retention of independent sales associates and teams. These actions include a focused strategy to recruit and retain top performing sales associates with the overall goal of sustaining or growing market share in various markets and ultimately improving the Company's overall profitability***. In addition, there is an enhanced focus on the value proposition offered to independent sales associate teams. ***We expect near-term moderate pressure on costs and margin from these initiatives as the benefits from recruiting new independent sales associates relate mainly to new listings and not pending listings.***

138. The 2Q17 10-Q discussed "current industry trends," and the importance of agent recruitment and retention, stating:

> ***While these recruiting and retention initiatives have increased our commission expense, we expect these initiatives will improve our operating results over the longer term and will continue to positively impact our market share trend on a year-over-year basis.***

139. The 2Q17 10-Q also commented on ABCR, stating:

> Since 2014 we have experienced approximately a one basis point decline in the average broker commission rate each year and ***we expect that over the long term the average brokerage commission rates will continue to modestly decline as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee.***

140. Analysts reacted positively to the Company's financial results, specifically the seemingly strong performance of NRT. For example, on August 3, 2017, J.P.Morgan issued an analyst report and noted "volume growth of 9% beat our forecast and the market data for the quarter (suggesting share gains)" with the Company's "key performance driver" being "strength" in NRT. The report also

commented that "the company's initiatives to recruit and retain top agents is working."

141. The statements identified in ¶¶125-139 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statements misrepresented and concealed that NRT's "progress" with Realogy's "strategic initiatives" specifically "designed to strengthen the recruitment and retention of sales agents" would result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA, at commission split levels necessary to increase agent recruitment and retention, transaction volume, and market share growth. As a result, Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve FY17 operating EBITDA of between $760 million and $770 million.

(b) Defendants' statements that any negative impact the commissions initiative would have on the Company's financial performance would be limited to only "near-term pressure on NRT's margins" with "benefit of these and other growth initiatives . . . being immediately realized" gave investors the false impression that any negative impact on the Company's financial performance would be limited to the short term if at all, when the truth was that the Company would continue to suffer the negative impact of the commissions initiative through the end

of the Class Period. In addition, Defendants also gave investors that false impression that its "successful recruiting and retention efforts" were a "factor[] driving growth in the quarter" and confirmed that the rate of commission splits increases would decline in 3Q17 and then "drop off" in 4Q17. In truth, commission splits were continuing to climb and Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve commission splits at 70% for full year 2017.

(c) Defendants' statements touting NRT's increased homesale transaction volume and the successes of Realogy's recruitment initiatives, concealed that any volume increases, or new agents, resulted from unsustainably increasing commission splits that would negatively impact EBITDA and the Company's profitability.

(d) Defendants' statement that "there is no pressure" from Redfin's business model and the Company was positioned to "capitalize on the market in ways small startups just cannot possibly capitalize," concealed the impact that more tech-savvy and consumer focused competition would have on the Company's business and agent retention efforts going forward due to their ability to offer discounted commission rates that Realogy could not sustain long term.

(e) Defendants concealed that NRT's ABCR "is very stable and sustainable for the foreseeable future" and that NRT's ABCR has only "experienced

a one basis point decline" each year since 2014, while reiterating that ABCR will only decline "modestly" in the "long term," despite the diminishing role of brokers, due to Defendants' undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(f) The Company's "tuck-in" acquisitions masked the full extent of the Company's decline in transaction volume market share by increasing new operations and agents that, unbeknownst to investors, were not effectively consolidated with the Company's existing operations, resulting in inefficiencies that negatively impacted the Company's operations and financial performance.

(g) The Company's 2Q17 10-Q was false and misleading because it failed to disclose to the market (in violation of Item 303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

**D. Investor Day 2017**

142. On August 10, 2017, Realogy hosted an investor day with analysts and investors. Schneider, Hull, and other members of Realogy's senior management gave presentations on behalf of the Company that focused on recent initiatives concerning agent recruitment and retention and technology. During the event, Smith

touted the Company's "***sustainable organic growth***" and Realogy's "focused effort on growth."

143. The CEO and President of NRT, Zipf, also spoke at Realogy's investor day and credited "NRT's legacy of growth" as being "one of acquisition" resulting in "the most diverse" and "incredible population of talent and operations in the industry."

144. As the investor day continued, Hull again assured investors of Realogy's sustainable business model, stating:

> Having said that, there are many things that we worry about. And you remind us of them every quarter. And they directly affect our revenue and profitability. Those are things like commission splits, net effective royalty rates, market share, productivity and above all the broader housing market. ***But it's important that we run through these 3 facts and clarify the sustainability of our business model***.

145. As the 2017 investor day continued, Hull commented on the ABCR being "remarkably flat" from 2012 to 2016 and added that "***[w]e continue to believe that the biggest driver of fluctuations to th[ese] numbers is higher average sales price, which we would expect to put a basis point or 2 of downward pressure on commission rates annually***."

146. On October 23, 2017, the Company filed a Form 8-K with the SEC, announcing Smith's retirement and that Schneider had been elected as President and COO of the Company, effective that day. Schneider was also appointed to the Board of Directors. The Company further stated that it expected to name Schneider CEO

by December 31, 2017, when Smith would retire from the Company and resign from the Board.

147. The statements identified in ¶¶142-145 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statements misrepresented and concealed that the Company's "organic growth" through its recruitment initiatives would result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA, at commission split levels necessary to increase agent recruitment and retention, transaction volume and market share growth. Defendants failed to disclose that the commission split increases required to attract new agents and "targeted recruits" would result in significantly higher expenses that could not be offset through volume and would, in fact, decrease the Company's operating EBITDA.

(b) Defendants concealed that NRT's ABCR was "remarkably flat" with any further declines to be limited to only "a basis point or 2 of downward pressure on commission rates annually," despite the diminishing role of brokers, because Defendants were engaged in undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(c) The Company's "tuck-in" acquisitions masked the full extent of the Company's decline in transaction volume market share by increasing new operations and agents that, unbeknownst to investors, were not effectively consolidated with the Company's existing operations, resulting in inefficiencies that negatively impacted the Company's operations and financial performance.

### E. Disappointing Third Quarter 2017 Financial Results Partially Reveal the Impact of High Commission Splits on Realogy's Operating EBITDA

148. On November 3, 2017, Realogy issued a release announcing disappointing 3Q17 financial results and reduced 2017 guidance. The release reported revenue of $1.7 billion, "an increase of 2% compared with the third quarter of 2016, driven by increases in homesale transaction volume" at NRT and RFG. The press release also announced that "combined homesale transaction volume increased 4% year-over-year, consisting of a 5% volume gain at RFG and a 4% volume gain at NRT . . . driven by increases in average sales price." It further emphasized that "Realogy outperformed national averages on sales volume and transaction sides." The release also stated that "NRT grew its agent count by 4.5% in the last 12 months to more than 50,000." Despite these seemingly positive results, the Company also reported a year-over-year decline in operating EBITDA of $258 million, down from $279 million for 3Q16, which Defendants attributed, in part, to "higher commission

splits due to the relative strength in NRT's West Coast operations and initiatives designed to attract and retain agents."

149. The 3Q17 earnings release also revealed that Realogy was lowering its 2017 guidance, which had been reiterated in the prior quarter, for operating EBITDA as a result of "recruiting and retention efforts" – *i.e.*, increased commission splits – stating:

> For the full year 2017, Realogy expects to generate revenue of between $6.1 billion and $6.150 billion, driven by combined transaction volume gains of between 6% to 7% year-over-year***. Realogy expects full year 2017 Operating EBITDA of between $725 million and $735 million***, which ***includes the expected impact of our recruiting and retention efforts***, natural disasters and charges related to its senior leadership transition. Based on the Operating EBITDA range noted above, the Company expects to generate Free Cash Flow of between $505 million and $520 million in 2017.

150. In the release, Smith discussed the Company's disappointing 3Q17 results, stating, "[w]hile we experienced gains in both homesale transaction volume and revenue, ***Operating EBITDA was adversely affected by the higher commission splits***, hurricanes, and weaker Cartus results." Smith attempted to downplay this negative news by shifting focus back to the positive results from the Company's "strategic initiatives," stating, "we continued to make progress on our strategic initiatives, including on our agent recruiting efforts, as evidenced by our strong retention rate and growing agent count." He continued, "[g]oing forward, we are focused on ***driving sustainable organic growth across our enterprise by***

***strengthening the services we provide to affiliated agents, which we believe will result in continued recruiting success and improved agent productivity***."

151. Also, on November 3, 2017, Realogy hosted a conference call with analysts and investors to discuss the Company's operations and disappointing 3Q17 financial results. During the call, Hull, Smith, and Schneider discussed the "challenges" the Company faced during the quarter while at the same time touting its "solid progress" with agent recruitment and retention. For example, Smith stated, "***our operating EBITDA was adversely affected by higher commission cost at NRT . . . .***"

152. However, Smith touted the increase in homesale transaction volume, stating, "volume was up 4% for the quarter . . . approximately 170 basis points higher than the statistics reported by the National Association of Realtors." He attributed the "improvement over NAR" to "progress on [the Company's] strategic initiatives . . . which we ***believe will drive higher absolute revenue and profitability over the next several years***."

153. Defendants further engaged in a back-and-forth discussion regarding Realogy's reduction in EBITDA guidance even though transaction volume increased. Hull positively stated, "the issue that we were concerned about last year, which was market share attrition, ***is largely behind us***." Hull stressed that "***we've gotten the plane stabilized and ready to start gaining altitude***" and "***we're well on***

***our way to our ultimate goal of increasing overall revenue and profitability of the company***." Hull reiterated, "***we're heading in the absolute right direction to increase revenue and EBITDA levels***."

154. Discussing agent commission splits, Smith explained that "[c]ommission splits in the quarter were higher than we anticipated" in part, due to ***NRT's successful recruiting and retention efforts*** and the incremental transaction volume from acquisitions." Despite previously assuring investors that commission splits would level off in the second half of 2017, Smith admitted, "***overall increased commission splits were a result of intentional efforts by NRT to be more competitive for the best talent as we focused on gains and market share***."

155. Smith commented further on the Company's recruitment initiatives and its impact on market share and commission splits, revealing that commission splits would exceed 70% for 2017, stating:

> ***While we are successfully addressing the market share concerns, which we pointed out late last year, the cost of doing so, especially when compounded by the geographic mix being skewed toward the West Coast, the splits increased slightly more than anticipated. For the year, we estimate that NRT's commission splits will be in the range of 70.25% to 70.5% as NRT field management balances trade-off between market share and split rate.***

156. During the call, Smith admitted that "[i]n 2018, NRT management is tasked with the objective of slowing the rate of increase in commission splits and agent productivity gains."

157. Smith discussed commission split trends for 2018, admitting that "we've been playing catch up" after "underperforming the market because we [were] working very, very hard to keep the agent splits as favorable to us as possible for about 3 years." He further stated:

> So this year, we've been playing catch up. ***We fully expect that to start stabilizing. And as you've heard me say, in 2018, NRT management has the goal and objective of slowing the rate of growth and stabilizing the agent split. And I think we're going to do that principally through increasing the productivity of the agents in the third and fourth quartile. We have good experience in that regard and we have a high degree of confidence in our ability to make them more productive, thus offsetting the increase in split rates.***

158. Regarding Realogy's commission splits strategy and whether there would be a "recalibration in terms of the split levels," or a change in targeted geographies, Smith stated:

> We think we've accomplished what we intended to accomplish, and personally every market we serve. ***So that balancing act between market share gains and splits, for the most part, has been accomplished. Now we'll be very selective as to which markets we want to grow. We'd like all the above, but the focus, clearly, will be on the most profitable markets from a split perspective. So you'll have to monitor our performance turn in 2018, but I assure you we are focused on the most profitable components of those markets***.

159. Hull also discussed the overall market for 2018 and whether the positive trends identified in October would continue, stating, "***we would expect strongly that we are going to outperform because we're continuing to do the targeted recruiting, which was very favorable to NRT this year in terms of their volume increases***."

160. Also during the call, Smith addressed the Company's acquisition strategy and its apparent success with "tuck-in" acquisitions, stating:

> ***[W]e're well-versed in tuck-in acquisitions***, so we'll continue doing that. We announced a couple this week. ***They're very synergistic***. We have a very high threshold for return on invested capital. ***We can do that in our sleep. We continue to focus on those tuck-ins***.

161. On the same day, November 3, 2017, Realogy filed its 3Q17 quarterly report on Form 10-Q ("3Q17 10-Q") with the SEC, which was signed by Defendants Smith and Hull, included SOX Certifications signed by each of them, and confirmed the Company's previously announced financial results and financial position. The 3Q17 10-Q discussed the Company's recruiting, and stated:

> ***This strategic emphasis on recruitment and retention is driven by our overall goal to sustain or grow market share in various markets and ultimately improve the Company's overall profitability***. While we have seen revenue improvements directly related to these initiatives, we have experienced and expect to continue to experience pressure on costs and margin from these initiatives.

162. In the 3Q17 10-Q, the Company reiterated impact of their higher commission splits on NRT's profitability. The 3Q17 10-Q stated:

> ***[W]e are placing an even greater focus on the quality of our services and use of financial incentives to strengthen our recruiting and retention of independent sales associates and teams***. These actions include a more aggressive strategy to recruit and retain high performing sales associates. In addition, there is an enhanced focus on the value proposition offered to independent sales associate teams. ***This strategic emphasis on recruitment and retention is driven by our overall goal to sustain or grow market share in various markets and ultimately improve the Company's overall profitability. While we have seen revenue improvements directly related to these initiatives, we have***

> ***experienced and expect to continue to experience pressure on costs and margin from these initiatives***.

163. The 3Q17 10-Q also discussed the Company's ABCR, stating:

> Since 2014 we have experienced approximately a one basis point decline in the average broker commission rate each year and ***we expect that over the long term the average brokerage commission rates will continue to modestly decline as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee***.

164. On news of the Company reporting decreased EBITDA from "higher commission splits" and increasing commission split guidance despite Defendants' previous assurances to investors over the prior two quarters that the 2017 commission split guidance was "right-sized" and that any "negative pressure" would be limited to 1Q17 and 2Q17, and that Realogy was lowering its 2017 outlook, the price of Realogy common stock dropped, falling 12%, or $3.62 per share, to close at $26.77 on November 3, 2017, on elevated trading volume.

165. Analysts were quick to comment on the Company's unexpected negative results. For example, on November 3, 2017:

(a) PiperJaffray issued a report citing "disappointing execution on agent recruitment strategy costs" and noting that Realogy's "strategy is costing more"; and

(b) Stephens issued a report stating that "expectations [were] officially reset." The report called the Company's higher commission splits in the quarter "troubling."

166. The statements identified in ¶¶148-163 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statements misrepresented and concealed that the Company's "strategic initiatives" and "agent recruiting" would result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA at commission split levels necessary to increase agent recruitment and retention, transaction volume and market share growth. Contrary to Defendants' statements, these initiatives were not "driving sustainable organic growth."

(b) Defendants' statements that any negative impact the commissions initiative would have on the Company's financial performance would "start stabilizing," that "we're well on our way to our ultimate goal of increasing overall revenue and profitability of the company," and that "we're heading in the absolute right direction to increase revenue and EBITDA levels," gave investors the false impression that any negative impact on the Company's financial performance would slow in 2018, when the truth was that the Company would continue to suffer the negative impact of increasing commission splits through the end of the Class

Period. In addition, Defendants also gave investors the false impression that Defendants had "accomplished" the "balancing act between market share gains and splits." In truth, commission splits were continuing to climb.

(c) Defendants' statements touting NRT's increased homesale transaction volume and the successes of Realogy's recruitment initiatives, concealed that any volume increases, or new agents, resulted from unsustainably increasing commission splits that would negatively impact EBITDA and the Company's profitability.

(d) Defendants' concealed that NRT's ABCR would only "modestly decline" due to "increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee," despite the diminishing role of brokers, because Defendants were engaged in undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(e) The Company's "tuck-in" acquisitions masked the full extent of the Company's decline in transaction volume market share by increasing new operations and agents that, unbeknownst to investors, were not "synergistic" or effectively consolidated with the Company's existing operations, resulting in

inefficiencies that negatively impacted the Company's operations and financial performance.

(f) The Company's 3Q17 10-Q was false and misleading because it failed to disclose to the market (in violation of Item 303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

### F. Realogy Announces a Shift in Focus to Technology and Agent Productivity

167. On January 25, 2018, Schneider participated in the Inman Connect conference, his first as CEO, and discussed Realogy's initiatives under its prior CEO, Smith, and the differences going forward based on "data-driven ideas that are going to make agents more successful," stating, in relevant part:

> And I want to build on a lot of the successes that he had. And one way to build on that is we are going to be relentlessly focused on agents. Our goal at Realogy is to make agents successful, both our own in our own brokerage as well as all of our franchisees' agents. Because if those agents are successful, our brokers will be successful and we are going to be successful. So we are going to have a massive focus there.
>
> . . . But as a Company, Realogy is going to be focused on nothing but making our agents successful and our franchisee agents successful because that is going to make us successful. So that's where our focus is going to be and that's one difference that you may feel going forward.

168. Regarding technological innovation at Realogy, Schneider reiterated that the Company was committed to making technological changes to support

agents, and referencing his recent CTO hire, Schneider stated, "our new CTO is going to have a substantial set of resources to make these to deliver the kind of future that I'm talking about. We have got work to do to actually change our Company to make that happen faster and better . . . ."

### G. Full Year 2017 Financial Results and Continued Pressure on Margins Results in the Company's Second Strategic Initiative

169. On February 27, 2018, Realogy issued a release announcing its financial results for the year ended December 31, 2017. The release reported revenue of $6.1 billion, "an increase of 5% compared to 2016, driven by increases in homesale transaction volume." The Company also announced, "[c]ombined 2017 homesale transaction volume for Realogy increased 7% year-over-year," which exceeded NAR's reported annual industry volume increase of 6%." In the release, Realogy revealed it "grew its U.S. market share of existing homesale transaction volume to 15.9%, up from 15.7% in 2016." The release provided additional detail on homesale transactions, stating, "[i]n aggregate, Realogy achieved homesale transaction volume of approximately $508 billion, an increase of 7% compared with 2016. NRT average homesale price increased 5% and homesale transaction sides increased 3%." But, the release also reported a "5% decline" on operating EBITDA for the quarter, due, among other things, to higher agent commission rates.

170. In the release, Schneider commented on the Company's data-driven strategic initiative, stating:

> Success requires that we deliver better business results, and we are moving quickly to drive change to enhance shareholder value. Our strategy is anchored by an ***aggressive focus on serving and supporting agents to help them become more successful, in large part by leveraging our technology and data scale***.

171. Also on February 27, 2018, Realogy hosted a conference call with analysts and investors to discuss the Company's 2017 financial results and 2018 outlook. Discussing the impact of Defendants' new approach on 1Q18 results, Schneider further commented, "***we expect to benefit increasingly over 2018 from continued organic growth through recruiting success, realization of already planned and executed operating efficiencies and improving agent productivity from new data and technology products over time***" He added, "***we expect our operating EBITDA for the balance of the year following Q1, to be in line or better than the same period last year. We believe our overall trajectory for the remainder of 2008 (sic) will be positive as the Q1 headwinds moderate and we build momentum into 2019 and beyond***."

172. In his prepared remarks, Hull provided additional detail on NRT's growth, stating, "As we continued to grow NRT's revenue through recruiting and agent productivity, ***we expect to see the combined results to deliver improved EBITDA growth for the company as a whole***."

173. Concerning the Company's new data-driven initiative, Schneider stated, "we will be enhancing our value proposition for agents by producing new

technology and data products." He continued, "[o]ur goal will be to quickly develop and test products in the market." Explaining the Company's new approach, Schneider noted, "While we are subject to competitive market forces, we will use a different approach to this issue in 2018 including providing new, great strategic clarity and the implications of ours [sic] choices." Schneider added, "[w]hile we continue to face upward pressure on commission rates in 2018, ***we expect year-over-year rate increases will substantially moderate after Q1 of '18***." He further stated:

> We are still subject to market forces on however our commission rate works, but ***we kind of caught up and we kind of reset our price effectively***.

174. Commenting on commission splits for 2018, Schneider stated:

> There will still be upward pressure after that, so it's not like it's going to start going down or anything but ***that upward pressure will bluntly -- as the words I chose were substantially moderate***. And there's always uncertainty because of the market forces, and this is kind of a hard business to forecast in the longer term. ***But you should expect a large increase in Q1 in split rates year-over-year and then substantial moderation from there***.

175. Turning to the topic of acquisitions, Schneider noted that the Company would be transitioning away from acquisitions, but blamed the shift in strategy on the high cost of acquisitions in the current market, stating:

> ***[W]e're seeing that the returns, we think, are going to be better for us on the organic growth side with recruiting for, example, as opposed to acquisitions in some of that because some of the pricing we see out there in the market is a lot higher than it's been in the past*** when we get a sense of what the multiples of things are trading at compared to what they used to trade at.

176. As to the stability of the ABCR Schneider added, "***I'm encouraged by how little [traction] disruptors have gotten by attacking the average broker commission rate over the years***" and "I am surprised by how much competitors are spending, both overall and individual offers to agents, to capture a pretty small share of the market."

177. On February 27, 2018, Realogy filed its annual report for 2017 with the SEC on Form 10-K ("2017 10-K"), which was signed by Schneider and Hull, included SOX certifications signed by each of them, and confirmed the Company's previously announced financial results and financial position. The 2017 10-K addressed Realogy's shift in its growth strategy, away from acquisitions to grow organically through agent recruitment and retention but reassured investors of the benefits of the Company's acquisitions, stating:

> ***Following the completion of an acquisition, we tend to consolidate the newly acquired operations with our existing operations. By consolidating operations, we reduce or eliminate duplicative costs, such as advertising, rent and administrative support. By utilizing our existing infrastructure to coordinate with a broader network of independent sales agents and revenue base, we can enhance the profitability of our operations. We also seek to enhance the profitability of newly acquired operations by strategies that increase the productivity of the newly affiliated independent sales agents***.

178. The 2017 10-K discussed current industry trends and noted the importance of the Company's agent recruitment and retention initiatives, including "immediate[]" benefits on the RFG segment, and stated:

> While the execution of these recruiting and retention initiatives increased NRT's commission expense, and is expected to continue to increase, and adversely impact the margin earned by NRT, ***we expect that the continued execution of the initiatives and associated revenues from increased homesale transaction volume will (i) immediately positively impact RFG results (via intercompany royalties), (ii) over the longer term, improve NRT's operating results and (iii) continue to positively impact our market share.***

179. Commenting on the Company's ABCR, the 2017 10-K stated:

> Since 2014, we have experienced approximately a one basis point decline in the average broker commission rate each year and ***we expect that over the long term the average brokerage commission rates will continue to modestly decline as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer or similar services for a reduced fee***.

180. Analysts were quick to comment on the Company's new data-driven recruitment initiatives. For example, on February 27, 2018, PiperJaffray commented on Realogy's "pivot in strategic direction" to a "focus[] on leveraging its technology and data platforms to improve agent productivity, retention and recruitment." The report commented that "[w]e are encouraged by new CEO Mr. Schneider's plan for how RLGY can deliver better results."

181. The statements identified in ¶¶169-179 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statement that new data-driven initiative would drive "organic growth" and "will be enhancing our value proposition for agents by producing new technology and data products" concealed that the Company's

technology and data were antiquated, and therefore, insufficient to counteract agent attrition.

(b) Defendants' statements regarding the moderation of the Company's increasing commission splits misrepresented and concealed that any increased commission splits would continue to result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA at commission split levels necessary to increase agent recruitment and retention, transaction volume and market share. As a result, Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve operating EBITDA for the balance of the year following 1Q18 to be "in line with or better than" the same period in 2017.

(c) Defendants' statements that any negative impact that increasing commission splits would have on the Company's financial performance would "substantial[ly] moderat[e]" after 1Q18, because Realogy "caught up" and "reset our price effectively," gave investors the false impression that any negative impact on the Company's financial performance would decline after 1Q18, when the truth was that the Company would continue to suffer the negative impact of the commissions initiative through the end of the Class Period. In truth, commission splits were continuing to climb.

(d) Defendants' statements that they are "encouraged by how little [traction] disruptors have gotten by attacking [ABCR] over the years" and that NRT's ABCR would only "modestly decline" due to "increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee," despite the diminishing role of brokers, concealed that Defendants were engaged in undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(e) Defendants' statements touting NRT's increased homesale transaction volume and the successes of Realogy's recruitment initiatives, concealed that any volume increases, or new agents, resulted from unsustainably increasing commission splits that would negatively impact EBITDA and the Company's profitability.

(f) Defendants' statements regarding the Company's shift in focus to "strategic acquisitions focused primarily on expanding our existing markets," concealed the truth regarding the Company's failed attempts to integrate the systems and operations of newly acquired companies with existing operations, resulting in inefficiencies that negatively impacted the Company's operations and financial performance.

(g) The Company's 2017 10-K was false and misleading because it failed to disclose to the market (in violation of Item 303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

### H. First Quarter 2018 Financial Results Start to Show Revenue and Transaction Volume Growth

182. On May 3, 2018, before the market opened, Realogy issued a release announcing its 1Q18 financial results. The release reported revenue of $1.2 billion, "an increase of 2% compared with the first quarter in 2017, driven by increases in homesale transaction volume." The release also announced, "combined homesale transaction volume increased 4% compared with the first quarter of 2017, consisting of a 5% volume gain at RFG and a 2% volume gain at NRT." NAR reported an "annual industry volume increase of 2% in the first quarter of 2018." The Company reported "Operating EBITDA [of] $34 million, consistent with [1Q18] guidance. . . ."

183. In the release Schneider stated, "[w]hile our results trajectory will not change overnight, we are committed to demonstrating a fast pace of change, returning capital to shareholders and improving profitability over time." Hull commented on the Company's low operating EBITDA of $34 million which had declined year-over-year but was "consistent with 1Q18 guidance," stating, "[t]he

year-over-year decline of $27 million was largely due to a $24 million decline at NRT, which was primarily a result of greater agent commission costs and softness in the New York City market."

184. The 1Q18 release also provided 2018 guidance, stating:

> Based on what we know today and subject to macro uncertainty, ***we continue to expect the aggregate second quarter 2018 to fourth quarter 2018 Operating EBITDA to be in line with or better than the same period in 2017***.

185. On May 3, 2018, Realogy hosted a conference call for analysts and investors concerning the Company's 1Q18 financial results and outlook. During the call, Schneider discussed the Company's 1Q18 results, stating, "***we continue to expect the aggregate Q2 to Q4 operating EBITDA to be in line with or better than the same period in 2017***." He continued, "[a]s we said in February, we expected Q1 commission rates to be up substantially year-over-year, including the impact of fewer transactions in our new development business." Schneider further stated:

> Consistent with what we said last quarter, while we expect continued upward pressure on agent commission rates, ***we expect the quarterly year-over-year increases will substantially moderate over the rest of 2018.***

186. Hull also commented on declining operating EBITDA at NRT despite increasing transaction volume, assuring investors the pressures would moderate during 2018, stating:

> NRT saw revenue growth, but agent commission splits continue to be challenged. Its revenue increased $20 million in Q1 2018 due to

> transaction volume that was driven by higher average sales price. NRT operating EBITDA decreased $24 million to negative $45 million as the increase in revenues was more than offset by $40 million of increased agent commission expense.
>
> Of the $40 million increase, approximately 1/3 was due to volume growth, about 1/2 from agent retention and recruiting and the remainder was due to new development activity.
>
> Just a reminder, in our last call, we told you that our NRT numbers will include a negative impact from lower new development business in Q2, similar to that in Q1, of approximately $10 million of EBITDA, ***but then less effect in Q3 and Q4. In Q2, this will show up in both the agent commission split rate and transaction volume.***

187. Discussing the Company's new date-driven initiative, Schneider stated:

> I am confident that we are headed in the right direction. ***We are growing revenue and volume in a competitive market, while we continue to recalibrate our agent commission approach. We are quickly producing multiple technology and data beta products to enhance our value proposition. We are driving efficiencies in our cost structure, and we are returning substantial capital to shareholders.***

188. During the question and answer portion of the call, Schneider provided additional clarity on commission splits stating, "we've looked at a lot of scenarios for the second quarter" and "bluntly, ***they all had a substantial moderation in the year-over-year increase***." He further stated, "[t]here's still upward pressure and so you should expect that there will still be year-over-year increase in the second quarter" but "***we expect it to be substantially moderate in Q2 and in Q3 and Q4***."

189. Also, during the call, Schneider commented on the "stability" of the ABCR, stating, it has been a "pleasant surprise."

190. On May 3, 2018, Realogy filed its 1Q18 quarterly report Form 10-Q ("1Q18 10-Q") with the SEC, which was signed by Schneider and Hull, included SOX certifications signed by each of them, and confirmed the Company's previously announced financial results and financial position. The 1Q18 10-Q included the following regarding ABCR:

> Since 2014, we have experienced approximately a one basis point decline in the average broker commission rate each year and ***we expect that over the long term the average brokerage commission rates will continue to modestly decline as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer or similar services for a reduced fee***.

191. Analyst reaction to the Defendants' statements regarding Realogy's 1Q18 financial results and outlook was largely positive. For example, on May 3, 2018, PiperJaffray stated it was "encouraged by Realogy's commentary around improving profitability over time" while also expressing concern that commission splits were "***higher-than-expected at 71.5%***." Likewise, on May 3, 2018, J.P.Morgan reported that the results were "largely as expected" and that it was "good news" that "management's brackets around operating EBITDA over the rest of 2018 [were] consistent with what it said last quarter (equal to or greater than 2017)." But, J.P.Morgan added that it was "***bad news***" that "***agent commission splits ran notably higher than our forecast (71.5% vs. or 69.75%) - and seemingly the Street's***." Barclays added that the results were "close to our estimates" but that there was "little learned today that would alter our go-forward estimates." Notably, Barclays

expressed concern that Realogy's "***full-year EBITDA guidance remains a source of risk given the need for a significant deceleration in split increases to meet guid[ance]***."

192. The statements identified in ¶¶182-190 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statements that Realogy's new data-driven initiative will "enhance our value proposition" by "quickly producing" new products, concealed that the Company's technology and data were antiquated, and therefore, insufficient to counteract agent attrition.

(b) Defendants' statements regarding the moderation of the Company's increasing commission splits misrepresented and concealed that any increased commission splits would continue to result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA at commission split levels necessary to increase agent recruitment and retention, transaction volume, and market share. As a result, Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve operating EBITDA for aggregate 2Q18 to 4Q18 to be "in line with or better than" the same period in 2017.

(c) Defendants' statements that any negative impact from increased commission splits on the Company's financial performance would "substantially

moderate over the rest of 2018," gave investors the false impression that the negative impact was limited to 1Q18, when the truth was that the Company would continue to suffer the negative impact of increased commission splits through the end of the Class Period. In truth, commission splits were continuing to climb and Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve commission splits in the range of 70.25% to 70.5% for 2018.

(d) Defendants' statement that the "stability of the ABCR" has been a "pleasant surprise" and that NRT's ABCR would only "modestly decline" due to "increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee," despite the diminishing role of brokers, concealed that Defendants were engaged in undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(e) Defendants' statements touting NRT's increased homesale transaction volume and the successes of Realogy's recruitment initiatives, concealed that any volume increases, or new agents, resulted from unsustainably increasing commission splits that would negatively impact EBITDA and the Company's profitability.

(f) The Company's 1Q18 10-Q was false and misleading because it failed to disclose to the market (in violation of Item 303) the known trends and

uncertainties described in this paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

**I. Second Quarter 2018 Financial Results**

193. On August 3, 2018, Realogy issued a release announcing its 2Q18 financial results. The release reported revenue of $1.82 billion, "an increase of 2% compared with the second quarter in 2017, driven by increases in homesale transaction volume." The release reported that "[c]onsistent with our guidance, the Company's combined homesale transaction volume increased 3% compared with 2Q17, due to a 4% volume gain at RFG and a 1% volume gain at NRT." NAR reported a "homesale transaction volume increase of 1% in the second quarter of 2018." The Company also reported Operating EBITDA of $276 million, an increase of $7 million compared to 2Q17.

194. In the release, Schneider highlighted that Realogy "outperformed the market on transaction volume." He stated, Realogy was "***moving quickly to make strategic changes to improve profitability over time, anchored in growing our base of independent sales agents at both NRT and RFG and providing agents compelling service, data and technology products to allow them to increase their productivity***."

195. The 2Q18 press release also reiterated the Company's FY18 guidance, stating:

> For the third quarter of 2018, Realogy ***expects that combined homesale transaction volume will increase in the range of 3% to 6% year-over-year*** with sides contributing between -1% to +1% and 4% to 5% coming from price. Broken down by business unit, we expect 4% to 6% transaction volume growth at RFG ***and 3% to 5% growth at NRT***.
>
> Based on what we know today and subject to macro uncertainty, ***we continue to expect the aggregate second quarter 2018 to fourth quarter 2018 Operating EBITDA to be in line with or better than the same period in 2017.***

196. Also on August 3, 2018, Realogy hosted a conference call with analysts and investors to discuss the Company's 2Q18 financial results and outlook. Discussing commission splits, Schneider reiterated that split rates would moderate as the year went on, stating, "while we expect continued upward pressure on agent commission rates overall, ***we do expect further year-over-year split increase moderation in the second half of 2018***."

197. During the call, Schneider commented that Realogy's initiatives were "starting to drive results," and stated, in relevant part:

> I'm excited that some of our earlier 2018 efforts are starting to drive results. ***We outperformed the market on transaction volume. We began to see the expense benefits from our expanded focus on operating efficiency, and our Q2 2018 operating EBITDA outperformed Q2 2017.***

198. Schneider also discussed 3Q18 guidance, stating, "***we continue to expect that aggregate Q2 to Q4 operating EBITDA will be in line with or better than the same period in 2017***."

199. During the call, Schneider further provided details regarding "strategic changes" that the Company would be making at NRT in 2018 and 2019, including "simplifying and standardizing our agent commission pricing to drive growth" because of "branch-level variations" in commission plans. Regarding the Company's products, Schneider stated that the Company would be introducing new products, including fee based platforms, to drive agent recruitment, retention, and productivity, and that the "fees will offset the cost to deliver the new products." He assured investors that Realogy was "***moving quickly to drive these changes, given our need to alter NRT's financial trajectory***."

200. During the question and answer portion of the call, Schneider made clear that Realogy had not "changed our commentary on splits" and that "***the kind of year-over-year increases we're seeing each quarter, we signaled and believe are going to moderate***."

201. Hull added, "we're still growing market share in this market, and we want to continue to grow profitable market share. So it's – ***the outlook is very positive***."

202. In response to a question on how investors could best track the progress of the Company's "new strategic direction" and the "commission splits strategy," Schneider stated:

> So look, first off, on splits, we've kind of given you the same guidance this quarter we had for the last 2 of how we expect this year to play out . . . . ***So I predict this year's numbers will stay with the guidance and the direction that we've given you. Even though there is the upward pressure, we do think there's going to be more of the moderation that you saw in the second quarter on the year-over-year increases.***
>
> * * *
>
> And then look, ***our core focus is the EBITDA trajectory, right. And so we want and need to make progress on that. We've given you guidance for this year on that. Obviously, the first quarter was pretty different than last year***, but we gave you the guidance on the rest of the year. But going into '19 and beyond, I'd want you to focus most on the EBITDA growth because that's what we, as a management team, are most focused on at the moment.

203. As the call continued, Schneider revealed the need for Realogy to have "integrated economics" to drive growth because the Company's acquisitions had resulted in "complex and inconsistent plans" that "make it really hard, actually, to explain to potential agents both what our pricing really is and what our value proposition really is." Schneider further stated, "But what we're trying to get to is less about any sort of a split number and more about driving growth with the right integrated economics." Adding additional color, Schneider stated:

> And our – and the issue is not that our – the issue I'm trying to solve is actually not the split level we have today. It's the complexity and

inconsistency and lack of data-drivenness in a lot of our commission plans that makes it really hard to explain our value proposition, makes it hard to kind of compare our kind of all-in pricing with someone else's all-in pricing. And so the more we can simplify and standardize that, I think we can get a lot more growth. And then the split dynamics will be what the split dynamics are going to be, both because of the industry and based on how these plans kind of work out. So that's what I'm going for here.

204. On August 3, 2018, Realogy filed its 2Q18 quarterly report on Form 10-Q ("2Q18 10-Q") with the SEC, which was signed by Schneider and Hull, included SOX certifications signed by each of them, and confirmed the Company's previously announced financial results and financial position. The 2Q18 10-Q commented on "Key Strategic Imperatives," stating:

> ***NRT remains focused on the recruitment, retention and development of productive independent sales agents, which we anticipate will be strengthened by our increasing utilization of advanced data analytics. We believe our adoption of a more data-driven strategy, together with strong product and services offerings, will further sharpen our productivity, recruitment and retention objectives. This is intended to allow us to provide more competitive and consistent products, services and pricing to existing and newly recruited independent sales agents, including through the expanded use of service and compensation models other than the traditional model.***

205. The 2Q18 10-Q discussed the Company's ABCR, stating:

> Since 2014, we have experienced approximately a one basis point decline in the average broker commission rate each year and ***we expect that over the long term the average brokerage commission rates will continue to modestly decline as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer or similar services for a reduced fee.***

206. In response to Defendants' statements regarding the Company's 2Q18 financial results and business strategies, analysts reacted positively. For example, on August 3, 2018, PiperJaffray declared that the results were "better than feared" while noting that ***commission splits had increased to 72.7%***. Similarly, J.P.Morgan pointed out that "EBITDA was solid, and guidance for 2Q-4Q EBITDA being at least as much as last year remains intact," but also expressed some concern about how the Company's new approach to "streamline commissions" would "play[] out."

207. The statements identified in ¶¶193-205 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statements touting Realogy's new data-driven initiative which sought to provide "agents compelling service, data and technology products" to "increase their productivity," concealed that the Company's technology and data were antiquated, and therefore, insufficient to counteract agent attrition.

(b) Defendants' statements regarding the moderation of the Company's increasing commission splits misrepresented and concealed that any increased commission splits would continue to result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA at commission split levels necessary to increase agent recruitment and retention, transaction volume, and market share. As a result, Defendants had no reasonable basis to expect, and did not

in fact expect, that Realogy could achieve operating EBITDA for the aggregate 2Q18 to 4Q18 to be "in line with or better than" the same period in 2017.

(c) Defendants' statements that any negative impact from increased commission splits on the Company's financial performance would "moderate" in 3Q18 and 4Q18, gave investors the false impression that the negative impact was limited to the first half of 2018, when the truth was that the Company would continue to suffer the negative impact of the increased commission splits through the end of the Class Period. In truth, commission splits were continuing to climb.

(d) The Company's "tuck-in" acquisitions masked the full extent of the Company's operating inefficiencies, and unbeknownst to investors, also resulted in "complex and inconsistent plans" that failed to attract new agents.

(e) Defendants' statements touting NRT's increased homesale transaction volume and the successes of Realogy's recruitment initiatives, concealed that any volume increases, or new agents, resulted from unsustainably increasing commission splits that would negatively impact EBITDA and the Company's profitability.

(f) Defendants concealed that NRT's ABCR would only "modestly decline" due to "increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee," despite the diminishing role of brokers, because Defendants were engaged in undisclosed anti-competitive

behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(g) The Company's 2Q18 10-Q was false and misleading because it failed to disclose to the market (in violation of Item 303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

### J. Third Quarter 2018 Results Show Poor Performance and a Decline in EBITDA

208. The truth about Realogy's inability to generate sustainable (*i.e.*, profitable) organic earnings or EBITDA growth at commission split levels necessary to increase agent recruitment and retention and transaction volume was partially revealed to investors before the market opened on November 2, 2018. On that date, Realogy issued a press release announcing its 3Q18 financial results. The release reported revenue of $1.68 billion, "an increase of $2 million compared with the third quarter of 2017." However, the release revealed that Realogy had missed its 3Q18 guidance for transaction volume that "combined homesale transaction volume (transaction sides multiplied by average sale price) increased 1% compared with 3Q17, due to a 1% volume gain at RFG ***while volume at NRT was flat***." In contrast, NAR reported a "homesale transaction volume increase of 1% in the third quarter of

2018." The Company also reported declining operating EBITDA of $242 million, "a decrease of $16 million compared with the third quarter of 2017."

209. In the earnings release, Schneider attempted to reassure investors by blaming the housing market softness, stating that the Company "generated substantial revenue, Operating EBITDA and Free Cash Flow, as well as maintained our market share, all despite the past few months of housing market softness." Schneider added that Realogy was "enhancing our value to agents with new products and expanding our use of technology and data." The 3Q18 release also quoted Hull as stating that Realogy was "well-positioned to weather shifts in market conditions" as it "continue[d] to invest in multiple avenues of growth."

210. The 3Q18 also withdrew the Company's operating EBITDA guidance of "in line with or better than the same period in 2017," which was $732 million in 2017, and instead revealed that operating EBITDA would decline substantially and that transaction volume would be flat in 4Q18, stating:

> ***For the fourth quarter of 2018, Realogy is overall modeling around flat homesale transaction volume compared to the fourth quarter of 2017. Based on this fourth quarter volume outlook and third quarter results, the Company now anticipates full year Operating EBITDA of $660-$670 million***, subject to macro uncertainty and current market conditions.

211. Also, on November 2, 2018, before the market opened, Realogy hosted a conference call with analysts and investors to discuss the Company's disappointing 3Q18 financial results and its data-driven "strategic initiative." Schneider discussed

the Company's $16 million decline in EBITDA, attributing the decline in part "to commission split increases." However, he reassured investors that "***[o]ur commission split increases are moderating as expected***" and that "Q3 was up 143 basis points, lower than Q1's increase of 284 basis points and lower than Q2's increase of 209 basis points." Schneider reiterated, "***We continue to expect further moderation in Q4***."

212. Commenting on the Company's new strategic initiatives announced in the prior quarter, Schneider stated that Realogy was "continu[ing] to move quickly on new commission pricing designed to attract faster-growing and higher-producing agents" that the "initiative is all about growth," and that Realogy was "leveraging these new plans to attract more agents quickly, while allowing our existing agents to continue on their existing plans or explore the new plans where appropriate."

213. When asked about commission splits and the status of market pressure on splits, Schneider responded, in part:

> ***So look, we've been, all year, telling you that we think the increases are going to moderate kind of quarter-to-quarter. It's happened 3 quarters in a row. I told you it was going to happen again in the fourth quarter. That's what we strongly believe.***

214. On November 2, 2018, Realogy filed its Form 10-Q ("3Q18 10-Q") with the SEC, which was signed and certified pursuant to SOX by Schneider and Hull, and confirmed the Company's previously announced financial results and

financial position. Regarding the Company's "Key Strategic Imperatives," the 3Q18 10-Q stated:

> ***NRT remains focused on the recruitment, retention and development of productive independent sales agents, which we anticipate will be strengthened by our increasing utilization of advanced data analytics. We believe our adoption of a more data-driven strategy, together with strong product and services offerings, will further sharpen our productivity, recruitment and retention objectives.*** This is intended to allow us to provide more competitive and consistent products, services and pricing to existing and newly recruited independent sales agents, including through the expanded use of service and compensation models other than the traditional model.

215. Addressing ABCR, the 3Q18 10-Q stated:

> Since 2014, we have experienced approximately a one basis point decline in the average broker commission rate each year and ***we expect that over the long term the average brokerage commission rates will continue to modestly decline as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer or similar services for a reduced fee.***

216. Immediately after the Company issued its 3Q18 press release, Realogy abruptly announced that Hull would retire three days later on November 5, 2018. Hull remained employed by Realogy as a "senior advisor" to Schneider for the next five months until March 31, 2019.

217. On the news of Realogy's poor 3Q18 financial results, the price of Realogy common stock plummeted 11.5%, or $2.31 per share, from a close of $20.07 per share on November 1, 2018, to close at $17.76 per share on November 2, 2018, on unusually heavy trading volume.

218. The statements identified in ¶¶209-215 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statement that Realogy's data-driven new strategic initiative, which was "all about growth," was "enhancing our value to agents with new products and expanding our use of technology and data," concealed that the Company's technology and data were antiquated, and therefore, insufficient to counteract agent attrition.

(b) Defendants' statements regarding the moderation of the Company's increasing commission splits misrepresented and concealed that any increased commission splits would continue to result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA at commission split levels necessary to increase agent recruitment and retention, transaction volume, and market share.

(c) Defendants' statements that any negative impact from increased commission splits on the Company's financial performance would "moderate" gave investors the false impression that any negative impact on the Company's financial performance would decline, when the truth was that the Company would continue to suffer the negative impact of increased commission splits through the end of the Class Period. In truth, commission splits were continuing to climb.

(d) Defendants concealed that NRT's ABCR would only "modestly decline" due to "increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee," despite the diminishing role of brokers, because Defendants were engaged in undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(e) The Company's 3Q18 10-Q was false and misleading because it failed to disclose to the market (in violation of Item 303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

**K. Realogy Reports Disappointing Full Year 2018 Results**

219. Before the market opened on February 26, 2019, Realogy issued a press release announcing its FY18 financial results, and investors learned additional truth about the impact of increased commission rates on the Company's operating EBITDA. In the FY18 release, Defendants reported that for FY18 revenue ***declined*** to $6.1 billion, "a decrease of $35 million compared to 2017," and 4Q18 revenue also declined to $1.4 billion, "a decrease of $90 million versus the fourth quarter of 2017."

220. The February 26, 2019 release reported also that combined homesale transaction volume, "increased 1% compared with 2017 and ***declined 5% year-over-year in the fourth quarter***." The press release stated that NAR's "homesale transaction volume remained flat in 2018 compared to 2017 and declined 4% year-over-year in the fourth quarter." The release stated, "In aggregate, Realogy achieved homesale transaction volume of approximately $512 billion, an increase of 1% compared to 2017" and that "NRT reported an average homesale price increase of 2% and homesale transaction sides decrease of 2%."

221. Importantly, Defendants reported declining FY18 operating EBITDA of $658 million, a "decrease of $74 million compared with 2017" and below the Company's 2018 guidance. Defendants attributed the decline to largely "***higher agent commission rates***." For 4Q18, operating EBITDA also declined to $106 million, a "decrease of $38 million compared with 2017." Realogy also reported a 65% decline in earnings per share, which fell from $3.15 in 2017 to $1.10 in 2018, as well as a loss per share of $0.19 in 4Q18 compared to earnings per share of $1.91 in 4Q17. Notably, the FY18 earnings release did not provide any financial guidance for 2019, representing a departure from Defendants' financial reporting in every previous quarter in the Class Period.

222. In the press release Schneider stated, "[w]hile we face an uncertain housing market, the strategic changes we are driving for agents across products,

technology, data and talent are beginning to get traction, giving me early confidence that these initiatives will lead to better company performance."

223. Also on February 26, 2019, before the market opened, Realogy hosted a conference call with analysts and investors to discuss the Company's operations and its "soft" 4Q18 and FY18 financial results. During the call, Schneider and Gustavson discussed the "challenging" year while at the same time reassuring investors of the "substantial changes" being made to drive "organic growth." Specifically, Schneider assured investors that "we've got some early evidence" of market growth and highlighted the positive changes occurring within Realogy and stated, in part:

> We are driving substantial changes at Realogy: culture changes, strategy changes, product changes, value proposition changes and talent changes, just to name a few. We are more agile. We're using data better and we're delivering better technology. And we're making all these changes at a time when the housing market has been pretty tough.
>
> 2018 was a challenging year in housing because of the headwinds in the latter half of the year. But even with those 2018 challenges, we entered 2019 with more optimism than you might expect. ***Our changes are making a big difference inside the company and for our agents and franchisees.***
>
> ***We're seeing some wins in the market from strategic initiatives we launched in 2018. We're seeing less upward pressure from agent commission costs.***

224. Regarding the Company's growth plans, Schneider added that:

> Pulling way up, ***we are focused on driving organic growth using technology and data innovation to improve our value proposition, recruit more agents and enhance agent productivity.***

225. Schneider also commented on Realogy's operating EBITDA, stating, in relevant part:

> ***2018 operating EBITDA was $658 million, $74 million below 2017. Three main issues drove this decline. First, agent commission costs rose $52 million. Second, with only 1% transaction volume growth, we did not have revenue growth to offset the commission pressure.***

226. With respect to Realogy's "strategic initiatives" and outlook for 2019, Schneider reassured investors that Realogy would drive revenue in 2019 and drive growth, stating:

> While we cannot control the housing market, we won't settle for performance simply in line with the market. First, we expect to drive incremental revenue in 2019 as our strategic initiatives begin to show results. We've changed many aspects of our business to improve our value proposition and drive growth, via both greater agent recruiting and greater productivity.
>
> * * *
>
> We like our pace of change, and our new products are having a positive impact.

227. Commenting on commission splits, Schneider explained that "without volume growth, the upward pressure on agent commissions has a substantial negative impact on our P&L." He continued:

> We expect upward pressure on agent commission rates in 2019, but we do not expect that pressure to look anything like what we saw for the full years 2017 and 2018. This continued upward pressure is a major reason why our strategic initiatives are so focused on how to drive above-market organic growth in the future.

228. When discussing agent growth, Schneider admitted, "we were flat on agent growth in 2018."

229. Further commenting on commission splits trends for 2019, Schneider downplayed their negative impact on the Company, stating that the Company had played "catch-up" in the past:

> I believe the ***personal Realogy catch-up is actually now over*** and we're now much more going to be a function of just what happens with kind of the market price out there. And so we think 2019 will be – won't look anything like that pressure in '17, '18. We think it'll look much more like the fourth quarter of '18 and better – and/or better kind of on a full year basis.

230. As the call continued, Schneider provided commentary on ABCR, and how it had not been disrupted by market competitors, stating, in relevant part:

> ***We haven't seen the disruption thing at all move it down, and we've done that analysis in Redfin markets versus non-Redfin markets, et cetera, et cetera. And so we watch it pretty closely***.

231. On February 26, 2019, Realogy filed its annual report for 2018 with the SEC on Form 10-K ("2018 10-K"), which was signed and certified pursuant to SOX by Schneider and Gustavson, and confirmed the Company's previously announced financial results and financial position. Commenting on the Company's ABCR, the 2018 10-K stated:

> Since 2014, we have experienced approximately a one basis point decline in the average broker commission rate each year, ***which we believe has been largely attributable to increases in average homesale prices (as higher priced homes tend to have a lower broker***

***commission) and, to a lesser extent, competitors providing fewer or similar services for a reduced fee.***

232. On this news, Realogy common stock plummeted nearly 21%, or $3.69 per share, to close at $14.14 per share on February 26, 2019, on unusually heavy trading volume.

233. The statements identified in ¶¶220-231 above were materially false and misleading or omitted material information when made. Specifically:

(a) Defendants' statement that Realogy's data-driven initiative "focused on driving organic growth using technology and data innovation to improve" Realogy's "value proposition, recruit more agents and enhance agent productivity," concealed that the Company's technology and data were antiquated, and therefore, insufficient to counteract agent attrition.

(b) Defendants' statements that "Realogy catch-up is actually now over," and that pressure from increased commission splits would continue to moderate for 2019 misrepresented and concealed that any increased commission splits would continue to result in a long-term negative impact on the Company's earnings and EBITDA because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA at commission split levels necessary to increase agent recruitment and retention, transaction volume, and market share.

(c) Defendants' statements that there would be decreased "upward pressure" from increasing commissions in 2019 gave investors the false impression

that any negative impact from increased commission splits on the Company's financial performance would subside in 2019, when the truth was that the Company would continue to suffer the negative impact of the commissions initiative through the end of the Class Period.

(d) Defendants' statements that NRT's ABCR only declined "one basis point" each year since 2014, despite the diminishing role of brokers, concealed that the minimal declines were the result of Defendants' undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation.

(e) The Company's 2018 10-K was false and misleading because it failed to disclose to the market (in violation of Item 303) the known trends and uncertainties described in this paragraph, and their materially unfavorable impact on the Company's profitability and EBITDA, in violation of SEC disclosure rules, as set forth below in ¶¶257-266.

### L. Litigation Involving Realogy Reveals Antitrust Violations Relating to Broker Commissions

234. On March 6, 2019, a class action lawsuit, *Moehrl v. National Association of Realtors*, No. 1:19-cv-01610 (N.D. Ill.) was filed against Realogy,

NAR, and several real estate brokerage firms.[6] In the complaint, Realogy and others were accused of violating federal antitrust laws by requiring home sellers to pay buyer's broker's commissions at inflated rates. More specifically, it was alleged that these anti-competitive actions permitted brokers like Realogy to consistently charge their standard commission rate of 2.5% - 3.0% of a home sale, which was critical to Realogy's financial performance at all times during the Class Period, despite the fact that a majority of buyers were relying on online listing sites such as Zillow to find their homes resulting in a more limited role for the broker.

235. In reaction to this news, the price of Realogy common stock dropped 6.4%, or $0.85 per share, to close at $12.47 per share on March 6, 2019.

236. On March 7, 2019, *Bloomberg Law* reported on the *Moehrl* litigation, stating that NAR "and the four largest real estate broker franchisors" were alleged to "conspire[] to inflate broker commissions" in violation of antitrust laws. On March 8, 2019, *Inman*[7] posted an article describing the *Moehrl* action and calling

---

[6] On March 6, 2019, firms representing plaintiffs in the action announced the filing of the case, with a link to the complaint, in releases on their respective websites. *See* www.hfajustice.com/news/hfa-files-antitrust-lawsuit-alleging-that-national-association-of-realtors-and-nations-biggest-franchisors-of-real-estate-brokers-conspired-to-inflate-commissions-paid-by-home-sellers (last visited Mar. 4, 2020); *see also* www.cohenmilstein.com/update/%E2%80%9Cantitrust-class-action-filed-against-realtors-over-commissions%E2%80%9D-courthouse-news (last visited Mar. 4, 2020).

[7] Inman describes itself as a provider of "accurate, innovative and timely information about the [real estate] business" and states it is "[k]nown for its award-

the case a "bombshell lawsuit that could undo the US real estate industry." Also on March 8, 2019, *Inman* posted an opinion article by Robert Hahn, a frequent speaker at real estate industry events and a former Realogy employee who oversaw the interactive marketing and technology for the commercial brand. The article described the *Moehrl* litigation as a potential "nuclear bomb on the industry" and a "serious threat" because the plaintiffs want to end "cooperation and compensation" that companies like Realogy relied on. Then, on March 11, 2019, an article entitled "A new class action lawsuit could upend the real estate market as we know it" was published on *The Real Deal*. The article commented on the lawsuit noting that it was filed against several realtors, including Realogy, for violations of antitrust laws.

237. On April 15, 2019, Realogy, NAR, and other major brokerages were hit with yet another antitrust class action over inflated buyer broker commissions, when Minnesota-based Sawbill Strategic Inc. filed a case in the Northern District of Illinois. On April 16, 2019, *Inman* published an article titled, "NAR hit with yet another antitrust suit over buyer commissions." Similarly, on April 18, 2019, *Housingwire* reported on the lawsuit in an article entitled "NAR slapped with second class-action lawsuit to end buyer broker compensation" which stated, in part:

---

winning journalism, cutting-edge technology coverage, in-depth educational opportunities, and forward-thinking events," making it "the industry's leading source of real estate information."

> The suit, filed in the Northern District of Illinois on Monday by Minnesota-based corporation Sawbill Strategic, alleges that NAR, Realogy, HomeServices of America, RE/MAX and Keller Williams violated federal antitrust laws by requiring property sellers to pay the buyer's broker an inflated fee.
>
> The suit is nearly identical to ***one filed last month*** by a Minnesota home seller, which NAR called "baseless" and filled with "an abundance of false claims."
>
> The suit alleges that the defendants conspired to drive up seller costs and reduce competition by requiring a home seller to pay compensation to the buyer's broker, even though their involvement in the transaction is minimal.
>
> According to the suit, NAR's Commission Rule maintains a commission requirement for buyer's brokers of 2.5-3% of the home's sale price. This has not changed in recent years, even as buyers increasingly turn to online listing sites to find their homes and often only retain a broker once a property has been selected.
>
> The suit alleges that buyer broker compensation rules have remained intact despite their changing role in the home purchase transaction because of a conspiracy among the defendants.[8]

### M. Disappointing First Quarter 2019 Results Reveal that NRT Continued to Underperform the Market

238. More truth about the Company's true financial condition was revealed to the market on May 2, 2019, when Realogy issued a release announcing its 1Q19 financial results for the quarter ended March 31, 2019. The Company reported "a decrease of 9%" in revenue, "compared to the first quarter in 2018, largely due to

[8] The *Moehrl* and *Sawbill Strategic* cases were subsequently consolidated and an amended complaint was filed on June 14, 2019.

lower transaction volume at NRT." The Company also reported, combined homesale transaction volume "decreased 9% compared with the first quarter of 2018." The Company admitted that NAR only reported a 4% decrease in homesale transaction volume in 1Q19, meaning that NRT underperformed the market by ***more than 50%***. In the earnings release, Defendants stated that the "differences [between NRT and NAR] were primarily driven by geographic concentration and an increase in the competitive environment especially in a few specific geographies."

239. The 1Q19 release provided additional detail on NRT's outsized decline in homesale transactions, stating, "In aggregate, Realogy achieved homesale transaction volume of approximately $91 billion in the first quarter of 2019 with $60 billion at RFG and $31 billion at NRT" and that "NRT reported a homesale transaction sides decrease of 9% and an average homesale price decrease of 2%." As a direct result of decreased transaction volume and increased commission splits, Realogy reported ***negative*** operating EBITDA of $4 million, "a decrease of $38 million compared with the first quarter of 2018," a net loss of $99 million, and a loss per share of $0.87 compared to a loss per share of $0.51 in 1Q18, as well as ***negative*** free cash flow of $172 million. Once again, Realogy did not offer guidance for second quarter 2019 or full year 2019 ("FY19").

240. Also on May 2, 2019, before the market opened, Realogy hosted a conference call with analysts and investors to discuss the Company's disappointing

1Q19 financial results. During the call, Schneider discussed why Realogy's volume was down more than twice as much as NAR's, pointing to geography and the increased competitive environment, which signaled that commission splits had significantly hurt the Company's financial performance, stating, in part:

> Our volume was lower than NAR's, which was down 4% year-over-year, and our variance was driven primarily by 2 factors. First, geographic mix. Industry volume in California was down significantly more than the national average, and we have a very high concentration in California. It makes up over 25% of NRT's volume. Second, an even greater increase in the competitive environment that began in late 2018, especially in a few specific markets.

241. Simonelli also commented on agent commission splits, stating:

> Q1 2019 agent commission splits were up 45 basis points year-over-year. On a like-for-like basis, splits were up 80 basis points, which is 31 basis points lower than the increase we saw in Q4 2018 due predominantly to geographic mix and improvement in our new development business. The 45 basis points year-over-year increase was affected by the increasing rollout of our new commission plans over the last 6 months. Remember that these new commission plans are meant to have more aspirational pricing to incent higher productivity and include charging additional fees. Given our rollout progress, these fees are becoming a more meaningful part of our agent economics and are recorded as a contra commission expense. This explains the 35 basis point difference between the 80 basis points like-for-like and the actual result of 45 basis points. You should assume the impact of these fees will be less than 35 basis points in higher volume quarters, but this is expected to continue to be a part of our agent commission expense story.

242. Commenting on Realogy's data-driven initiative, Schneider admitted that the Company needed to do "more" to increase investments in technology and stated, "we need to do it rapidly." Schneider also commented that the Company's

recruitment initiatives had not worked because "on a net basis we are flat on agent count." Schneider also admitted the Company's precarious financial position leading up to the Class Period forced Defendants to take on aggressive commission splits, stating, "we were on a negative trajectory" and "we're probably better off being on market on commissions."

243. During the call, Schneider revealed additional facts regarding the Company's long-standing inefficiencies resulting from Realogy's growth by acquisition strategy, admitting that the Company needed to move more "aggressively in our strategy execution and on streamlining our operations." Schneider noted that the Company's intentional transition away from acquisitions towards organic growth, because the Company's acquisitions failed to be profitable, or "change the bottom line."

244. On May 2, 2019, Realogy filed its Form 10-Q ("1Q19 10-Q") with the SEC, which was signed and certified pursuant to SOX by Schneider and Simonelli, and confirmed the Company's previously announced financial results and financial position. The 1Q19 10-Q commented on the Company's ABCR, stating:

> Since 2014, we have experienced approximately a one basis point decline in the average homesale broker commission rate each year, ***which we believe has been largely attributable to increases in average homesale prices (as higher priced homes tend to have a lower broker commission) and, to a lesser extent, competitors providing fewer or similar services for a reduced fee***.

245. In response to this news, Realogy common stock plummeted 23%, or $3.00 per share on May 2, 2019, and another 9%, or $0.88 per share on May 3, 2019, on unusually heavy trading volume.

246. Several analysts expressed concern and adjusted their estimates following Defendants' disclosures of the Company's poor financial results. For example, on May 2, 2019, J.P.Morgan stated, "revenue came in softer than expected" as well as "some market share was lost." On May 3, 2019, Compass Point downgraded Realogy from "Neutral" to "Sell," and commented that "Realogy clearly looks to be losing market share" with a 5.30% decline in NRT market share on a volume basis which "led its total volume to underperform the overall market by 4.5%."

247. The statements identified in ¶244 above were materially false and misleading or omitted material information when made. Specifically, Defendants' statements that NRT's ABCR only declined "one basis point" each year since 2014, despite the diminishing role of brokers, concealed that the minimal declines were the result of Defendants' undisclosed anti-competitive behavior designed to artificially inflate the ABCR.

### N. The DOJ Announces an Investigation into Anticompetitive Practices in the Real Estate Industry Implicating Realogy's Business

248. On May 22, 2019, media reports revealed that the DOJ opened an investigation into antitrust practices of the real estate industry, which implicated Realogy's operations. That day, *Bloomberg* published an article, "U.S. Opens Antitrust Probe of Real Estate Brokerage Industry," which discussed the investigation, stating, in part:

> U.S. antitrust officials are investigating potentially anti-competitive practices in the residential real estate brokerage business, with a focus on compensation to brokers and restrictions on their access to listings.
>
> The probe was detailed in a civil investigative demand, which is akin to a subpoena, issued by the Justice Department to CoreLogic Inc., which provides real estate data to government agencies, lenders and other housing-market participants.
>
> The U.S. residential real estate industry has long faced criticism that it stifles competition among brokerages, protecting agent commissions that are higher than those paid by sellers in many other countries. In 2008, the Justice Department reached a settlement with the National Association of Realtors, a trade group, that was designed to lower commissions paid by consumers by opening the industry to internet-based brokers.
>
> The investigative demand to CoreLogic, dated last month, follows a lawsuit filed against the Realtors association and real estate broker franchisors, including Realogy Holdings Corp., claiming they conspired to prevent home sellers from negotiating commissions they pay to buyers' agents.

249. After closing at $7.84 per share on May 21, 2019, the price of Realogy stock fell more than 5%, or $0.41 per share, to close at $7.43 on May 22, 2019. The

following day, Realogy stock fell an additional 4% to close at $7.13 per share. That day, *Bloomberg* published an article linking Realogy's two-day stock decline to the DOJ probe. Over the course of these two days, Realogy stock fell more than 9%.

250. All told, Realogy stock fell ***nearly 80%*** from its Class Period high of $34.98 per share on August 7, 2017, to its closing price of $7.13 on May 22, 2019. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Realogy common stock at the artificial inflation was removed, Plaintiff and the other Class members suffered significant losses and damages.

## VI. POST-CLASS PERIOD REVELATIONS

251. On May 30, 2019, Schneider and Simonelli presented at the KBW Mortgage Finance & Asset Management Conference, during which they provided additional details on the Company's reckless disregard for the negative impact that its aggressive commission split plans were having on the Company's profitability. Schneider stated, "the competition has got to such a point where it did actually show up in a negative way in our results . . . so we'll have to compete and deal with it." Moreover, despite the Company's touting the success of its agent recruitment and retention efforts throughout the Class Period, Schneider admitted that the Company "need[ed]" to bring more products into the market to make its "agent[s] more productive" and "efficient" and to help "drive volume . . . agent retention [and] agent recruiting." Schneider confirmed that the Company had been recklessly

disregarding such improvements, stating, "We are a big company, but I feel like we're a diesel engine kind of building momentum with these things" and the Company's need to "get[] up to a very fast speed." He continued, "we've got to be focused on support [to] our agents every single day because in the owned business, they are truly free agents for the whole industry." Schneider further acknowledged the Company' susceptibility to downturns in the real estate industry, stating, "in the weaker housing market we've had recently, you've seen the volatility on the downward side in our owned brokerage business."

252. Simonelli further confirmed the Company's reckless disregard for technological innovations and cost cutting initiatives, stating, "some of the things that were low-hanging fruit to [the consumer packaged goods industry] 20 years ago have not yet happened in this industry . . . and specifically at Realogy" and noting Realogy's need to "prioritize" costs savings and "better value proposition[s] to the agents." When asked specifically about why Realogy is just "now . . . finally catching up" to the efficiencies of its competitors. Simonelli pointed to how Realogy "was built through acquisition" and commented that the Company has "multiple different systems and how businesses operate" stating, "it's very inefficient" to "have multiple people that have to do the same work."

253. On July 10, 2019, Realogy initiated a lawsuit against Compass, styled *Realogy Holdings Corp. v. Urban Compass, Inc.*, No. 653927/2019 (N.Y. Sup. Ct.)

accusing Compass of unfair business practices and illegal schemes to gain market share and to damage, and eliminate, competition. The Company specifically alleged that "Compass offers compensation packages to competitors' employees and real estate agents that are so inflated that Compass is sure to operate at a loss, and not just in the short term." In fact, Realogy alleged that Compass has leveraged more than $1 billion in funding to make up for losses it has incurred by "grossly overpaying – and thus poaching – its competitors' employees and independent real estate agents" "to drive competitors out of the high-end real estate markets" including New York, San Francisco, and Los Angeles. The complaint further detailed how Compass specifically targeted NRT agents, branch managers, and high-ranking executives, stole Realogy's proprietary and confidential internal data, and made false and misleading about Realogy's business to recruit agents.

254. Analysts were quick to comment that the lawsuit raised questions about Realogy's financial capabilities going forward. For example, on July 11, 2019, J.P.Morgan commented that "the outlook for the business in the next several years is very uncertain" and noted that the lawsuit's allegations regarding Compass' escalating recruiting efforts boded "poorly for RLGY and could signal that it's off to an even tougher start to 2019 than we thought" and "the market read the lawsuit as RLGY perhaps not gaining the traction it was hoping for in 2019."

255. On the same day, Barclays issued an analyst report lowering its price target on Realogy from $9.00 to $5.00 and stated that it "view[ed] the timing of this lawsuit as a worrisome indicator around near-terms trends." Barclays further noted, "[b]y 1Q'19, after another year of rising splits, we saw RLGY's intention to curtail split inflation manifest in lost market share with significant underperformance vs. the local market data on the NRT side." Barclays further commented that "the incremental negative, in our view, is the increased likelihood that share loss persists for longer than previously expected."

256. Realogy's NRT business continued to underperform after the close of the Class Period. Specifically, on November 7, 2019, when Realogy reported its 3Q19 financial results, Realogy reported a net loss of $70 million, "driven by a $180 million impairment at NRT." Subsequently explaining the need for the impairment, Realogy's 2019 annual report filed with the SEC on Form 10-K on February 25, 2020, stated that after undertaking an impairment assessment because of the "decrease in stock price of the Company and the impact on future earnings related to the discontinuation of the USAA affinity program,"[9] the impairment assessment

[9] USAA, a financial services group of companies offering banking, investing, and insurance to people and families who serve, or served, in the United States Armed Forces, had a referral relationship with Realogy (managed by Cartus) that provided Realogy with military buyer and seller leads.

"indicated that the carrying value of [NRT] exceeded its estimated fair value by $180 million primarily as a result of a reduction in [NRT's] long-term forecast."

## VII. BY FAILING TO DISCLOSE THE TRUE IMPACT OF THE COMPANY'S AGGRESSIVE AGENT RECRUITMENT INITIATIVES, DEFENDANTS VIOLATED SEC DISCLOSURE RULES

257. SEC rules and regulations explicitly required Defendants to disclose the financial ramifications associated with the Company's strategy to aggressively recruit new agents based on unsustainably high commission splits, especially in higher priced coastal markets such as California, Florida, and New York, during the Class Period. They also required Defendants to disclose the negative impacts on market share and volume that would result from Realogy's efforts to reduce commission split increases by focusing recruitment efforts on outdated data-driven technologies.

258. Item 303, required Realogy's quarterly Forms 10-Q and 10-K to describe "any known trends or uncertainties that have had, or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). This regulation mandates that the Forms 10-Q and 10-K Realogy filed with the SEC during the Class Period disclose "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported

income from continuing operations and, in each case, indicate the extent to which income was so affected."

259. The instructions to Item 303(a) explain that Realogy's Management's Discussion and Analysis ("MD&A") disclosures during the Class Period were to "focus specifically" on material events and uncertainties that would cause the Company's reported financial information not to be necessarily indicative of future operating results, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past" stating, in pertinent part:

> The discussion and analysis shall ***focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past***, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

260. Concerning material events and uncertainties, in 1989, the SEC issued interpretative guidance on Item 303, which states, in pertinent part:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> * * *
>
> Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.

> More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. ***In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.

261. In December 2003, the SEC issued additional interpretative guidance on Item 303 ("2003 Interpretive Release"). This guidance makes clear that Realogy's MD&A disclosures during the Class Period were required to provide disclosures about known demands, events or uncertainties, including, for example, that Realogy's strategy to increase commission splits over the short term for purposes of agent retention and recruitment would have a long-term impact on the Company's future financial results due to the resulting higher expenses associated with higher commissions which were bound to decrease operating EBITDA, unless management determined increased expenses: (a) were not reasonably likely to occur; or (b) they would not have a material effect on the Company's operating EBITDA. The 2003 Interpretive Release states, in pertinent part:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty ***is required unless*** a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

262. As detailed herein, Realogy derives a substantial portion of its revenue from commission splits earned on home sale transactions and the Company's financial performance relies heavily on its relationship with agents. *See, e.g.*, ¶¶2, 37-38.

263. Prior to the beginning of the Class Period, Realogy's commission splits had remained stagnant and Defendants understood that the Company was losing market share from its primary revenue driver, commission revenue at NRT, due to increased competition and a shift to a market allowing more favorable commission terms for agents. *See* ¶¶41-47.

264. Indeed, starting in late 2016, the Company abandoned its long-standing traditional compensation model in favor of a "financial incentives" based recruitment initiative, which focused on targeted recruitment and retention of Tier 1 and Tier 2 agent at NRT by drastically increasing commission splits in order to match or exceed those of its competitors.

265. Given that Defendants closely monitored the competition and tracked commission splits, Defendants knew, but failed to disclose, the Company's operating EBITDA during the Class Period was reasonably likely to be adversely impacted.

266. This was particularly true because starting in 3Q17, Defendants once against pivoted their strategy to in favor of a new technology and "data-driven

strategy" that focused on recruiting and retaining agents through its products and services instead of through further increasing commission splits, which were unsustainable. Here, too, Defendants violated Item 303 by failing to disclose the known trend of market share losses stemming from Defendants' efforts to curtail commission splits in a highly competitive environment, especially in light of the fact that Realogy's data-driven technologies were outdated and in need of a significant upgrade, which would take a long time to develop.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

267. The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that Defendants knowingly made materially false or misleading statements or omissions, or acted recklessly in doing so, during the Class Period.

### A. The Importance of NRT and Agent Retention and Recruitment to the Company's Operations

268. NRT was the Company's largest revenue generating business segment, accounting for 76% of the Company's overall revenues in 2017 and 2018. To that end, NRT and Realogy were heavily dependent on the Company's most productive agents, which generated the "lion's share" of the Company's revenue and 90% of NRT's revenue.

269. Defendants closely monitored and routinely discussed the competitive market for agents, and productive agent attrition, retention, and recruitment

throughout the Class Period, both on conference calls and in the Company's public filings. For example, on February 24, 2017, Smith stated, "we are constantly evaluating and enhancing our agent value proposition" to "attract and retain the best talent in the industry." Realogy's Forms 10-K dedicated a section to "Competition" at NRT and noted that agent recruitment and retention was "critical" to the Company's business and financial results and competition for productive agents was "high."

270. Defendants' focused two initiatives during the Class Period were dedicated to recruiting and retaining productive agents in order to combat the competitive landscape. Defendants discussed these "agent" centered "strategic initiatives" in each of the Company's press releases and SEC filings during the Class Period. Defendants also spoke about them during their prepared remarks on every quarterly earnings call throughout the Class Period, and were repeatedly asked and answered detailed questions by analysts about the progress of the strategic initiatives, the impact and trajectory of commission splits, and the Company's use of technology and product offerings. For example, during the 1Q18 conference call, Schneider stated that the Company's commission splits were an "incredibly important market factor that we are all going to . . . keep watching." Moreover, Realogy's Forms 10-K dedicated multiple pages to discussions about each of "NRT's Initiatives."

271. These facts support the Individual Defendants' investigation, analysis, and direct personal knowledge of the Company's recruitment and retention plans and the negative impact on the Company's financial position as a result. To the extent the Individual Defendants were unaware of such facts, they were reckless in their statements to investors on these subjects.

### B. Defendants' Substantial Experience, Significant Access to Data, and Monitoring of Test Markets

272. Smith, Hull, and Gustavson had years of experience with the residential real estate market, with most of their experience coming from their time at Realogy. Smith led the Company for 21 years before he retired, and held various executive roles with Realogy and its predecessor Company since 1992. Hull had 15 years of experience with the Company before he departed, the last 12 of which he served as the Company's VP, CFO, and Treasurer. Gustavson spearheaded the Company's finance business for 12 years, where his responsibilities included the Company's financial reporting in its SEC filings. Prior to that he was a CPA at a major auditing firm for 16 years. Given their substantial experience and knowledge of the industry, and financial background, Defendants were well aware that the Company had severely outdated commission splits leading into their commissions initiative, and that they would need to be significantly increased to become competitive. For example, during the 3Q17 conference call Smith admitted the Company's below market commission policy was intentional, stating, "[W]e were . . . working very,

very hard" to keep splits "as favorable to us as possible" for the three years leading up to the Class Period. It is also reasonable to infer that given their long-standing time as executive leaders of the Company, Smith, Hull, and Gustavson would have become aware of or recklessly disregarded that the Company was suffering from numerous issues related to outdated technology, inefficient acquisitions, and anti-competitive behavior that either were or would negatively impact Realogy's financial performance.

273. Schneider joined the Company in October 2017, after 15 years of senior leadership in the financial industry, bringing with him "substantial experience" in "regulatory affairs" and a Ph.D. in Economics. Schneider also prides himself on his "tech" background. Schneider worked closely with Smith throughout the CEO transition. Given Schneider's substantial experience in finance, technology, and regulatory affairs, it is reasonable to assume that within a short time of starting at the Company he would have become aware of or recklessly disregarded that the Company was suffering from unsustainable commission splits, outdated technology, inefficient acquisitions, and anti-competitive behavior that either were or would negatively impact its financial performance.

274. Defendants' access to and monitoring of data and test markets further supports their scienter. For example, on January 25, 2018, Schneider hyped Realogy's access to a "huge quantity and quality of historical data" claiming that

"we have access to more national data" than Realogy's competitors. Defendants also had access to, and relied on, machine analytics to better "identify" and "prioritize" high-potential agents for recruiting. During the 1Q19 earnings call, Schneider commented that Defendants "like[d] the results" of new piloted commissions plans. Moreover, discussing Realogy's data-driven initiatives, Schneider explained how "we" use "real-time" "data" to deliver products and services that increase agent value. In addition, when Realogy sued Compass after the Class Period it noted that Realogy's employees (which would undoubtedly include the Individual Defendants) had access to confidential and propriety data regarding unannounced products and services, sales, agent splits, agent production, and commissions.

275. Defendants also had real-time access to data that they used to evaluate the success of Realogy's products on agent retention through the use of test markets. For example, Listing Concierge, one of Realogy's new products for agents, was initially released in one-third of Realogy's markets. During the Company's FY19 conference call, Schneider discussed Defendants' tracking of Listing Concierge, and noted that ABCR was "higher" for Realogy agents using Listing Concierge than those who did not.

276. Based on these facts it is reasonable to infer that Defendants knew or recklessly disregarded that in order to retain and recruit agents based on commission

splits, the Company would have to raise its commission splits to such a high level that the Company's earnings and EBITDA growth would suffer. It is also reasonable to infer that Defendants knew or recklessly disregarded that the Company's technology and product offerings were outdated and, therefore, would take a significant amount of time to counteract agent attrition and leave Realogy unable to meet its financial guidance.

### C. Post-Class Period Admissions Support an Inference of Scienter

277. Defendants' scienter is further supported by post-Class Period admissions. For example, the Individual Defendants admitted that they knew or recklessly disregarded that the Company's technology and product offerings were outdated and, therefore, it would take a significant amount of time to counteract agent attrition. Indeed, during a May 30, 2019, conference, Schneider admitted that the Company "need[ed]" to bring more products into the market to make its "agent[s] more productive" and "efficient" and to help "drive volume," including "agent retention and agent recruiting." Schneider further confirmed that the Company recklessly disregarded the need for such technological improvements and was operating like "a diesel engine" in the face of increased technological improvements.

278. Simonelli also confirmed the Company's reckless disregard for technological innovations and cost cutting initiatives, stating that Realogy failed to implement "low-hanging fruit" from 20 years ago.

279. In addition, post-Class Period admissions further confirm that the Individual Defendants knew or recklessly disregarded that the Company's growth by acquisition strategy resulted in previously undisclosed inefficiencies that negatively impacted the Company's operations. During the May 30, 2019 conference, Simonelli stated that the Company was suffering from "multiple different systems" and business operations, was "inefficient," and had "multiple people that have to do the same work."

**D. Smith, Hull, and Numerous Other Executives Depart**

280. Numerous executive departures, including two of the high-ranking Individual Defendants, in close temporal proximity to revelations regarding the Company's negative financial results, and Schneider taking office, further support an inference of scienter.

281. In 2016, at the same time the Company was facing increased competition, and suffering from declining market share, the Board initiated a leadership succession plan. Smith's transition from the CEO of the Company, was one of the "cornerstones" of the plan.

282. On October 23, 2017, a week before the Company reported negative 3Q17 financial results, it was announced that Schneider would become President and COO of the Company, effective immediately and that he would replace Smith as CEO by December 31, 2017.

283. When Schneider became Realogy's CEO on December 31, 2017, he abruptly made numerous changes to Realogy's executive ranks, which were announced on January 5, 2018. For example, the Company announced that the President and CEO of NRT, Zipf, would be transitioning, to an "executive advisor" role. Zipf was employed by NRT for 20 years, and was the President and CEO of NRT for over a decade. He was replaced by Ryan Gorman, who had served Chief Strategy & Operating Officer of NRT since mid-2016.

284. In addition, it was announced that 21-year veteran CEO and President of Cartus, Kelleher, would, like Zipf, be moved to an "executive advisor" role and that Realogy would search for Kelleher's replacement. Finally, Senior VP and CIO Fraser was replaced with an unnamed executive to be announced within a week. Fraser was hired by the Company for those roles four years earlier. In response to the January 5, 2018 organizational changes, Schneider stated, "The intent of these organizational changes is to drive better results while accelerating the pace of change required to transform our company. We are moving forward quickly."

285. On January 10, 2018, the Company announced the appointment of Gordon as Executive VP and CTO. Gordon previously worked with Schneider at Capital One and had 20 years of leadership experience in technology, innovation, and business operations. Schneider noted that he received positive feedback from the broker community after Gordon's hiring because "[t]hey expect us to invest more

in technology." Commenting on the executive shake-up, Schneider stated, "I want to get the best team I can on the field to support agents, and that started with the changes in January."

286. On November 2, 2018, immediately after Realogy released its 3Q18 financial results, the Company announced that Hull would retire three days later, on November 5, 2018. Commenting on his retirement, Hull acknowledged the Company was in need of new direction, and stated that Schneider would "help guide the company through its next chapter of growth and evolution." Hull remained employed, and therefore compensated, by Realogy as a "senior advisor" to Schneider for the next five months until March 31, 2019. Curiously after leaving Realogy to "retire," in November 2019, Hull took a job as the CFO and Treasurer of Carrols Restaurant Group.

### E. Defendants' Monitoring of the Regulatory Environment Related to the ABCR

287. Throughout the Class Period, Realogy's SEC filings noted that the Company was subject to government regulations including RESPA, created to eliminate abusive practices in the real estate settlement process and to reduce the costs of closings by restricting payments that brokers like Realogy receive in connection with home sale transactions. The Company's Forms 10-K also stated that the DOJ and the FTC have monitored and scrutinized the anti-competitive effect of NAR's MLS services for over a decade. Notably, in June 2018, in the middle of

the Class Period, the DOJ and the FTC held a joint public workshop to discuss competition issues in the real estate brokerage industry, including whether commission sharing by listing brokers was anti-competitive, and whether ABCRs were too high.

288. The workshop was attended by Realogy, including Simon Chen, CEO of Realogy's Electronic Realty Associates Real Estate. According to Chen's biography, one of his responsibilities at Realogy was "enhancing agent recruitment and productivity through the use of technology." Chen was a panelist on the topic of "Developments in Real Estate Fee and Service Models," where the anti-competitive nature of buyer broker commission as offered on the MLS was discussed. During the panel entitled "Regulatory and Industry Factors Affecting Residential Real Estate Competition," a panelist discussed empirical evidence that properties with higher listed broker commissions are more likely to sell faster, which limits broker commission price competition. In addition, during the FY19 conference call, Schneider noted how the Company tracks ABCR "pretty closely." These facts support Defendants' knowledge or reckless disregard of the increased government scrutiny surrounding Realogy's anti-competitive behavior designed to maintain an artificially inflated ABCR. In fact, such scrutiny eventually came to fruition at the end of the Class Period, when the DOJ announced an investigation

into potentially anti-competitive practices in the residential real estate brokerage business, focused on buyer broker compensation.

## IX. LOSS CAUSATION/ECONOMIC LOSS

289. As detailed herein, Defendants' fraudulent scheme artificially inflated the price of Realogy stock by misrepresenting and concealing the true extent of the negative financial impact that the Company's commission split initiatives, including Realogy's ability to attract and retain agents at commission split levels that would generate operating EBITDA growth, outdated technological systems and offerings, inefficient and non-integrated systems from acquisitions, and anti-competitive behavior were having and would have on the Company's financial results, market share, and outlook. Defendants' false or misleading statements and/or omissions, individually and collectively, concealed among other things, that the Company's ongoing adjustments to commission splits would have a long-term, not near-term, detrimental impact on, among other things, Realogy's profitability and EBITDA, substantially weakening Realogy's earnings and outlook. Similarly, Defendants concealed the Company's anti-competitive behavior, and the risks resulting from it, designed to stifle innovation and competition in the real estate market and secure the Company's ABCR, which posed an increased risk of legal liability and regulatory scrutiny to Realogy.

290. Defendants' false and misleading statements and omissions, individually and collectively, concealed Realogy's true business prospects and risks, resulting in Realogy stock being artificially inflated until, as indicated herein, the relevant truth about the Company was revealed through several partial disclosures. These false and misleading statements and omissions had the intended effect of preventing the market from learning the full truth and keeping the price of Realogy stock artificially inflated throughout the Class Period. Indeed, Defendants' false statements and omissions caused, or were a substantial contributing cause of, Realogy stock trading at artificially inflated prices, with the price of Realogy stock reaching $34.98 during the Class Period on August 7, 2017. As the truth began to leak out, the price of Realogy stock declined dramatically, inflicting significant financial harm on the Class.

**A. November 3, 2017**

291. The truth began to emerge before the market opened on November 3, 2017. ¶¶148-163. On that day, Realogy reported its 3Q17 financial results, hosted a conference call, and filed its 3Q17 10-Q. The Company reported decreased EBITDA from "higher commission splits . . . and initiatives designed to attract and retain agents," despite the fact that leading up to this disclosure, Defendants had previously assured investors over the prior two quarters that the 2017 commission

split guidance was "right-sized" and that any "negative pressure" would be limited to 1Q17 and 2Q17.

292. As a result of the information provided to the market, the price of Realogy stock dropped nearly 12%, from a close of $30.39 per share on November 2, 2017, to a closing price of $26.77 per share on November 3, 2017, on elevated trading volume of more than 8.1 million shares.

293. The decline in the price of Realogy stock on November 3, 2017, was the direct result of the nature and extent of the partial revelations made to the market regarding decreased EBITDA and higher commission splits. The partial removal of artificial inflation from the price of Realogy stock would have been greater had Defendants fully disclosed the truth. But, because of Defendants' materially false and misleading statements and omissions, the price of Realogy stock remained artificially inflated.

**B. November 2, 2018**

294. On November 2, 2018, additional problems were revealed to the market. ¶¶208-215. Before the market opened that day, more information was disclosed about Realogy's inability to sustain organic agent growth at commission split levels sufficient to drive sustainable EBITDA, with the Company revising its FY18 EBITDA guidance down as NRT performed below the market and its competitors.

295. On this news, additional artificial inflation was removed from the price of Realogy stock, which declined 11.5%, falling $2.31 from a close of $20.07 per share on November 1, 2018, to close at $17.76 per share on November 2, 2018, on elevated trading volume of more than 9.5 million shares.

296. The partial removal of artificial inflation from the price of Realogy stock on November 2, 2018, was the direct result of the nature and extent of the partial revelations made to the market regarding decreased EBITDA and commission split issues. The partial removal of artificial inflation from the price of Realogy stock would have been greater had Defendants fully disclosed the truth. But, because of Defendants' materially false and misleading statements and omissions, including statements that commission split increases were moderating and that Realogy's new products would enhance value to agents, the price of Realogy stock remained artificially inflated.

**C. February 26, 2019**

297. Additional problems at Realogy shocked investors on February 26, 2019, when Realogy reported missed guidance and negative financial results for 2018, including a year-over-year decline in EBITDA resulting from increased agent commission split costs that were not offset by volume growth. ¶¶219-231.

298. On this news, the price of Realogy stock dropped suddenly. After closing at $17.83 per share on February 25, 2019, Realogy stock collapsed nearly

***21%***, or $3.69 per share, to close at $14.14 per share on February 26, 2019, on unusually high trading volume of more than 12.8 million shares.

299. The additional partial removal of artificial inflation from the price of Realogy stock on February 26, 2019, was the direct result of the nature and extent of the partial revelations made to the market regarding decreased EBITDA, high commission splits, and the inability of Realogy to overcome such issues. The partial removal of artificial inflation from the price of Realogy stock would have been greater had Defendants fully disclosed the truth. But, because of Defendants' materially false and misleading statements and omissions, including statements that any lag or "catch-up" Realogy was playing with commission splits was "over" and that 2019 commission split pressures would not look anything like the "pressure in '17 and '18," and that the Company's technology initiatives were producing traction that would lead to better Company performance, the price of Realogy stock remained artificially inflated.

**D. March 6, 2019**

300. To the additional dismay of investors, news of Realogy's anticompetitive behavior to manipulate ABCR was partially revealed on March 6, 2019, when the Company was sued, along with NAR and several other real estate brokerages, for violating federal antitrust laws by requiring home sellers to pay buyer's broker's commission at inflated rates. ¶234.

301. On this additional partial disclosure of negative news, the price of Realogy stock declined more than 6%, or $0.85 per share, on March 6, 2019, to close at $12.47 per share.

302. This additional partial disclosure removed some of the artificial inflation from the price of Realogy stock and was the direct result of the nature and extent of the partial revelations made in the lawsuit regarding Realogy's anticompetitive behavior. The partial removal of artificial inflation from the price of Realogy stock would have been greater had Defendants fully disclosed the truth.

303. Similarly, on April 15, 2019, a second class action was filed against Realogy, and others, for anticompetitive behavior and involvement in a conspiracy to drive up seller costs through ongoing efforts to require a home seller to pay buyer broker commission rates, "even though the [broker's] involvement in the transaction is minimal." ¶237.

**E. May 2, 2019**

304. Even more problems at Realogy caught investors by surprise on May 2, 2019, when Defendants reported Realogy's 1Q19 financial results and revealed that the Company was substantially underperforming the market and losing market share, unable to sustain organic agent growth at commission split levels sufficient to drive sustainable EBITDA growth, and that Realogy was hamstrung by antiquated technology offerings that were failing to make up for agent attrition. ¶¶238-244.

Investors also learned that the Company's "tuck-in" acquisition strategy and its purported efficiencies had, in reality, inhibited Realogy's financial performance and left it with disparate systems and operating inefficiencies that failed to enhance the Company's bottom line.

305. On this news, the price of Realogy stock dropped suddenly to an ***all-time*** low. After closing at $13.11 per share on May 1, 2019, Realogy stock plummeted nearly ***23%***, or $3.00 per share, to close at $10.11 on May 2, 2019, on a significant increase in trading volume to more than nine million shares traded. On May 3, 2019, Realogy stock fell an additional 8.7% to close at $9.23 per share on elevated trading volume of more than eight million shares traded. All told, the price of Realogy stock fell $3.88 per share, or ***nearly 30%***, between May 2 and 3, 2019, as more than 17 million shares were traded. This additional decline left Realogy stock down an astonishing 62% year-over-year.

306. This additional partial disclosure removed artificial inflation from the price of Realogy stock and was the direct result of the nature and extent of the partial revelations made in Defendants' May 2, 2019 disclosures regarding Realogy's poor financial performance, lost market share and underperformance, inability to grow agent count in a profitable way, the Company's poor product offerings, and the Company's failure to benefit its bottom line from so-called "tuck-in" acquisitions.

### F. May 22, 2019

307. Additional negative news regarding Realogy reached investors on May 22, 2019, when media reports disclosed that the DOJ had initiated an investigation into anticompetitive practices in the residential real estate brokerage business, and that the investigation focused on buyer broker compensation rates. ¶248. This additional disclosure provided credence to the allegations in the two class actions against Realogy described above.

308. On this news, the price of Realogy stock dropped even more. After closing at $7.84 per share on May 21, 2019, the price of Realogy stock fell more than 5%, or $0.41 per share, to close at $7.43 on May 22, 2019. The following day, Realogy stock fell an additional 4% to close at $7.13 per share. Over the course of these two days, Realogy stock fell more than 9%.

309. All told, Realogy stock fell ***nearly 80%*** from its Class Period high of $34.98 per share on August 7, 2017, to its closing price of $7.13 on May 23, 2019.

310. While each of Defendants' misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate the Company's stock price or maintain the artificial inflation in Realogy's stock and give the market the false notion that Realogy's strategic initiatives were successful and the Company was managing competitive threats for agents in a sustainable manner that did not threaten the Company's long-term

profitability or market share, while allowing the Company to increase homesale transaction volume and revenue with high-performing agents identified through a superior access to data and retained with technological offerings that rivaled Realogy's competitors. In addition, Defendants falsely assured investors that Realogy's "tuck-in" acquisitions were beneficial and integrated into the Company such that Realogy was unlocking efficiencies and synergies that would enhance its profitability. Defendants' false and misleading statements and omissions had their intended effect and caused, or were a substantial contributing cause of, Realogy stock trading at artificially inflated levels, reaching as high as $34.98 per share on August 7, 2017.

311. The timing and magnitude of the stock price declines identified above negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The point is supported by the performance graph below, which demonstrates the clear divergence of the price of Realogy stock from the stock prices of Realogy's self-identified peer index[10] as the

---

[10] In Realogy's 2018 10-K, the Company compared Realogy to the S&P Home Builders Select Industry Index, or XHB Index, which "provides a diversified group of holdings representing home building, building products, home furnishings and home appliances," which Realogy "believe[s] correlate[s] with the housing industry as a whole." In fact, a portion of Realogy's 2016, 2017, and 2018 long-term

revelations of the truth became known. Notably, Realogy stock ***fell 80%*** while the Company's peer index ***increased 3%***:




312. In sum, the rapid declines in the price of Realogy stock on the dates identified herein were the direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market. Thus, the revelations of truth, as well as the resulting clear market reactions, support a reasonable inference that the market understood that Defendants' prior statements were misleading. In short, as the truth about Defendants' prior

incentive compensation awards was tied to the relative performance of Realogy's total shareholder return to the S&P Home Builders Select Industry Index.

misrepresentations and concealments was revealed, the price of Realogy quickly sank, the artificial inflation came out of the stock, and Plaintiff and members of the Class were damaged, suffering true economic losses.

313. Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff and Class members on November 3, 2017, November 2, 2018, February 26, 2019, March 6, 2019, May 2, 2019, and May 22, 2019, were the direct and proximate result of Defendants' misrepresentations and omissions that artificially inflated the price of Realogy stock and the subsequent significant declines in the value of the stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

314. At all relevant times, the market for Realogy stock was an efficient market for the following reasons, among others:

(a) Realogy common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, Realogy filed periodic public reports with the SEC and the NYSE;

(c) Realogy regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services

and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Realogy was followed by numerous securities analysts employed by major brokerage firms, including Stephens, J.P.Morgan, Barclays, Evercore ISI, PiperJaffray, Compass Point, and William Blair & Company, who wrote reports that were distributed to those brokerage firms' sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

315. As a result of the foregoing, the market for Realogy stock promptly digested current information regarding Realogy from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Realogy stock during the Class Period suffered similar injury through their purchase of Realogy stock at artificially inflated prices, and the losses they suffered when the artificial inflation was removed, and a presumption of reliance applies.

316. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material, adverse information regarding Realogy's business and operations –

information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

317. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements alleged herein. Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

318. Indeed, the risk warnings that were provided by Defendants in their Class Period statements included boilerplate statements, such as:

- The residential real estate market is cyclical and we are negatively impacted by downturns in this market.
- Adverse developments in general business and economic conditions could have a material adverse effect on our financial condition and our results of operations.
- Competition in the residential real estate and relocation business is intense and may adversely affect our financial performance.

- Market competition, the influence of independent sales agents and the continued execution of our strategic initiatives may continue to shift a higher proportion of homesale commissions to affiliated independent sales agents or otherwise erode our share of the commission income generated by homesale transactions, which could negatively affect our profitability.

- Several of our businesses are highly regulated and any failure to comply with such regulations or any changes in such regulations could adversely affect our business.

- We may not realize anticipated benefits from acquisitions.

- We are reliant upon information technology to operate our business and maintain our competitiveness.

- The price of our common stock may fluctuate significantly.[11]

319. These or other materially similar risk disclosures were disseminated throughout the Class Period and did not serve to adequately inform the market of the true risks and actual operational experience of the Company. Indeed, that these stated warnings were inadequate and provided no new, meaningful information, is evident from the market's reaction to the revelation of Defendants' untrue and/or misleading statements. *See, e.g.*, ¶¶289-313.

320. More specifically, with respect to the risk warning regarding "market competition" and the "execution" of the Company's "strategic initiatives," that supposed risk warning failed to mention that the Company's commission split based

---

[11] *See* Realogy's 2017 10-K, at Part 1. Item 1A (Risk Factors). The 2017 10-K was incorporated by reference into the Company's 1Q18 10-Q to 4Q18 Form 10-Q.

strategic initiative was incapable of achieving sustainable organic agent growth at commission split levels that would not significantly negatively impact the Company's earnings and EBITDA. The risk disclosure also failed to warn that the Company's data-driven initiative would fail to counteract agent attrition because the Company's technology and product offerings were outdated and insufficient to recruit and retain agents. The risk disclosure further failed to warn that the Company was engaged in anti-competitive behavior to maintain an artificially inflated ABCR, subjecting Realogy to increased government scrutiny and intervention that would threaten financial performance. The generic nature of this disclosure is further illustrated by the fact that it was repeated in the Company's 2018 Form 10-K, during a time when Defendants knew and/or recklessly disregarded the negative financial impact of the Company's strategic initiatives, which negatively impacted the Company's EBITDA and resulted in revised guidance in November 2017 and November 2018.

321. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Realogy who knew that the statement was false when made. Moreover, to the extent that Defendants issued any

disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## XII. CLASS ACTION ALLEGATIONS

322. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased Realogy common stock between February 24, 2017, and May 22, 2019, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any defendants have or had a controlling interest.

323. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Realogy stock was actively traded on the NYSE. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that the number of Class members is at least in the thousands and that they are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by Realogy or its transfer agent and may be notified of the pendency of this action by

mail, using the form of notice similar to that customarily used in securities class actions.

324. Plaintiff's claims are typical of the claims of the other members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

325. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

326. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

327. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f) whether the market prices of Realogy stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

**COUNT I:**

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST DEFENDANTS**

328. Plaintiff repeats and re-alleges the allegations in ¶¶1-327 above, as if fully set forth herein.

329. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations

and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

330. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

331. In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to Realogy's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of Realogy stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

332. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases of Realogy stock during the Class Period because, in reliance on the integrity of the market, they paid artificially inflated prices for Realogy stock and experienced losses when the artificial inflation was released from Realogy stock as

a result of the revelations and price decline detailed herein. Plaintiff and the Class would not have purchased Realogy stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Realogy's and the Individual Defendants' misleading statements.

333. By virtue of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II:

## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

334. Plaintiff repeats and re-alleges the allegations set forth in ¶¶1-327 above, as if fully set forth herein.

335. The Individual Defendants acted as controlling persons of Realogy within the meaning of Section 20(a) of the Exchange Act.

336. By virtue of their high-level positions as officers and/or directors of Realogy and/or their substantial ownership of Realogy stock; participation in, awareness of, and ability to control the Company's policies and operations; and/or their intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants, had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and

misleading. The Individual Defendants (either directly or through their representatives on the Board) were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

337. As set forth above, Realogy and the Individual Defendants violated Section 10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the Section 10(b) violation alleged herein. As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Realogy stock during the Class Period, as evidenced by, among others, the stock price decline alleged above, when the artificial inflation was released from the price of Realogy stock.

338. By reason of such conduct, the Individual Defendants, are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: March 6, 2020

SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
CHRISTOPHER L. AYERS

*s/ Christopher A. Seeger*
CHRISTOPHER A. SEEGER

55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
cayers@seegerweiss.com

Local Counsel for Plaintiff

ROBBINS GELLER RUDMAN
& DOWD LLP
JACK REISE (*pro hac vice*)
ROBERT J. ROBBINS (*pro hac vice*)
KATHLEEN B. DOUGLAS
(*pro hac vice*)
BAILIE L. HEIKKINEN (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com
kdouglas@rgrdlaw.com
bheikkinen@rgrdlaw.com

Lead Counsel for Lead Plaintiff

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 6, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification to all counsel of record and paper copies were sent to those indicated as non-registered participants.

*s/ Christopher A. Seeger*
CHRISTOPHER A. SEEGER