SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com

Local Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SASA TANASKOVIC, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | No. 2:19-cv-15053-SRC-CLW |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| REALOGY HOLDINGS CORP., et al., | ) ) | |
| Defendants. | ) ) | |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS <u>ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ...............................................................................1

II.     FACTUAL BACKGROUND................................................................3

        A.      Defendants' Recruitment Initiatives ......................................4

        B.      Tuck-In Acquisitions Fail to Change the "Bottom Line" ....................6

        C.      Defendants Artificially Inflate the ABCR...................................7

        D.      The Truth Emerges Through Multiple Disclosures .............................8

III.    STANDARDS OF LAW ......................................................................10

IV.     THE COMPLAINT PLEADS MATERIAL MISSTATEMENTS
        AND OMISSIONS ............................................................................11

        A.      Defendants' Actionable Misstatements and Omissions......................12

                1.      The Commissions Initiative .........................................12

                2.      The Technology Initiative...........................................17

                3.      Realogy's Growth-By-Acquisition Strategy...........................18

                4.      The ABCR......................................................................19

        B.      The Complaint Does Not Plead Fraud-By-Hindsight.........................21

        C.      Defendants Had a Duty to Disclose Omitted Facts...........................22

        D.      Defendants' Statements Are Not Puffery.........................................25

        E.      The PSLRA's Safe Harbor Is Inapplicable ......................................29

        F.      Defendants' Purported Opinion Statements Are Actionable ..............34

        G.      Plaintiff's Commission Split Guidance Allegations Are Timely .......35

V.      THE COMPLAINT ADEQUATELY PLEADS SCIENTER ......................37

        A.      Considered Holistically, Plaintiff's Allegations Give Rise to a
                Strong Inference of Scienter................................................................38

- i -

**Page**

1.    The Importance of NRT and Its Operations ............................39

2.    Defendants' Positions and Experience, Access to Data, and the Specificity of Their Statements ....................................40

3.    Admissions and Post-Class Period Events................................42

4.    Defendants' Active Monitoring of the ABCR..........................43

5.    Plaintiff's Other Scienter Allegations......................................44

B.    Plaintiff's Inference of Scienter Is More Compelling than Defendants' Opposing Inference........................................................46

VI.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION........47

VII.    CONTROL PERSON LIABILITY IS ADEQUATELY ALLEGED...........50

VIII.    CONCLUSION........................................................................................50

# TABLE OF AUTHORITIES

**Page**

## CASES

*Advanta Corp. Sec. Litig.*,
180 F.3d 525 (3d Cir. 1999) .........................................................................27, 38

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
No. CIV. 03-1519, 2012 WL 1680097 (D.N.J. May 14, 2012) ........................36

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009) ............................................................................17

*Angres v. Smallworldwide PLC*,
94 F. Supp. 2d 1167 (D. Colo. 2000)................................................................18

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..........................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................10

*Bensel v. Allied Pilots Ass'n*,
387 F.3d 298 (3d Cir. 2004) .............................................................................36

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...........................................................................30

*Cal. Pub. Emps'. Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) .......................................................................16, 22

*City of Hialeah Emps.' Ret. Sys. v. Toll Bros., Inc.*,
No. CIV.A. 07-1513, 2008 WL 4058690 (E.D. Pa. Sept. 2, 2008)...................31

*Curran v. Freshpet, Inc.*,
No. CV 16-2263, 2018 WL 394878 (D.N.J. Jan. 12, 2018)...................22, 25, 31

*Dow Corning Corp. v. BB&T Corp.*,
No. CIV. 09-5637 FSH PS, 2010 WL 4860354
(D.N.J. Nov. 23, 2010)......................................................................................24

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................47, 48, 49

**Page**

*Emps. Ret. Sys. of the P.R. Elec. Power Auth. v. Conduent Inc.*,
No. CV198237SDWSCM, 2020 WL 3026536
(D.N.J. June 5, 2020) ........................................................................14, 18, 27, 47

*EP Medsystems, Inc. v. Echocath, Inc.*,
235 F.3d 865 (3d Cir. 2000) .....................................................................11, 38

*Epstein v. World Acceptance Corp.*,
203 F. Supp. 3d 655 (D.S.C. 2016) ................................................................44

*Fain v. USA Techs. Inc.*,
707 F. App'x 91 (3d Cir. 2017) .....................................................................40

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......................................................*passim*

*Glover v. DeLuca*
No. 2:03-CV-0288, 2006 WL 2850448 (W.D. Pa. Sept. 29, 2006) ...................28

*Glover v. FDIC*,
698 F.3d 139 (3d Cir. 2012) ..........................................................................37

*Hall v. Johnson & Johnson*,
No. CV 18-1833 (FLW), 2019 WL 7207491
(D.N.J. Dec. 27, 2019) ...................................................................................49

*Hughes v. Panasonic Consumer Elecs. Co.*,
No. CIV.A. 10-846 SDW, 2011 WL 2976839
(D.N.J. July 21, 2011) ....................................................................................28

*In re Adams Golf, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) ..........................................................................26

*In re Allergan Generic Drug Pricing Sec. Litig.*,
No. CV169449KSHCLW, 2019 WL 3562134
(D.N.J. Aug. 6, 2019)................................................................................39, 49

**Page**

*In re AT&T Corp. Sec. Litig.*,
  No. CIV. 00-CV5364(GEB), 2002 WL 31190863
  (D.N.J. Jan. 30, 2002) .....................................................................................26

*In re Bradley Pharms., Inc. Sec. Litig.*,
  421 F. Supp. 2d 822 (D.N.J. 2006) ...........................................................40, 48

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. June 19, 2001) ....................................................50

*In re CommVault Sys., Sec. Litig.*,
  No. 14-CV-5628 (PGS), 2016 WL 5745100
  (D.N.J. Sept. 30, 2016) ...................................................................................17

*In re Datatec Sys. Sec. Litig.*,
  No. 04-CV-525 GEB, 2006 WL 3095951 (D.N.J. Oct. 30, 2006).....................28

*In re Enzymotec Sec. Litig.*,
  No. CV145556JLLMAH, 2015 WL 8784065
  (D.N.J. Dec. 15, 2015) ..............................................................................*passim*

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  411 F. Supp. 2d 377 (S.D.N.Y. 2006) ..............................................................36

*In re Heartland Payment Sys., Inc. Sec. Litig.*,
  No. CIV. 09-1043, 2009 WL 4798148 (D.N.J. Dec. 7, 2009) ..........................30

*In re Henry Schein, Inc. Sec. Litig.*,
  No. 18-CV-01428 (MKB), 2019 WL 8638851
  (E.D.N.Y. Sept. 27, 2019)................................................................................20

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  No. CV 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017), *aff'd*,
  905 F.3d 106 (3d Cir. 2018) .......................................................................31, 46

*In re Intelligroup*,
  468 F. Supp. 2d 670 (D.N.J. Dec. 20, 2006) ....................................................50

**Page**

*In re Lincoln Educ. Servs. Corp. Sec. Litig.*,
No. CIV.A. 10-460 SRC, 2011 WL 3912832 (D.N.J. Sept. 6, 2011) ..........13, 31

*In re Lucent Techs., Inc. Sec. Litig.*,
217 F. Supp. 2d 529 (D.N.J. 2002)....................................................27, 30, 32, 36

*In re Merck & Co. Sec., Derivative, & "ERISA" Litig.*,
No. CIV.A. 05-1151 SRC, 2011 WL 3444199 (D.N.J. Aug. 8, 2011) .......*passim*

*In re MobileMedia Sec. Litig.*,
28 F. Supp. 2d 901 (D.N.J. 1998).......................................................................28

*In re Navient Corp. Sec. Litig.*,
No. CV 17-8373 (RBK/AMD), 2019 WL 7288881
(D.N.J. Dec. 30, 2019) .......................................................................................40

*In re NutriSystem, Inc. Sec. Litig.*,
653 F. Supp. 2d 563 (E.D. Pa. 2009)..................................................................31

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) .............................................................46

*In re Resource Am. Sec. Litig.*,
No. CIV. 98-5446, 2000 WL 1053861 (E.D. Pa. July 26, 2000) .......................17

*In re Salix Pharms., Ltd.*,
No. 14-CV-8925 (KMW), 2016 WL 1629341
(S.D.N.Y. Apr. 22, 2016)....................................................................................33

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) .................................................................................42

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 CIV. 6728 (CM), 2018 WL 6167889
(S.D.N.Y. Nov. 26, 2018) ...................................................................................35

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015).............................................24, 30, 48, 49

**Page**

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
No. CV157658MASLHG, 2017 WL 1658822
(D.N.J. Apr. 28, 2017) ....................................................................15, 20, 38, 45

*In re Veritas Software Corp. Sec. Litig.*,
No. 04-831-SLR, 2006 WL 1431209 (D. Del. May 23, 2006) .........................32

*In re ViroPharma, Inc. Sec. Litig.*,
No. CIV.A. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003)....................26

*In re ViroPharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458 (E.D. Pa. 2014)............................................................*passim*

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) ............................................................................12

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) ..............................................................27

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ..............................................................................25

*Inst'l Inv'rs Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ......................................................................*passim*

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
No. 0:15-CV-02393-MGL, 2016 WL 3981236
(D.S.C. July 25, 2016) ...............................................................................19, 41

*Laborers' Int'l Union v. Foster Wheeler Energy Corp.*,
26 F.3d 375 (3d Cir. 1994) .........................................................................26, 29

*Li v. Aeterna Zentaris, Inc.*,
No. CV3147081PGSTJB, 2016 WL 3583821
(D.N.J. Jun. 30, 2016)......................................................................................45

*Lormand v. Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ......................................................................22, 42

**Page**

*Luczak v. Nat'l Bev. Corp.*,
   812 F. App'x 915(11th Cir. 2020) ...................................................................46

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ................................................................41, 43, 46

*Martin v. GNC Holdings, Inc.*,
   No. 2:15-CV-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) ...................49

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)..................................................................................11, 22

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010)...............................................................................35, 36

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019) ..............................................15, 25, 35, 45

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd*, 771 F. App'x 551
   (2d Cir. 2019).......................................................................................30

*Omanoff v. Patrizio & Zhao LLC*,
   No. CIV.A. 14-723, 2015 WL 1472566 (D.N.J. Mar. 31, 2015) .................47, 49

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.
   Pension Fund*,
   575 U.S. 175 (2015)........................................................................24, 27, 31, 35

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000) .........................................................................25

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ....................................................................10, 50

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) .........................................................................32

*SEPTA v. Orrstown Fin. Servs. Inc.*,
   No. 1:12-CV-00993, 2016 WL 466958 (M.D. Pa. Feb. 8, 2016).......................45

**Page**

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992) ..................................................................28

*Sitzer v. Nat'l Association of Realtors, Realogy Holdings Corp.*,
    No. 4:19-cv-00332-SRB (W.D. Mo. Oct. 16, 2019) .........................................21

*Steiner v. MedQuist Inc.*,
    No. CIV. 04-5487 (JBS), 2006 WL 2827740
    (D.N.J. Sept. 29, 2006) ..................................................................20

*Stratte-Mcclure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ...............................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................10, 37, 38, 40

*Tomaszewski v. Trevena, Inc.*,
    No. CV 18-4378, 2020 WL 5095865 (E.D. Pa. Aug. 28, 2020) ........................38

*Underland v. Alter*,
    No. CIV.A. 10-3621, 2012 WL 2912330 (E.D. Pa. July 16, 2012) .............24, 25

*Utesch v. Lannett Co.*,
    385 F. Supp. 3d 408 (E.D. Pa. 2019)..................................................44

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    No. CIV.A. 13-6731, 2015 WL 3755218 (E.D. Pa. June 16, 2015) ......22, 26, 45

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
    426 F. Supp. 3d 864 (D. Kan. 2019)..........................................*passim*

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §78u-5(c)(1)(A)(i)...............................................................29

Fedederal Rules of Civil Procedure
    Rule 15(c)................................................................................36
    Rule 15(c)(2)............................................................................36

17 C.F.R. §229.303(a)(3)(i)-(ii)............................................................24

**Page**

## SECONDARY AUTHORITIES

*Near-term*, CAMBRIDGE DICTIONARY,
https://dictionary.cambridge.org/us/dictionary/english/near-term
(last visited Aug. 20, 2020)...................................................................................16

Lead Plaintiff Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants'[1] Motion to Dismiss the Amended Class Action Complaint ("Mem.").[2]  ECF No. 36.

## I.    INTRODUCTION

This securities fraud action seeks damages resulting from Defendants' false or misleading statements and omissions during the February 24, 2017 to May 22, 2019 Class Period.  Realogy is a leading provider of residential real estate services and is the country's largest residential real estate brokerage.  Leading up to the Class Period, Realogy's business suffered from a "traditional" compensation model that intentionally paid "critical" agents below-market commission splits, as well as outdated technology and product offerings.  To combat competition and maintain market share, Defendants implemented two initiatives focused on agent recruitment and retention: increasing commission splits; and revamping "data-driven" services.

Defendants, however, repeatedly misled investors by misrepresenting that Realogy's commission split adjustments would only impact "near-term"

---

[1]  "Defendants" are Realogy Holdings Corp. ("Realogy" or "Company") and the "Individual Defendants" are Richard A. Smith ("Smith"), Ryan M. Schneider ("Schneider"), Anthony E. Hull ("Hull"), and Timothy B. Gustavson.

[2]  The "Complaint" is ECF No. 27 and is cited as "¶__".  All defined terms used herein are the same as in the Complaint and have the same meaning here.

profitability and EBITDA and that its technology and product offerings were capable of countering agent attrition and driving profitability.  In fact, intense competition was driving commission splits to even higher levels and Realogy's products remained antiquated.  Defendants also repeatedly touted Realogy's "tuck-in" growth-by-acquisition strategy.  Due to undisclosed inefficiencies and costs, however, Defendants knew that acquisitions inhibited Realogy's financial performance, causing Realogy to abruptly shift its focus to organic growth in 2018. Defendants also failed to disclose that Realogy was intentionally engaged in behavior designed to artificially inflate the Average Broker Commission Rate ("ABCR"), subjecting Realogy to increased risks, including liability and regulatory scrutiny.  As a result of such ABCR related conduct, two class action lawsuits were filed against Realogy and the Department of Justice ("DOJ") initiated an investigation into the industry.  When the truth began to emerge through a series of partial disclosures, the market was stunned, Realogy's common stock price plunged as the artificial inflation was removed, and investors suffered damages.  Altogether, Realogy's stock price fell nearly 80% from its Class Period high.

Faced with the Complaint's well-pled allegations, Defendants improperly offer a counter-narrative and argue this case is based on fraud-by-hindsight.  The Complaint's allegations, however, when considered in totality as binding precedent requires, demonstrate that Defendants knowingly or recklessly made numerous

materially false and misleading statements and omitted material facts they had a duty to disclose. Defendants' motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

Realogy is the country's largest residential real estate brokerage. ¶32. Realogy's NRT segment, which owns, operates, and franchises real estate brokerage businesses in the country's largest metro areas, accounts for 76% of Realogy's revenue. ¶38.[3] Realogy's listings are sourced through agents, and its ability to recruit and retain productive agents is "critical" to its financial results, with agents generating 90% of NRT's revenue through commissions earned on home sales. ¶42. Due to its size, Realogy historically enjoyed a competitive advantage in attracting and retaining agents, allowing Realogy to keep expenses down, and sales transaction revenues high, by offering below-market commission splits to agents while allowing its products and services to age without technological improvement. ¶46.

Leading up to the Class Period, however, Realogy faced intense competition for its highly coveted agents. ¶¶41-43. Online competitors minimized the roles that agents play in home sales, while non-traditional brokers like Compass, "grossly overpay[ed]" agents with commission splits as high as 95% to 100%. *Id.* Unable to keep pace with competitors, Realogy faced a mass exodus of its top-tier agents,

---

[3]    NRT's performance and profitability bolsters Realogy's other segments, including RFG which derives a royalty from NRT-based franchises. ¶39.

- 3 -

which compressed Realogy's market share and forced it to make dramatic changes. *Id.* During the Class Period, Defendants implemented initiatives and practices designed to counteract declining market share, and agent attrition, while maintaining sustainable growth. But Defendants failed to disclose that Realogy was incapable of doing so without negatively impacting long-term profitability. ¶¶48-50.

### A.    Defendants' Recruitment Initiatives

Realogy's "Commissions Initiative" sought to target, recruit, and retain top tier agents at NRT by increasing commission splits to "catch up" with its competitors. ¶52. Defendants routinely discussed the Commissions Initiative, but failed to disclose that Realogy's prior, below-market commissions strategy had (as admitted by Schneider) put Realogy on a "negative [financial] trajectory." ¶242. Attracting agents was, unbeknownst to investors, no easy, task. Realogy had to make up for "*3 years*" (since 2014) of underperforming the market on splits while also facing ongoing "upward" pressure from aggressive competitors. ¶¶46, 52, 61, 243, 272.

Nevertheless, Defendants touted the Commissions Initiative as the gateway to "growing market share" and "sustainable organic growth" (¶¶127, 137), and assured the market no less than 17 times that the initiative would only put "*near-term*" "moderate" negative pressure on margins. *See, e.g.*, ¶137; Mem. at 17 n.4. Defendants affirmed NRT's "right-sized" 2017 commissions split guidance and

- 4 -

stated that any pressure would be "mitigated" by increased earnings at NRT, with "immediate[]" benefits to Realogy's other segments. *See, e.g.*, ¶¶100-102. On its face, Defendants' plan was successful, artificially inflating Realogy's stock price to a Class Period peak of $34.98 per share on August 7, 2017. ¶250. In truth, it took Realogy over two years to counteract competition, which negatively impacted Realogy's EBITDA and revenues as more money went to paying agents and improving technology. ¶¶98-245.

On October 23, 2017, Realogy announced that Schneider would become Realogy's new President and COO. ¶282. On November 3, 2017, Defendants surprised investors by announcing negative 3Q17 financial results, including decreased EBITDA from "higher" splits. ¶291. In response, Realogy stock fell 12%, closing at $26.77 per share on November 3, 2017. ¶292. Although Defendants increased NRT's "right-sized" 2017 commission split guidance (¶155), Defendants eased investor concern by stating the "balancing act" between market share gains and splits had "been accomplished" and that splits would "stabiliz[e]" in 2018. ¶¶157-158.

By 2018, the Commissions Initiative failed to counteract competition, and the negative financial effects of rising splits continued. ¶64. Schneider promptly replaced NRT's long-standing President and CEO and Realogy's CIO, among others, to "drive better results" and "transform" Realogy. ¶¶65, 284. Schneider also

- 5 -

pivoted Realogy to a "Technology Initiative" focused on providing agents with "data driven" offerings. ¶¶66, 167. Unbeknownst to investors, however, Defendants concealed that Realogy had neglected technological improvements for so long that its products operated like an outdated "diesel engine," and the Technology Initiative was incapable of counteracting competition in the short term. ¶251.

Despite this, Defendants told investors that the Technology Initiative was successfully growing the ranks of productive agents through "compelling service, data and technology products to allow them to increase productivity." ¶¶70, 194. Hull noted that Realogy's initiatives would result in "improved EBITDA growth for the company as a whole." ¶¶68, 172. Defendants assured the market that the negative pressure from rising splits would "substantial[ly]" moderate, and reiterated that 2Q18 through 4Q18 Operating EBITDA guidance would be equal to or better than 2017 results. ¶¶71, 173-174, 184-185, 195.

### B.      Tuck-In Acquisitions Fail to Change the "Bottom Line"

Realogy's historical growth strategy was rooted in both tuck-in acquisitions and organic growth through agent recruitment and retention. ¶72. For example, NRT represented a combination of more than 500 companies. ¶¶38, 73. Although Realogy's acquisition strategy grew the Company, it masked declining market share and, as admitted by non-defendant CFO Charlotte Simonelli ("Simonelli") and Schneider, saddled Realogy with unprofitable acquisitions that failed to "change the

bottom line." ¶¶72-74, 243. Put simply, Realogy's growth-by-acquisition strategy left it scarred with financial and operational "inefficien[cies]," including multiple operating systems and responsibility overlap. ¶¶72-74, 252. Despite this, Defendants touted the benefits of Realogy's acquisitions, claiming they "enhance profitability," by "reduc[ing] or eliminat[ing] duplicative costs." ¶73. When Realogy announced on February 27, 2018, that it was abandoning acquisitions, Defendants misleadingly blamed "pricing," while omitting the negative financial and operational consequences from poorly integrated acquisitions. ¶¶72-74, 175.

### C. Defendants Artificially Inflate the ABCR

Realogy faced competition from industry start-ups and "disrupters" that offered lower broker commissions on real estate transactions. ¶75. To combat this, Realogy and other industry stalwarts intentionally maintained and inflated the ABCR, by ensuring that brokers (like Realogy) could charge buyer broker commissions of 2.5%-3.0% of a home sale, which was critical to Realogy's financial performance, despite the fact that most home buyers rely on online listing sites to find homes and only retain a broker after a property has been selected. ¶¶75-79, 234-237. By engaging in such behavior, Realogy intentionally inflated the ABCR. *Id.* Meanwhile, Defendants commented on the "remarkably strong and stable" ABCR, and credited "modest declines" to the ABCR to external sources like home prices and competition. ¶¶80, 104. For example, Schneider stated he was

- 7 -

"encouraged by how little traction disruptors have gotten by attacking the [ABCR] over the years." ¶176. Defendants, however, never disclosed their efforts were manipulating the ABCR or the risks associated with their misconduct.

### D.     The Truth Emerges Through Multiple Disclosures

On November 2, 2018, Realogy revealed it was withdrawing its previously reiterated 2018 operating EBITDA guidance, that operating EBITDA for 3Q18 had declined, and that "volume at NRT was flat." ¶208. But Defendants assured investors that commission split increases were "moderating" and would moderate "further" in 4Q18, and Schneider hyped the Technology Initiative's success in improving Realogy's results. ¶¶211, 274. On this news, Realogy stock fell 11.5%, closing at $17.76 on November 2, 2018. ¶¶217, 295. Right after, Realogy announced that Hull would retire, effective almost immediately. ¶216.

Before the market opened on February 26, 2019, Realogy again surprised investors by reporting negative FY18 financial results, including decreased operating EBITDA attributed to "higher" commission splits and a 65% decline in EPS compared to 2017. ¶¶85, 221. Despite these negative results, Defendants made positive statements regarding commission splits, market growth, and increasing ABCR. ¶¶86, 223, 229-230. Schneider stated that Realogy was "over" playing catch-up with its competitors. ¶¶86, 299. On this news, Realogy common stock plunged another 20% on February 26, 2019, closing at $14.14 per share. ¶¶87, 298.

Additional negative news was partially revealed to the market on March 6, 2019, when Realogy, among others, was sued in a class action lawsuit for its anti-competitive behavior to maintain an artificially inflated ABCR through buyer broker commissions. ¶¶13, 88, 234. In response, the price of Realogy stock declined more than 6% on March 6, 2019, to close at $12.46 per share. ¶¶13, 88.[4]

On May 2, 2019, Realogy shocked investors and reported negative 1Q19 financial results, revealing that its homesale transaction volume for the quarter decreased twice as much as the overall market. ¶¶238, 244, 304-306. Schneider conceded that Realogy needed to do "more" "rapidly" to increase technology investments, that Realogy was on a "a negative trajectory" at the start of the Class Period, and that "we're . . . better off being on market on commissions." ¶¶91, 242. EBITDA decreased again and despite two recruitment initiatives and agent count was "flat." ¶¶14, 91. Contrary to his prior assertion blaming pricing, Schneider admitted Realogy abandoned its acquisition strategy because it failed to increase the "bottom line." ¶¶92, 243. On this additional negative news, Realogy stock plummeted *23%*, to close at $10.11 per share on May 2, 2019, and fell another 8.7% on May 3, 2019, to close at $9.23 per share. ¶¶14, 93, 305.

The Class Period ends on May 22, 2019, when media reports disclosed the

---

[4] A second class action alleging substantially similar facts was filed on April 15, 2019 (collectively, "ABCR Actions"). ¶¶13, 88, 237.

DOJ's investigation into anti-competitive practices in the real estate brokerage industry, giving credence to the ABCR Actions.  ¶¶15, 94, 248, 307.  In response, the price of Realogy stock fell 5% to close at $7.43 per share on May 22, 2019, and another 4%, the following day, to close at $7.13 per share.  ¶¶15, 249, 308.  All told, Realogy stock fell nearly **80%** from its Class Period high, causing substantial damages to Plaintiff and members of the Class as the artificial inflation was removed from the price of Realogy stock.  ¶¶16, 250, 309.

## III.   STANDARDS OF LAW

Under Rule 12(b)(6), the Court must consider the Complaint in its entirety and "accept all factual allegations . . . as true" and construe all reasonable inferences in Plaintiff's favor.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The issue "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims."  *In re Merck & Co. Sec., Derivative, & "ERISA" Litig.*, 2011 WL 3444199, at *2 (D.N.J. Aug. 8, 2011) (J. Chesler).  Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

To state a claim for securities fraud under §10(b) of the Exchange Act and

- 10 -

SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants argue Plaintiff failed to plead any material misstatements or omissions, scienter, and loss causation. Defendants are wrong and their motion should be denied.

## IV. THE COMPLAINT PLEADS MATERIAL MISSTATEMENTS AND OMISSIONS

The Complaint establishes that Defendants made materially false statements and omissions during the Class Period. Rule 10b-5 prohibits not only literally false statements, but also omissions of material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. . ." *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 871 (3d Cir. 2000). "[A] misrepresentation or omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Id.* at 872. A complaint adequately pleads falsity with particularity if it specifies "the who, what, when, where and how" of a defendant's statements. *Inst'l Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

The Complaint readily satisfies this requirement by identifying the time, place, and content of each misstatement (¶¶98-108, 111-122, 125-139, 142-46, 148-

- 11 -

163, 167, 169-179, 182-190, 193-205, 209-215, 220-231, 244); by whom it was made (*id.*); the reason it was misleading (¶¶110, 124, 141, 147, 166, 181, 192, 207, 218, 233, 247); and why the misrepresented information was material to a reasonable investor (¶¶37-38, 97, 262).  At this stage, nothing more is required.

### A.    Defendants' Actionable Misstatements and Omissions

The Complaint alleges that Defendants made materially false and misleading statements regarding Realogy's: (1) Commissions Initiative; (2) Technology Initiative; (3) acquisitions; and (4) the ABCR.[5]  While "slightly distinct" from each other, Defendants' statements were "all collectively aimed at perpetuating a broader, material lie" that Realogy was capable of counteracting increased competition, agent attrition, and declining market share, without a long-term negative impact on profitability.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("Where a company seeks fraudulently to hide a particularly large problem . . ., it is quite probable that the company will have to lie about a number of related topics").

### 1.    The Commissions Initiative

Defendants made false and misleading statements and omissions regarding the long-term negative financial impact associated with the Commissions Initiative. ¶¶97, 289.  When considered in context, Defendants' statements falsely represented

---

[5]   In analyzing falsity, "it is not necessary to identify each allegedly offending statement."  *Merck*, 2011 WL 3444199, at *7 (analyzing falsity by categories).

- 12 -

that: (i) the initiative could successfully attract and retain agents, at commission split levels that would generate "sustainable organic growth" and increase Realogy's profitability (*see, e.g.*, ¶¶98-99, 103, 105, 127, 129); (ii) any negative impact from rising splits would be "near-term," "mitigated" by revenue at NRT and Realogy's other segments (*see, e.g.*, ¶¶100-101, 105-106), and "substantially moderate" by 2018 and through 2019 (*see, e.g.*, ¶¶100-101, 105-106, 132, 226, 229);[6] and (iii) the initiative would not negatively impact Realogy's ability to meet or exceed its 2017 commission split guidance or FY18 operating EBITDA guidance (¶¶101-102, 116-119, 126, 130, 171).[7] Defendants' statements were material because they concerned Realogy's efforts to attract "critical" agents at NRT, which was responsible for the "lion's share" of Realogy's revenues. ¶¶37-38, 42; *see Freudenberg v. E\*Trade Fin.*

---

[6] Defendants argue they "never said" the negative impact of rising commission splits would be limited to the first half of 2018. Mem at 19. But during the 2Q17 call, Hull stated that: Realogy was no longer "seeing extreme pressure" from competition on splits; there would be "less" pressure on splits in Q3 than "in Q2" with splits "drop[ing] off in Q4"; Realogy had "ways to offset" the "normal pressure" from increased competition; and any negative impact was limited to "near-term moderate pressure on margins." ¶¶57, 128, 131, 132. These statements gave the false impression that by Q217, the bulk of the negative impact on Realogy's financials had already occurred, and any future impact would be substantially less or offset. ¶141. These allegations must be taken as true, and Defendants' interjection of alternative meanings to their statements is improper. *In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458 at 470 n.20 (E.D. Pa. 2014).

[7] Unlike in *In re Lincoln Educ. Servs. Corp. Sec. Litig.*, 2011 WL 3912832 (D.N.J. Sept. 6, 2011), here, Plaintiff does more than "snip[] selective words" from Defendants' statements and the duration of the financial impact of rising commission splits was material to investors. Mem. at 19; *see* §IV.A.1.

*Corp.*, 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010) (statements concerning a "segment . . . of the [] business that . . . play[s] a significant role in the [company's] operations or profitability" are material).

The Complaint plausibly alleges that when Defendants made these statements, Realogy was incapable of generating commission split levels necessary to increase agent retention and recruitment, transaction volume and market growth, without a long-term negative impact on Realogy's financial condition. ¶¶46, 51-71, 110, 124, 141, 147, 166(a)-(c), 181(b)-(c), (e), 192(b)-(c), (e), 207(b)-(c), (e), 218(b)-(c), 232(b)-(c). At the time these statements were made, Realogy had to make up for "*3 years*" of below-market commissions splits (¶¶46, 52, 61, 272) while also overcoming "upward" pressure on splits stemming from competitors willing to "grossly overpay[]" agents. ¶¶46, 253. Continuously rising splits increased NRT's expenses and, in turn, negatively impacted Realogy's EBITDA. ¶¶62, 64. By 2Q17, splits increased 150 basis points year-over-year ("YOY") to 70.6%, and by 2Q18 had increased 209 basis points YOY, soaring to 72.7%. ¶206; Mem. at 9-10. In truth, it would take Realogy over 27 months (not "15 months" (Mem. at 8)) to reach competitive splits, all while negatively impacting revenues and EBITDA. ¶¶81-96.

Given these facts, Defendants' statements regarding the Commissions Initiative are actionable. *See Emps. Ret. Sys. of the P.R. Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536, at *5 (D.N.J. June 5, 2020) (statements giving

- 14 -

"the misleading impression that [Company] would be able to achieve profitable growth based on its progress with [] Strategic Transformation," to modernize information technology, were actionable).[8]

Defendants incorrectly fault Plaintiff for not relying on internal documents or confidential witnesses (Mem. at 18) even though no such obligation exists. *See In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *11 (D.N.J. Apr. 28, 2017) ("lack of citations to confidential informants and internal documents does not preclude the Court from finding sufficient allegations").[9] Defendants also ignore that literally "accurate" statements (Mem. at 18-19) can be actionably misleading when viewed in context. *See Merck*, 2011 WL 3444199, at *9. While commission splits may have "moderate[d]," Defendants' statements were misleading because they failed to disclose that despite moderation, splits *still* needed to increase substantially and would negatively impact Realogy's financial performance. ¶¶52-64, 71, 181(b), 272-273.

---

[8]  *See also Yellowdog Partners, LP v. CURO Grp. Holdings Corp*., 426 F. Supp. 3d 864, 870 (D. Kan. 2019) (finding statements regarding the "strategy and timing of the transition . . . which [] was bound to have a substantial undisclosed impact on financial performance" as actionable); *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *13 (D.N.J. Dec. 15, 2015) (statements regarding "sustainable" nature of business actionable).

[9]  *See also Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38 (S.D.N.Y. 2019) (denying motion to dismiss, finding "this Court is aware of no authority requiring confidential witness allegations").

- 15 -

Finally, Defendants interject an improper factual dispute as to whether investors understood "near-term" to mean that the negative impact of rising splits would last 27 months.[10] Mem. at 20; *see ViroPharma*, 21 F. Supp. 3d at 470 n.20 (rejecting defendants' alternative version of the facts, noting plaintiff is entitled "to discovery to flesh out the truth of the narrative"). This argument also amounts to an improper truth on the market defense, which is "inappropriate" at the motion to dismiss phase. *Enzymotec*, 2015 WL 8784065, at *16. Defendants further ignore that their constant reassurances of only "near-term" pressure prevented investors from learning the truth.[11] *See Merck*, 2011 WL 3444199, at *35 (rejecting truth on the market defense where defendants made "repeated reassurances" to counteract the negative information). Lastly, the stock price reaction to corrective disclosures revealing the financial impact of the Commissions Initiative (¶¶164, 217, 232, 245)

---

[10] It is nonsense to suggest that "near-term" means 27 months (or even 15 months) because "near-term" means "relating to what will happen soon and not what will happen further in the future". *See Near-term*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/near-term (last visited Aug. 20, 2020); *see also* FASB Accounting Standards Codification Master Glossary (defining "near term" for accounting purposes, as a "period of time not to exceed one year from the date of the financial statements.").

[11] Defendants' continuous reassurances of the time-frame of the negative impact distinguishes this case from *Cal. Pub. Emps'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 156 (3d Cir. 2004), where plaintiffs' falsity allegations amounted to mere "anecdotal examples" of "profitable customers lost or policies renewed at flat or slightly raised rates" and defendants repeatedly disclosed that the "initiative was expected to and was indeed causing the loss of profitable business." Mem. at 19-20.

demonstrates that the disclosures were "material" and not "previously available to the market." *See In re Resource Am. Sec. Litig.*, 2000 WL 1053861, at *5 (E.D. Pa. July 26, 2000).[12]

### 2.    The Technology Initiative

Defendants also made material misstatements and omissions regarding Realogy's "new technology" and "strong products and services" poised to escalate "productivity, recruitment and retention objectives" (¶¶204, 171, 224), "driv[e] organic growth" (¶¶212, 224), and "improv[e] profitability" (¶194).[13]  Because these statements concerned a "new" initiative related to a "core" strategy (providing agents with "technology products and services") they were material.  ¶¶37-38, 42.

Contrary to Defendants' statements, however, Realogy's technology and product offerings were antiquated, would take a significant time to update, and were, therefore, insufficient to recruit or retain agents or counteract rising competition. *See*, *e.g.*, ¶¶64-71, 97, 181(a), 192(a), 207(a), 218(a), 233(a).   As such, these

---

[12]  *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) (finding materiality "self-evident when we look at the market's negative reaction- to the tune of a nine percent drop in stock price in three days"); *In re CommVault Sys., Sec. Litig.*, 2016 WL 5745100, at *7 (D.N.J. Sept. 30, 2016) (materiality "may be measured post hoc by looking at the [stock's] movement").

[13]  Plaintiff does not contest the "extent to which Realogy was investing in technology" (Mem. at 5, 20).  Plaintiff's allegations are rooted in Defendants' misstatements and omissions that gave the false impression that the Technology Initiative would counteract competition and drive profitability.  ¶¶66-71, 192(a).

- 17 -

statements are actionable. *Conduent*, 2020 WL 3026536, at \*5; *Angres v. Smallworldwide PLC*, 94 F. Supp. 2d 1167, 1173 (D. Colo. 2000) (upholding statements about new technology products that gave a misleading impression about their current development, and ability to generate revenue). Indeed, Schneider's admissions that Realogy was still "flat on agent growth" (¶228), and his post-Class Period comparison of Realogy's offerings to an outdated "diesel engine" support the falsity of these statements. ¶251; *Freudenberg*, 712 F. Supp. 2d at 183 (post-class period admissions used to establish falsity); *Angres*, 94 F. Supp. 2d at 1171 (same).

### 3. Realogy's Growth-By-Acquisition Strategy

Defendants made material misstatements and omissions that acquired companies and agents were efficiently incorporated into Realogy's existing infrastructure and "operations" (¶143) and that they "reduce[d] or eliminate[d] duplicative costs" and "enhance[d] the profitability" and "earnings" of Realogy's operations. ¶¶107, 177, 120, *see also*, ¶¶134, 160. Defendants gave investors the misleading impression that Realogy abandoned the strategy in 2018 for external business reasons such as "pricing." ¶175. These statements were material because NRT was created from over 500 acquisitions, and Realogy's tuck-in acquisitions constituted half of its growth strategy. ¶¶38, 40. The truth, however, was Realogy's acquisitions resulted in undisclosed operational inefficiencies that were so adverse to Realogy's operational and financial condition that Realogy abandoned the

- 18 -

practice. *See, e.g.*, ¶¶72-74, 97, 110(d), 124(e), 141(f), 166(e), 181(f), 207(d). Schneider and Simonelli confirmed the falsity of these statements by admitting Realogy cast aside acquisitions because they were unprofitable (¶243), and that they resulted in "inefficien[cies]." ¶252. Defendants' acquisition statements are actionable. *See KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *5 (D.S.C. July 25, 2016) (statements that "represented [company's] acquisition strategy to investors as positive," "while presenting little downside" were misleading); *Freudenberg*, 712 F. Supp. 2d at 183.

### 4.   The ABCR

Defendants also made misstatements about their "surprise" (¶189) regarding the "remarkably strong and stable" nature of the ABCR in the face of increased competition (¶¶80, 104, 176, 189, 230), and that "modest declines" to the ABCR stemmed from market sources like home prices and competition. ¶¶108, 123, 139, 145, 163, 179, 190, 205, 215, 231. Defendants' statements even continued after Realogy was named in the ABCR Actions. ¶¶236-243, 247. At the time these statements were made, Defendants failed to disclose they were engaging in efforts to artificially maintain the ABCR's stability, subjecting Realogy to a heightened risk of regulatory scrutiny and litigation.[14] ¶¶75-80, 97, 110(c), 124(d), 141(e), 147(b),

---

[14] Because ABCR fluctuations, impacted Realogy's profitability, statements regarding it were material. ¶¶26-34.

- 19 -

166(d), 181(d), 192(d), 207(f), 218(d), 234(d).   To stifle innovation that was minimizing the role of homebuyers' agents, Realogy coordinated with other large brokerages to ensure homes listed on the MLS had to include buyers' broker commissions of 2.5%-3.0%.   ¶¶75-80.   This conduct kept the ABCR stable, stifled competition that would have lowered buyer broker commissions, and, in turn, benefitted Realogy's financial performance.   *Id.*   Realogy was sued multiple times for such conduct and the DOJ launched an investigation at the end of the Class Period.   *Id.*, ¶¶234, 237, 248.

Defendants mischaracterize Plaintiff's ABCR allegations to argue Plaintiff must plead Defendants' acts were illegal under the Sherman Act.   Mem. at 21-23. But whether Defendants' actions were "illegal" is irrelevant.   Defendants' "surprise" regarding the ABCR's stability, and statements putting the source of its "modest" declines at play, were misleading because they failed to disclose Defendants' intentional efforts to prevent disruption of the ABCR (regardless of whether those efforts were legal).[15]   *See In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *10-11 (E.D.N.Y. Sept. 27, 2019) (denying motion to dismiss in part, where

---

[15]   *Valeant*, 2017 WL 1658822, at *3, *11 (defendants' statements actionable where they failed to disclose deceptive conduct regarding the topics at issue); *Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *15 (D.N.J. Sept. 29, 2006) (failure to disclose source of revenues actionable when company's statements put the source of its revenues at issue).

defendant omitted "a material basis for the company's achievements - [defendant's] alleged collusion with its competitors . . . to fix prices and margins").[16]

## B.     The Complaint Does Not Plead Fraud-By-Hindsight

Plaintiff does not allege "fraud-by-hindsight."   Mem at 18-20.   Instead, Plaintiff appropriately relies on Defendants' admissions and post-Class Period events to provide specific facts existing at the time of the misstatements that triggered a duty to disclose.  *ViroPharma*, 21 F. Supp. 3d at 470 n.20 (rejecting fraud-by-hindsight as inappropriate at the pleadings stage).   Hull admitted in November 2017, that Defendants had intentionally kept splits below competitors' rates for "three years" (¶157), and Schneider conceded that Realogy was "on a negative trajectory" since the start of the Class Period and that acquisitions were unprofitable.  ¶¶242-243.  Post-Class Period, Simonelli and Schneider confessed that Realogy's technology offerings were ***still*** outdated and riddled with operational inefficiencies.  ¶¶243, 251-252.  In July 2019, Realogy sued Compass for "poaching" its agents, confirming the destructive impact competition was having on agent retention.  ¶¶253-254.  And, four months later, Realogy recorded a $180 million

---

[16] Defendants contend Plaintiff is legally "foreclosed" from alleging Defendants' liability for the ABCR statements based on their misconduct regarding buyer broker commissions.  Mem. at 23.  But as Defendants know, the court in *Sitzer v. Nat'l Association of Realtors, Realogy Holdings Corp.*, No. 4:19-cv-00332-SRB (W.D. Mo. Oct. 16, 2019) denied Realogy's motion to dismiss.  *See* Ex. A (Sitzer Order) (upholding allegations that Realogy's anti-competitive ABCR behavior violated the Sherman Act).

impairment related to NRT.[17]   ¶256.   Far from hindsight, Plaintiff's allegations which must be taken as true, are probative of falsity.  *See Lormand v. Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) ("reliance on alleged facts dating from the post-class period does not amount to fraud by hindsight").[18]

### C.   Defendants Had a Duty to Disclose Omitted Facts

An omission is actionable when the defendant is subject to a duty to disclose the omitted facts.  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  Here, disclosure was "necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx*, 563 U.S. at 44.  Disclosure was also mandated by Item 303.  *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *8 (D.N.J. Jan. 12, 2018).

*First*, by voluntarily choosing to speak about: (i) the ability of Realogy's Commissions and Technology Initiatives to combat competition and maintain growth; (ii) the benefits of acquisitions; and (iii) the stability and sources of the

---

[17]  In *Chubb*, 394 F.3d at 158, the court rejected plaintiffs' theory that defendant's single admission regarding the timing of the company's losses supported falsity, because unlike here, plaintiffs took the statement out of context and the court found multiple disclosures to the contrary.  Mem. at 20.  Here, Defendants reassured the market of only a "near-term" impact over a dozen times.

[18]  *See also W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *14 (E.D. Pa. June 16, 2015) (rejecting fraud-by-hindsight where "Plaintiffs repeatedly claim that DFC Global failed to use conservative lending and underwriting practices despite its comments to the contrary.").

ABCR, Defendants put these issues in play and were bound to speak truthfully about them. *See ViroPharma*, 21 F. Supp. 3d at 472 (finding omission material when the information "bore directly" on the subject of the company's favorable public statements). Defendants failed to satisfy their duty here. ¶97.

For example, Defendants' statements that Realogy was "executing on an aggressive campaign to increase [] recruitment of productive independent sales agents" and to "grow market share" and "improv[e] NRT's overall profitability" (¶¶97-98, 99, 105) triggered a duty to disclose that the commission split increases necessary to do so, would: (i) result in significantly higher expenses (that could not be offset by increased revenues); (ii) span over two years; and (iii) substantially dilute earnings and EBITDA, rendering NRT's 2017 commission split and Realogy's 2018 EBITDA guidance unachievable, and negatively impacting Realogy's revenues and EBITDA over a 27-month period. ¶¶208-213, 219-229, 238-242.

Further, the Complaint identifies numerous omitted facts that were "known or knowable" at the time of Defendants' statements that they had a duty to disclose including that: (i) Realogy's technology and product offerings were antiquated and outdated, and unable to counteract agent attrition or increase recruitment in the short term (¶¶46-47, 251-252); (ii) tuck-in-acquisitions resulted in significant operating inefficiencies and failed to increase profitability to such an extent that Realogy

- 23 -

abandoned them in 2018 (¶¶72-74, 243, 252); and (iii) the ABCR's stability resulted from Defendants' intentional efforts to maintain it, subjecting Realogy to increased risks and scrutiny (¶¶75-80, 234-237, 248). *Dow Corning Corp. v. BB&T Corp.*, 2010 WL 4860354, at *12 (D.N.J. Nov. 23, 2010) (defendants had duty to disclose known risks about an investment when offering positive commentary about that investment in general).[19] These material omissions rendered Defendants' statements misleading "because the excluded fact[s] show[] that [Defendants] lacked the basis for making those statements that a reasonable investor would expect." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 196 (2015).

*Second*, Item 303 required Realogy's Forms 10-Q and 10-K to describe any "known trends or uncertainties." 17 C.F.R. §229.303(a)(3)(i)-(ii). Disclosure under Item 303 "is triggered when the trend is both known to management and is seen as reasonably likely to have a material effect on the company's financial condition. *Underland v. Alter*, 2012 WL 2912330, at *6 (E.D. Pa. July 16, 2012).[20]

---

[19] *See Enzymotec*, 2015 WL 8784065, at *15 (highlighting viability of key product triggered a duty to disclose); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 652 (E.D. Pa. 2015) ("By specifically pointing out [sales trends and promotional activity], defendants put these topics 'in play' and triggered a duty to disclose and correct any 'inaccurate or misleading prior disclosure'").

[20] While Item 303 violations may not "create an independent cause of action" (Mem. at 36), where the underlying omissions are material, as they are here, Item 303 violations can form the basis of 10(b) liability. *See Stratte-Mcclure v. Morgan*

Here, Defendants' strategy to combat competition by pursuing two new initiatives at Realogy's largest revenue producing segment were known "events or uncertainties" reasonably likely to have a material effect on Realogy's financial condition. ¶¶257-266; *see Underland*, 2012 WL 2912330, at *7 (Item 303 required disclosure of "change in [company's] pricing practices" that would knowingly have material effect on its financial position).[21]  In addition, the importance of both NRT and productive agents made it exceptionally likely that Realogy's initiatives would knowingly have a negative, material impact on Realogy's operations and financial condition. ¶¶42, 272; *see also* §§V, IV.A; *Lexmark*, 367 F. Supp. 3d at 35 (finding segment's "significance as [company's] primary profit engine," supported "Defendants' [knowledge] of a trend likely to have a material effect on the Company's" financial condition.").[22]

### D.   Defendants' Statements Are Not Puffery

"To determine whether a statement is puffery, a court must examine the

---

*Stanley*, 776 F.3d 94, 103-04 (2d Cir. 2015) (citing *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000)); *Curran*, 2018 WL 394878, at *1, *7-8 (finding Item 303 liability).

[21]  *Curran*, 2018 WL 394878, at *1, *7-8 (company's statements regarding growth of fridge installations while experiencing "issues with its largest customers and most popular products" violated Item 303); *CURO*, 426 F. Supp. 3d at 872 (defendants' failure to disclose "decisions concerning the strategy and timing of the transition, as well as the resulting impact on the 2018 performance as a whole" violated Item 303).

[22]  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, at 96 (2d Cir. 2016) (materiality under Item 303 is a "mixed question of law and fact" generally inappropriate for resolution on a motion to dismiss).

context in which the statement was made." *In re ViroPharma, Inc. Sec. Litig.*, 2003 WL 1824914, at \*6 (E.D. Pa. Apr. 7, 2003). Where immaterial statements are mixed with actionable statements, the statements "in their entirety do not constitute mere puffery." *In re AT&T Corp. Sec. Litig.*, 2002 WL 31190863, at \*23 (D.N.J. Jan. 30, 2002). "Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 (3d Cir. 2004) "Only if the alleged misrepresentations or omissions are so ***obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality is it appropriate" for a court to find statements inactionable. *Id.* at 275 (emphasis in original). Realogy's initiatives, tuck-in acquisitions, and the ABCR were critical business matters, reported publicly, and statements regarding them were material. *See supra* §IV.A; *see also DFC Glob.*, 2015 WL 3755218, at \*13 (statements about the "conservative nature" of the company's underwriting were not puffery but "a fundamental aspect" of its business and important to investors).

Defendants cherry pick snippets of their commission split, technology, and acquisition statements to argue they are "inactionable puffery." Mem. at 34-36.[23]

---

[23] Defendants only contest the materiality of a handful of statements. Mem. at 34-36. Defendants therefore waive any argument that the rest of their statements or any of the ABCR-related statements are immaterial. *See Laborers' Int'l Union v. Foster*

However, the "fact that a statement uses conclusory, indefinite, and unverifiable terms []does not compel a conclusion that it is immaterial." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, at 572 (S.D.N.Y. 2011). As such, statements considered puffery in one context may be material in other contexts. *See In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 558-59 (D.N.J. 2002).

In similar context, courts routinely find statements, like those challenged here (Mem. at 34), regarding the Commissions Initiative as material. *See Conduent Inc.*, 2020 WL 3026536, at *4-5 (statements regarding progress of "Strategic Transformation" were material).[24] Additionally, many of the statements Defendants challenge are material because they are "determinate" and "verifiable" and thus "not mere puffery." *Omnicare*, 575 U.S. at 184. For example, Defendants' statements that technology offerings were "enhancing our value proposition for agents" and acquisitions were "reduc[ing] or eliminat[ing] duplicative costs" (Mem. at 35-36) included measurable terms objectively disproven by later admissions that "we are flat on agent count" (¶¶228, 242), and that acquisitions were "inefficient" (¶252) and

---

*Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief. . . .").

[24]    In contrast to *Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999), Defendants' statements concerning the Commissions Initiative were not "vague expressions of hope." Mem. at 34. Instead, such statements contradict other statements (*see, e.g.*, ¶¶101-102, 116-119, 116, 130) and do more than report "previous success and confidence." *Advanta*, 180 F.3d at 538.

unprofitable (¶243).  *See Freudenberg*, 712 F. Supp. 2d at 185-186 (statements about financial "discipline" were material).[25]

Likewise, Defendants' "optimistic statements," such as that acquisitions are "very synergistic," are actionable because they were undermined by then-known, nondisclosed facts.  *See supra* §IV.A.3; *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) ("conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading"); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) (statement that acquisition would "enhance" company's "competitive position" held actionable where company had no reasonable basis for belief).[26]

---

[25] Defendants rely on *Hughes v. Panasonic Consumer Elecs. Co.*, 2011 WL 2976839, at *12 (D.N.J. July 21, 2011), a non-securities fraud case that found opinion statements describing technology offerings as "breathtaking," and "vivid," as puffery, as well as *In re Datatec Sys. Sec. Litig.*, 2006 WL 3095951, at *17 (D.N.J. Oct. 30, 2006), which found optimistic statements about a future product's capability of "rapidly" delivering "high quality," as inactionable optimism.  *See* Mem. at 35-36.  Unlike *Hughes* and *Datatec*, Defendants' liability is rooted in verifiable statements and known omissions that gave investors the false impression that Realogy's **current** technology and product-based offerings were counteracting agent attrition by bringing competitive "value" to agents, when, in fact, as later admitted, Realogy's offerings were outdated and would take years to rival the competition. ¶266.

[26] Unlike the statements in *Glover v. DeLuca* (Mem. at 35), Defendants' statements regarding Realogy's tuck-in acquisitions were not vague, non-specific statements of optimism related to a single acquisition "tracking well."  *Compare* 2006 WL 2850448, at *31 (W.D. Pa. Sept. 29, 2006) *with* ¶107 (Defendants repeatedly touted

- 28 -

### E.    The PSLRA's Safe Harbor Is Inapplicable

The PSLRA's statutory safe harbor protects forward-looking statements only if they: (i) are accompanied by appropriate cautionary language sufficiently "meaningful" to render the false forward-looking statements immaterial; or (ii) were not made with actual knowledge of their falsity.  15 U.S.C. §78u-5(c)(1)(A)(i); *Avaya*, 564 F.3d at 254.  The safe harbor is inapplicable here for four reasons.[27]  ¶¶317-321.

*First*, "statements of present or historical fact . . . are not entitled to [the] PSLRA's safe harbor at [the motion to dismiss] stage."  *Enzymotec*, 2015 WL 8784065, at *11.  Likewise, the safe harbor is inapplicable to "mixed present/future" statements regarding "the part of the statement that refers to the present."  *Id.*  Many of the statements Defendants label as forward-looking either concern then-present factual conditions or are "mixed present/future" statements.  *See, e.g.*, Mem. at 25-28 (challenging "*we see* no reason to think it's any higher"; "*following* the completion of an acquisitions we [] *consolidate* the newly acquired operations with

---

the current and past benefits of Realogy's growth-by-acquisition strategy (not one acquisition), pointing to measurable metrics like "costs, such as advertising, rent and administrative support" and "profitability.").

[27]  Defendants do not claim safe harbor protection over the ABCR statements and therefore any argument is waived.  Mem. at 24-28; *see Laborers' Int'l Union*, 26 F.3d at 398.

- 29 -

our existing operations . . . *we reduce or eliminate duplicative costs*";[28] Realogy was "*enhancing* our value proposition for agents by *producing* new technology and data"; and "*They're* very synergistic" as forward-looking).[29]  Courts find similar statements actionable and not entitled to safe harbor.  *Enzymotec*, 2015 WL 8784065, at *11 (finding "well positioned for future growth" and "achieving rapid penetration" as "then-existing conditions as opposed to future projections").[30]

   *Second*, the safe harbor does not apply to "defendants' alleged omission of

---

[28]  Unlike the statements in *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd*, 771 F. App'x 551 (2d Cir. 2019), none of Defendants' statements about Realogy's acquisitions are forward-looking because they do not express hopes for the future; rather, they simply state the effectiveness (albeit misleadingly) of current and past acquisitions.  However, even if these statements were forward-looking they would not be protected by the safe harbor, because they were not accompanied by meaningful cautionary language and were made with knowledge of falsity.  *See* §§IV.A.3, V.

[29]  Defendants' statements regarding Realogy's technology's offerings were of present fact.  As such, the court's finding in *In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *6 (D.N.J. Dec. 7, 2009) that statements that company "was *going to* adopt new technology" were forward-looking and unrelated to the alleged claims is inapposite.

[30]  *See also Lucent*, 217 F. Supp. 2d at 545-46, 556-57 (ruling that "experiencing" growth and "is growing" are not forward-looking statements); *Urban Outfitters*, 103 F. Supp. 3d at 650 (holding statements that "sales trends continue to be strong" and that there is "no reason to believe that we couldn't see a continued decrease in markdowns" as non-forward-looking).  Defendants' efforts to transform statements of present and/or historical facts into forward-looking statements, or claim that all acquisition and technology statements are forward-looking (Mem. at 27-28) should be ignored.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, at 986 (9th Cir. 2008) (reversing dismissal of complaint and rejecting Defendants' alternative interpretation of statements on motion to dismiss as "hardly" the "most plausible" interpretation).

- 30 -

present facts." *Curran*, 2018 WL 394878, at *4.  Omissions of existing facts in financial projections are not entitled to the safe-harbor where the omitted facts show that defendants lacked a reasonable basis for making those projections. *Id*. Although certain of Defendants' statements, which include financial projections (*i.e.*, guidance, expected "near-term" pressure (Mem. at 25-26)) do have a forward-looking component, Defendants miss the point:[31] because Defendants' statements omitted then-existing material facts regarding the long-term, negative impact of Realogy's rising commissions initiative (*see supra* §IV.C), Defendants' statements limiting the future, negative impact to the "near-term," along with NRT's 2017 commission split and Realogy's 2018 EBITDA projections, are actionable.[32]  *See, e.g.*, *City of Hialeah Emps.' Ret. Sys. v. Toll Bros., Inc.*, 2008 WL 4058690, at *2

---

[31] Defendants' attempt to inoculate themselves from liability by merely adding "believe" or "expect" to their statements runs afoul of *Omnicare*, 575 U.S. at 193 ("we believe" or "we think" "can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors").

[32] Context matters, and Defendants' multiple assurances of only a "near-term" negative impact on Realogy's financial position, and Plaintiff's allegations of omissions of existing facts, distinguish this case from Defendants' citations. *See* Mem. at 26 (citing *Lincoln*, 2011 WL 3912832, at *8 (involving vague, predictive statements where plaintiff "confus[ed] the subjects" of defendants' statements and plaintiffs failed to allege any concrete contrary information); *In re NutriSystem, Inc. Sec. Litig.*, 653 F. Supp. 2d 563, 580 (E.D. Pa. 2009) (plaintiff failed to allege omissions of existing fact undermining defendants' single statement of a "near-term hiccup"); *In re Hertz Glob. Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *3 (D.N.J. Apr. 27, 2017), *aff'd*, 905 F.3d 106 (3d Cir. 2018) (expressed confidence in guidance statements was a "clos[e] call" but fell short because, unlike here, plaintiff failed to allege omission of existing facts).

(E.D. Pa. Sept. 2, 2008) (finding financial projections actionable because sales difficulties existed when they were made).

*Third*, even if any of Defendants' misstatements were forward-looking, the safe harbor cannot apply because the statements were made with actual knowledge of their falsity.  ¶321; *infra* §V.  "[T]he safe harbor provision does not afford corporations a free pass to lie to investors."  *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *7 (D. Del. May 23, 2006) ("No manner of cautionary language can cure false statements knowingly made.").

*Fourth*, Defendants' cautionary language was not sufficiently meaningful to satisfy the safe harbor because it was boilerplate and the risks warned of had already transpired.  "[A] vague or blanket (boilerplate) disclaimer which merely warns [of] risks will ordinarily be inadequate to prevent misinformation.  To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions. . . ."  *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000).  Warning of potential risks is insufficient if the "risks had already come to pass. . . ."  *Enzymotec*, 2015 WL 8784065, at *11.  In any case, whether "cautionary language is sufficiently "meaningful" raises fact issues that are improperly resolved on this motion to dismiss."  *Lucent*, 217 F. Supp. 2d at 557.

Defendants claim language in Realogy's press releases, SEC filings, conference calls, and the "Risk Factors" section of Realogy's Forms 10-K were

- 32 -

sufficiently cautionary. Mem. at 28-30. But warning that statements "are subject to known and unknown risks" "which may cause actual results, performance or achievements to be materially different" falls woefully short of being meaningful. *Id*. Indeed, at the time supposed risk warnings were made, many of the risks had already come to pass, rendering the cautionary language meaningless. *See* ¶¶318-320; *supra* §IV.C.[33]

Defendants concede the ineffectiveness of these "warnings" by stressing that they were repeated in "each earnings release" and throughout Realogy's "SEC filings," regardless of changed circumstances.[34] ¶320; Mem. at 29; *see In re Salix*

---

[33] The statement in the 2017 10-K that Realogy's performance might suffer from an "inability to realize the benefits of acquisitions due to the . . . possibility that expected benefits and synergies may not be achieved" failed to sufficiently warn investors. *See* Mem. at 30. This is because the risk warned against had already materialized (Realogy's acquisitions were never efficiently integrated (¶252)) and by the time the 2017 10-K was issued, Realogy was already abandoning its acquisition strategy because acquisitions failed to "change the bottom line." ¶243. Likewise, Realogy's November 3, 2017 statement that its performance could decline if it was unable "to replace or introduce new technologies and systems as quickly as competitors . . . to achieve the benefits anticipated" (Mem. at 30), was not meaningful because as late as May 30, 2019, the Company's technology and product offerings were *still* antiquated, needing to get up to "speed" "fast" (¶251).

[34] Indeed, Defendants failed to meaningfully update the risk factors once the very risks warned of materialized, rendering them ineffective. *See, e.g.*, Exhibit B, Realogy Holdings Corp., Annual Report (Form 10-K) (Feb. 27, 2018) and Exhibit C, Realogy Holdings Corp., Annual Report (Form 10-K) (Feb. 26, 2019) (stating "we may not successfully develop or procure technology . . . which could adversely affect our results of operations"; and "competition . . . is intense and may adversely affect our financial performance").

*Pharms., Ltd.*, 2016 WL 1629341, at \*12 (S.D.N.Y. Apr. 22, 2016) ("Defendants' failure to update these statements from quarter to quarter and from year to year renders them meaningless in light of the changing circumstances and risks.").

Moreover, despite purportedly "warning" of the "continuing pressure" associated with rising commission splits and competition, Defendants told the market no less than 17 times that any pressure would be only "near-term" (*see, e.g.*, ¶¶105-106, 173; Mem. at 17 n.4) and would "substantially moderate" by 1Q18. ¶¶173,174.  Defendants also confirmed they had accounted for such risks when reaffirming "right-sized" and "correct" FY17 commission split s (even after 2Q17 splits exceeded it) (¶¶102, 119, 126, 130-132), and 2018 EBITDA guidance (¶¶195, 198).  Defendants then surprised the market by increasing split guidance in 3Q17, withdrawing EBITDA guidance in 3Q18, and reporting disappointing FY18 and 1Q19 revenues and EBITDA, causing dramatic stock price declines.  ¶¶289-309. Defendants' reassurances, along with the market's reaction when the truth was revealed, undermines Defendants' "warnings." *Freudenberg*, 712 F. Supp. 2d at 194 (defendants' statements contradicted, and thus, nullified any risk disclosures).

## F.    Defendants' Purported Opinion Statements Are Actionable

Defendants assert their misleading statements are nonactionable, "opinions." Mem. at 31-33.  But Defendants fail to adequately explain why their statements are opinions, and simply adding the phrase "believe" or "think" to a statement does not

shield it from liability, as the statements may contain embedded statements of fact. *Omnicare*, 575 U.S. 193.  Many of the statements Defendants label as "opinions" are "neither forward-looking nor estimative," but speak to a present state of affairs. *Supra* §IV.E; *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) (calling a statement an opinion "does not make it so"). But even if Defendants' statements were opinions, they remain actionable because Plaintiff identified "particular [and material] facts going to the basis for the issuer's opinion – facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the opinion statement at issue misleading to a reasonable person. . . ."  *Omnicare*, 575 U.S. at 194.  *See supra* §IV.C; *Lexmark*, 367 F. Supp. 3d at 32.

### G.   Plaintiff's Commission Split Guidance Allegations Are Timely

Defendants argue claims regarding their commission split guidance are time barred because they were not commenced within two years of the November 3, 2017 partial disclosure.  Mem. at 37-38.  Defendants' argument is a red herring.  First, the two-year limitations period does not begin until "a reasonabl[e] diligent plaintiff would have discovered the facts constituting the violation including scienter. . . ." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (rejecting inquiry notice standard).  Accepting Defendants' position requires overlooking that the November 3, 2017 disclosure was the first of several "partial revelations," as well as the

- 35 -

Complaint's allegation that "Defendants [had not yet] fully disclosed the truth." ¶293.[35] It was not until after subsequent partial disclosures, which revealed additional facts and represented materialized risks (¶¶208, 246, 294-296), that the import of Defendants' commissions split guidance statements, and the facts constituting Defendants' fraud were fully revealed. Although resolving the question of when the two-year limitations period begins to run is a fact-intensive inquiry, it is clear that it could not have been triggered on November 3, 2017. *See Merck*, 559 U.S. at 653 (FDA letter and actions alleging company concealed material risks were insufficient to start the limitations period); *see also Lucent*, 217 F. Supp. 2d at 542.

Defendants' "relation back" argument also fails because Plaintiff's claims "restate the original claim with greater particularity" and "amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading." *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004); Fed. R. Civ. P. 15(c)(2).[36] Here, the Complaint is brought on behalf of the same

---

[35] To be sure, the Complaint details Defendants' simultaneous reassurances and further misstatements that masked the full truth from being revealed. *See, e.g.*, ¶¶153, 157-158; *see also Alaska Elec. Pension Fund v. Pharmacia Corp.*, 2012 WL 1680097, at *7 (D.N.J. May 14, 2012) (noting the "validity of taking reassurances into consideration" when determining start of limitation period).

[36] Fed. R. Civ. P. 15(c) should be liberally construed, particularly where, as here, "an amendment does not 'allege a new cause of action but merely . . . make[s] defective allegations more definite and precise." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 411 F. Supp. 2d 377, 385 (S.D.N.Y. 2006).

- 36 -

Class and Class Period, against the same Defendants, and for identical claims based on allegations regarding "Realogy's commission plan competition" as the original complaint. *Compare* ¶¶1, 22-26, 41-47 *with* ECF No. 1 at ¶¶1, 7-12, 26, 29, 45-64.[37]

## V.     THE COMPLAINT ADEQUATELY PLEADS SCIENTER

Scienter is pled by "alleg[ing] facts giving rise to a strong inference of either reckless or conscious behavior." *Avaya*, 564 F.3d at 267. A court must accept a plaintiff's allegations as true and evaluate them "holistically" to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323, 326. The standard is met where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. Explicitly rejecting a higher standard, the Supreme Court concluded that the inference of scienter "need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id.* The Court's scienter analysis "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at

---

[37] Defendants' reliance on *Glover v. FDIC*, 698 F.3d 139 (3d Cir. 2012) is misplaced. Mem. at 38. *Glover* found relation back inapplicable because the second amended complaint added a "factually and legally distinct" claim against certain defendants for conduct previously attributed to other defendants in the original complaint. 698 F.3d at 146-47.

least as likely as not that defendants acted with scienter." *Avaya*, 564 F.3d at 269.

The allegations also must be considered in light of the fact that securities fraud plaintiffs do not have the benefit of discovery. *EP Medsystems*, 235 F.3d at 882.[38]

### A.   Considered Holistically, Plaintiff's Allegations Give Rise to a Strong Inference of Scienter

The Complaint sets forth particularized allegations that when viewed holistically demonstrate that Defendants' statements were made with knowledge or recklessness.[39]   *See, e.g.*, ¶¶267-288.   Faced with these well-pled allegations, Defendants' main defense is to improperly attack them in isolation while offering an alternative version of the facts, despite the fact that *Tellabs* forbids this tactic.  Mem. at 39-48; *Tellabs*, 551 U.S. at 322.  In fact, when assessing scienter, the Court must "constantly assum[e] the plaintiff's allegations to be true."   *Id.* at 326-327. Defendants disregard these binding principles, and their motion should be denied.

---

[38]   As Defendants admit, Plaintiff need not rely on motive to allege scienter. *Tellabs*, 551 U.S. at 325 ("the absence of a motive allegation is not fatal").  Despite this, Defendants argue the point.  Mem. at 40.  Not only is motive not required, but there is "no requirement that plaintiffs in a securities fraud action support their allegations with information attributed to confidential witnesses" or internal company documents. *Tomaszewski v. Trevena, Inc.*, 2020 WL 5095865, at *10 (E.D. Pa. Aug. 28, 2020); *Valeant*, 2017 WL 1658822, at *11.  Likewise, Plaintiff is not required to allege stock sales to plead scienter. *Id.*

[39]   Allowing recklessness to serve as a sufficient basis for liability "promotes the policy objectives of discouraging deliberate ignorance and preventing defendants from escaping liability solely because of the difficulty of proving conscious intent to commit fraud." *Advanta*, 180 F.3d at 535.

- 38 -

### 1.     The Importance of NRT and Its Operations

The importance of NRT, Realogy's largest business segment, to Realogy's overall financial condition supports an inference of scienter.  ¶¶268-271.  Facts critical to a business's core operations generally are so apparent that their knowledge may be attributed to the company and its key corporate officers.  *See In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (finding "fraud to be imputed to individual defendants" when it "relates to the core business of the company").

NRT accounted for 76% of Realogy's revenue and its "critical" top-tier agents produced 90% of NRT's revenues.  ¶¶38, 42, 268.  NRT was created through over 500 acquisitions, and keeping the ABCR as high as possible was paramount to Realogy's financial health.[40]  ¶¶34-35, 38; *supra* §II.  Given the importance of NRT, it defies logic that Defendants were not closely involved in and monitoring the

---

[40]  Defendants contend Plaintiff failed to alleged what "specific information" was conveyed to management regarding the fraud.  Mem. at 42 (citing *Avaya*, 564 F.3d at 270).  The Complaint alleges specific facts known or recklessly disregarded by Defendants at the time their statements were made.  *See supra* §IV.A.  In addition, Defendants were specifically asked about the impact and trajectory of commission splits and repeatedly stated that they would only have a "near term" or "moderate" impact on the Company's profitability.  ¶122.  Defendants also frequently commented on: the Technology Initiatives' ability to "driv[e] organic growth," tuck-in acquisitions, falsely stating they were "synergistic"; and feigned "surprise" at the ABCR's stability.  ¶¶92, 160, 189, 212.  *Avaya* countenances that Defendants' specific statements support a strong inference of scienter.  564 F.3d at ¶270 (finding that "focused questions . . . mark an important distinction between this case and those in which defendants win dismissal").

impact of the initiatives, Realogy's acquisitions strategy, or its manipulation of the ABCR, and therefore knew or recklessly disregarded their negative consequences. *In re Navient Corp. Sec. Litig.*, 2019 WL 7288881, at *11 (D.N.J. Dec. 30, 2019) (finding "core operation inference" was applicable as a significant portion of total revenue was attributed to the matter at issue).

### 2.    Defendants' Positions and Experience, Access to Data, and the Specificity of Their Statements

The Individual Defendants were Chairman of the Board, CEO, and CFOs of Realogy with access to internal documents and control over its operations, record keeping, press releases, SEC filings, public statements and strategies, including access to information concerning the initiatives, tuck-in acquisitions, and Realogy's conduct related to the ABCR.[41]  ¶¶28-31.  Defendants admittedly had access to and relied on analytics to "identify" and "prioritize" top tier agents for recruitment purposes and used "real-time" data to evaluate the success of Realogy's technology offerings in test markets.  ¶¶274-275.  These facts, when considered as part of the collective analysis, support an inference of scienter.  *See In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 830 (D.N.J. 2006) (finding defendants' position,

---

[41]  Defendants rely on *Fain v. USA Techs. Inc.*, 707 F. App'x 91, 96 (3d Cir. 2017) to argue that corporate positions *alone* are insufficient to allege scienter.  Mem. at 42-43.  But the Complaint includes many indicia of scienter and Defendants' divide-and-conquer approach to scienter ignores that *Tellabs* requires a "holistic" analysis of the Complaint.  *Tellabs*, 551 U.S. at 323, 326.

role in drafting and issuing financial statements, and access to information concerning the transaction at issue supported scienter analysis).

Furthermore, the Individual Defendants often spoke directly about NRT, the initiatives, the efficiencies of acquisitions, and the ABCR, which further supports scienter. *See supra* §IV.A. Because Defendants were Realogy's designated representatives for speaking to the market about these matters, it was "exceedingly unlikely" that Defendants were "unaware of the problems." *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 711 (7th Cir. 2008). Indeed, "the most powerful evidence of scienter is the content and context of [defendants'] statements," particularly, when "specifically asked, directly and repeatedly," about the matters at issue. *Avaya*, 564 F.3d at 269-270; *Enzymotec*, 2015 WL 8784065, at *18 (finding scienter adequately plead in part because the "matter at issue [was] central to the core business of the Company, about which Defendants spoke regularly").

Defendants' denials, and access to information contradicting their denials, is additional indicia of scienter. *KBC Asset Mgmt.*, 2016 WL 3981236, at *9 (finding defendants' denials of issues relating to core operations that were repeatedly questioned by analysts "can support a strong inference of scienter"); *ViroPharma*, 21 F. Supp. 3d at 473. When specifically questioned about commission splits and the reasonableness of 2017 split guidance, Defendants denied concerns and reassured the market that the bulk of the negative impact of rising splits would occur

- 41 -

by 2Q17, with split guidance "right sized" at 69.5% to 70%. ¶¶101-102. Defendants even confirmed 2017 split guidance despite continued increases in splits rates, only to shock investors with a downward revision and decreased EBITDA due to rising commissions. ¶¶148-150. Moreover, Defendants attributed Realogy's transition away from acquisitions to pricing, only to later admit that acquisitions were unprofitable and inefficient. ¶¶175, 279. Defendants' specific statements in response to analyst and investor questions further supports an inference of scienter.

### 3. Admissions and Post-Class Period Events

Far from constituting "fraud-by-hindsight" (Mem. at. 46-47), Defendants' admissions and post-Class Period events contribute to an inference of scienter. ¶¶251-256, 277-279; *see supra* §IV.B; *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001) ("post-class period data may be relevant to determining what a defendant knew or should have known during the class period"); *Lormand*, 565 F. 3d at 254 ("admissions" provide "evidence that the defendants actually knew earlier that the course of action would turn out badly").

In this case, Hull conceded Realogy had been offering below-market commission spits since 2014, which Schneider admitted put Realogy on a "negative trajectory." ¶242. Schneider conceded agent count was "flat," compared Realogy's technology lapses to "a diesel engine," and confessed Realogy abandoned acquisitions because they were unprofitable. ¶¶228, 242, 251-252. Likewise,

Simonelli explained that Realogy ignored 20 years of easily accessible innovations and cost cutting initiatives, and that its acquisition strategy caused "inefficen[cies]." ¶252. Considered with the other inferences of scienter, these admissions give rise to a strong inference that Defendants acted with scienter.[42] *See CURO*, 426 F. Supp. 3d at 874 (post-class period admissions supported defendants' recklessness in not disclosing negative impact of transition).

Defendants claim that because certain admissions were made by non-defendant Simonelli they cannot contribute to scienter. Mem. at 46. But, Simonelli's status as a non-defendant is irrelevant. *Tellabs*, 513 F.3d at 709 ("[a] corporation is liable for statements by employees who have apparent authority to make them"). As CFO, Simonelli had access to the same highly relevant information as the Individual Defendants, and like them, was authorized to speak on Realogy's behalf and carried the same duty to disclose material information. Simonelli joined Realogy in March 2019, prior to Realogy's May disclosures, which confirms her familiarity with Realogy's antiquated technology and inefficient acquisitions during the Class Period. ¶¶26, 95.

### 4.    Defendants' Active Monitoring of the ABCR

Defendants' scienter is further bolstered by the Individual Defendants' active

---

[42] Defendants' alternative interpretation of the alleged admissions (Mem. at 46) is improper and should be disregarded. *ViroPharma*, 21 F. Supp. 3d at 470 n.20.

- 43 -

monitoring of the ABCR in the face of increased competition and governmental scrutiny of the anti-competitive effect NAR's buyer broker commissions policy. ¶¶230, 287. Defendants acknowledged they tracked the ABCR "closely" and discussed the ABCR every quarter. ¶¶287-288. Realogy's Forms 10-K noted Federal Trade Commission ("FTC") and DOJ scrutiny of the anti-competitive effect of NAR's MLS policies for over a decade, and Realogy representatives attended a DOJ and FTC workshop that criticized the anti-competitive nature of buyer broker commissions. *Id*. Yet, Defendants never ceased, nor publicly disclosed, their practices designed to maintain an artificially inflated ABCR. These facts demonstrate Defendants' scienter.

Defendants erroneously contend that absent a finding of wrongdoing, the DOJ investigation into Realogy's ABCR behavior fails to support scienter. Mem. at 44. Not so. An ongoing investigation represents a "piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter." *Utesch v. Lannett Co.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019) (finding investigations by government entities supported an inference of scienter); *see also Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671-672 (D.S.C. 2016) (same).

### 5.   Plaintiff's Other Scienter Allegations

The Complaint contains other allegations contributing to a strong inference of scienter. *First*, scienter stems from the magnitude of Realogy's declines in operating

EBITDA, in 3Q17, 3Q18, and FY18, and the decrease in revenue in 1Q19, which missed analysts' expectations, as well as the fact that NRT's 1Q19 transaction volume underperformed the market by more than 50%. ¶¶148, 165, 208, 221, 238, 246; *see Lexmark*, 367 F. Supp. 3d at 38 ("[T]he magnitude of the aftershock suggests more than a careless mistake or trivial miscalculation by [the company] and its executives.").

*Second*, the timing of CEO Smith's and CFO Hull's departures[43] and the abrupt removal of four top executives (including the CEO of NRT and Realogy's CIO) within a week of Schneider taking over also contribute to a strong inference of scienter. ¶¶23-24, 282-284; *Li v. Aeterna Zentaris, Inc.*, 2016 WL 3583821, at *2 (D.N.J. Jun. 30, 2016) (suspicious timing of the CEO's departure supported a finding a scienter); *Valeant*, 2017 WL 1658822, at *10 (numerous executive and director departures aided in a finding of scienter).[44]

---

[43] A week prior to Realogy's negative 3Q17 financial results, Realogy announced Schneider would replace Smith as CEO, effective immediately. ¶¶24, 282. After Realogy's poor 3Q18 financial results, it was announced that Hull, a 15-year veteran, retired three days later. ¶¶25, 286. There were no prior signs that Hull's departure was planned. *See, e.g.*, ¶¶201, 204, 214. After "retiring," Hull became the CFO of another company, casting doubt on his supposed "retirement." ¶286.

[44] *See also DFC Glob.*, 2015 WL 3755218, at *17 ("the resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior"); *SEPTA v. Orrstown Fin. Servs. Inc.*, 2016 WL 466958, at *5 (M.D. Pa. Feb. 8, 2016) (relying on "allegations regarding the timing of the resignation of senior management" in finding an inference of scienter). Defendants raise inappropriate fact questions

- 45 -

*Third*, when considered collectively with the other factors alleged in the Complaint, Defendants' SOX certifications (¶¶105, 121, 137, 161, 177, 190, 204, 214, 231, 244) also bolster scienter. *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743, 745 (E.D. Mich. 2007).[45]  Scienter is adequately alleged.

## B.    Plaintiff's Inference of Scienter Is More Compelling than Defendants' Opposing Inference

The Complaint's scienter allegations are far more compelling than any competing non-culpable inference.  Defendants' competing inference that they "believed" Realogy's initiatives and growth-by-acquisition strategy would "counteract" competition is belied by the allegations in the Complaint and should be rejected.[46] Mem. at 47.  "The fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Tellabs*, 513 F.3d at 710.[47]  Because Plaintiff's inference of scienter is cogent and at least, if not more,

---

regarding Realogy's executive departures, which should be ignored.  Mem. at 45; *Luczak v. Nat'l Bev. Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020).  Even *Hertz* acknowledged that executive departures "is a factor that can strengthen the inference of scienter." *Hertz*, 905 F.3d at 118.

[45]  Defendants fail to contest that SOX certification allegations bolster scienter, and any such argument has been waived.

[46]  Defendants fail to provide a more plausible inference regarding the ABCR and, as a result, concede the point.

[47]  *CURO*, 426 F. Supp. 3d at 876 (rejecting defendants' non-culpable explanation, where allegations that defendants "adopted a particular strategy (which allegation must be accepted as true) that had obvious negative consequences in contradiction

- 46 -

compelling than any opposing inference, the motion should be denied.

## VI.   THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

To plead loss causation, Plaintiff need only provide a "short and plain statement" giving Defendants "some indication of the loss and the causal connection [that it has] in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Conduent Inc.*, 2020 WL 3026536, at *8 (applying Rule 8(a) to loss causation). "The Third Circuit has repeatedly cautioned that [the loss causation] determination is a fact-sensitive inquiry typically left to the trier of fact." *Omanoff v. Patrizio & Zhao LLC*, 2015 WL 1472566, at *6 (D.N.J. Mar. 31, 2015).

The Complaint adequately alleges loss causation.  It details how the disclosures were made, what was disclosed and when, what the disclosures revealed, and the market's reaction to the disclosures.  ¶¶289-313.  It alleges partial disclosures on November 3, 2017 (¶¶148-163, 291-293), November 2, 2018 (¶¶208-215, 294-296), February 26, 2019 (¶¶219-231, 297-299), March 6, 2019 (¶¶234, 300-303), May 2, 2019 (¶¶238-244, 304-306), May 22, 2019 (¶¶248, 307-308), and details each stock price reaction. *Id*.  The Complaint also details that Realogy significantly underperformed its peer index, "negat[ing] any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry

---

to their public statements, and innocent explanations for the failure to disclose that strategy and those consequences are not as readily apparent").

- 47 -

factors, or Company-specific facts unrelated to Defendants' fraudulent conduct." ¶311.

Devoting only a page and a half to the argument, Defendants assert the Complaint fails to allege a "corrective disclosure" and other disclosures "could" have caused Realogy's stock price decline.  Mem. at 48-49.  Both arguments fail.[48] First, regarding "corrective disclosures" (Defendants ignore materialization of risk), Defendants assert that "negative [financial] results" and "news of the antitrust class actions" are not "corrective."  Mem. at 49.  But as Defendants concede, pleading loss causation only requires that a misstatement or omission conceal "something" from the market that, when disclosed negatively affected the value of the security. *See* Mem. at 48 n.9.  Indeed, "*Dura* did not address what type of events or disclosures may reveal the truth.  Nor did *Dura* explain how specific each disclosure must be." *Bradley Pharms.*, 421 F. Supp. 2d at 828-29 (finding loss causation alleged through a series of disclosing events).  Also, "there is *no* requirement that the disclosure mirror the earlier misrepresentation." *Urban Outfitters*, 103 F. Supp. 3d at 655.

It is well-established that "the market may learn the truth regarding the misrepresentation from '[] analysts questioning financial results, resignation of

---

[48]  Defendants add that if the November 3, 2017 disclosure is "corrective," certain claims are time-barred. *Id.*  Defendants' statute of limitations argument fails for the reasons set forth above. *See supra* §IV.G.

CFOs, . . . newspapers and journals,' and other informers who are otherwise not representatives of the company or the company itself." *Id.* at 656; *Merck*, 2011 WL 3444199, at \*31 (requiring the "alleged fraud" to "occur in a single, all-encompassing disclosure . . .would be at odds with *Dura* in that it would essentially allow wrongdoers to immunize themselves with a protracted series of partial disclosures."). It is clear that the disclosure events detailed in the Complaint are adequate to allege loss causation. *Allergan*, 2019 WL 3562134, at \*14 (holding announcement of "DOJ investigation can be the basis for a corrective disclosure").[49]

Second, Defendants argue that "other disclosures" "***could*** also have been the cause" of Realogy's stock price decline. Mem. at 49. But the question of what other disclosures "could" have impacted Realogy's stock price is a factual dispute that "cannot be adjudicated at this early stage." *Omanoff*, 2015 WL 1472566, at \*6-7; *Hall v. Johnson & Johnson*, 2019 WL 7207491, at \*28 (D.N.J. Dec. 27, 2019) ("Although Defendants point to other possible bases for the decline in stock price, such a factual dispute cannot be adjudicated at this early, motion to dismiss stage of

---

[49] Defendants overstate the holding of *Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at \*18-19 (W.D. Pa. Sept. 8, 2017) to argue "disappointing earnings" and news of other cases cannot be corrective disclosures. Mem. at 49. To the contrary, *Martin* simply held that under the facts of that case, the events alleged were not sufficiently corrective.

- 49 -

the litigation.").[50]  Defendants' loss causation arguments fall short and Defendants' motion should be denied.

## VII.   CONTROL PERSON LIABILITY IS ADEQUATELY ALLEGED

Defendants' sole argument regarding their liability under Section 20(a) is that Plaintiff fails to sufficiently plead a primary securities fraud claim.  *See* Mem. at 50.  Because Plaintiff adequately pled its primary violations, and because Plaintiff adequately alleged a control person violation (¶¶29-30, 335-337), Defendants' motion should be denied.  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599-600 (D.N.J. June 19, 2001).

## VIII.  CONCLUSION[51]

For the reasons described herein, Defendants' motion should be denied.

DATED:  September 17, 2020            SEEGER WEISS LLP
                                     CHRISTOPHER A. SEEGER


                                            *s/ Christopher A. Seeger*
                                     CHRISTOPHER A. SEEGER

---

[50]  *Intelligroup* does not aid Defendants. Mem. at 49.  In that case, the court found the plaintiffs failed to plead that they bought stock at artificially inflated prices, a defect not present here. *Compare In re Intelligroup*, 468 F. Supp. 2d 670, 688 (D.N.J. Dec. 20, 2006) *with* ¶313.

[51]  If the motion is granted in whole or in part, Plaintiff respectfully requests leave to amend. *See Phillips*, 515 F.3d at 228.

55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com

Local Counsel for Plaintiff

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE (*pro hac vice*)
ROBERT J. ROBBINS (*pro hac vice*)
KATHLEEN B. DOUGLAS
(*pro hac vice*)
BAILIE L. HEIKKINEN (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com
kdouglas@rgrdlaw.com
bheikkinen@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 51 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 17, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification to all counsel of record and paper copies were sent to those indicated as non-registered participants.

*s/ Christopher A. Seeger*
CHRISTOPHER A. SEEGER
