# EXHIBIT B

Table of Contents

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2017

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File No. 001-35674**

# REALOGY HOLDINGS CORP.

*(Exact name of registrant as specified in its charter)*

**20-8050955**

*(I.R.S. Employer Identification Number)*

**Commission File No. 333-148153**

# REALOGY GROUP LLC

*(Exact name of registrant as specified in its charter)*

**20-4381990**

*(I.R.S. Employer Identification Number)*

**Delaware**

*(State or other jurisdiction of incorporation or organization)*

**175 Park Avenue**

**Madison, NJ 07940**

*(Address of principal executive offices) (Zip Code)*

**(973) 407-2000**

*(Registrants' telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| | Title of each class | Name of each exchange on which registered |
|---|---|---|
| Realogy Holdings Corp. | Common Stock, par value $0.01 per share | New York Stock Exchange |
| Realogy Group LLC | None | None |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Realogy Holdings Corp. Yes ☑ No ☐    Realogy Group LLC Yes ☐ No ☑

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.

Realogy Holdings Corp. Yes ☐ No ☑    Realogy Group LLC Yes ☑ No ☐

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Realogy Holdings Corp. Yes ☑ No ☐    Realogy Group LLC Yes ☐ No ☑

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files).

Realogy Holdings Corp. Yes ☑ No ☐    Realogy Group LLC Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filer pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Realogy Holdings Corp. ☑    Realogy Group LLC ☑

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | Large accelerated filer | Accelerated filer | Non-accelerated filer (Do not check if a smaller reporting company) | Smaller reporting company | Emerging growth company |
|---|---|---|---|---|---|
| Realogy Holdings Corp. | ☑ | ☐ | ☐ | ☐ | ☐ |
| Realogy Group LLC | ☐ | ☐ | ☑ | ☐ | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Realogy Holdings Corp. Yes ☐ No ☑    Realogy Group LLC Yes ☐ No ☑

The aggregate market value of the voting and non-voting common equity of Realogy Holdings Corp. held by non-affiliates as of the close of business on June 30, 2017 was $4.4 billion. There were 130,150,797 shares of Common Stock, $0.01 par value, of Realogy Holdings Corp. outstanding as of February 23, 2018.

Table of Contents

of existing independent sales agents and improved recruiting success, we have experienced and expect to continue to experience adverse pressure on costs and margin from these initiatives.

There are also market participants who differentiate themselves by offering consumers lower commission rates on transactions. Although such competitors have yet to have a material impact on overall brokerage commission rates, this could change in the future if they use greater discounts as a means to increase their market share or improve their value proposition.

If independent sales agents are paid a higher proportion of the commissions earned on a homesale transaction or the level of commission income we earn from a homesale transaction is otherwise reduced, the operating margins of our company owned residential brokerages or our franchisees could be adversely affected.

*We may not successfully develop or procure technology, including Zap® product enhancements, that support the ability of our company owned and franchisee real estate brokerages and their affiliated independent sales agents to compete effectively and efficiently, which could adversely affect our results of operations.*

Our future success depends in part on our ability to continuously develop and improve our technology products and services or procure such technology, in particular for our company owned and franchisee real estate brokerages, affiliated independent sales agents and their customers as well as for our relocation and title and settlement services segments. We have expended, and expect to continue to expend, substantial time, capital, and other resources to identify the needs of our company owned brokerages, franchisees, independent sales agents and their customers and to develop technology and service offerings to meet those needs.

We may incur unforeseen expenses in the development of enhancements to the Zap platform or the advancement of other technology products and we may not be able to introduce new technologies as quickly as we would like or in a cost-effective manner. In addition, we may be unable to attract and retain employees involved in developing our technology and systems. Furthermore, we may not be successful, or as successful as our competitors, in procuring or developing technologies and systems that operate effectively across multiple devices and platforms in a way that is appealing or beneficial to our users and there can be no assurance that independent sales agents in our franchise system, including those affiliated with our company owned brokerages, or customers will use the Zap platform or other technology products we may develop. Any of the foregoing could adversely affect our value proposition and the productivity of independent sales agents, which in turn could adversely affect our results of operations.

*Competition in the residential real estate and relocation business is intense and may adversely affect our financial performance.*

We generally face intense competition in the residential real estate services business.

*As a real estate brokerage franchisor, our products are our brand names and the support services we provide to our franchisees and our ability to grow our franchisor business is also dependent on the operational and financial success of our franchisees.*

- Upon the expiration of a franchise agreement, a franchisee may choose to franchise with one of our competitors or operate as an independent broker. Competitors may offer franchisees whose franchise agreements are expiring or prospective franchisees products and services similar to ours at rates that are lower than we charge.

- We face the risk that currently unaffiliated brokers may not enter into franchise agreements with us because they believe they can compete effectively in the market without the need to license a brand of a franchisor and receive services offered by a franchisor. Additionally, unaffiliated brokers may decide not to enter into a franchise relationship with us as they may believe that their business will be more attractive to a prospective purchaser without the existence of a franchise relationship.

- Regional and local franchisors as well as franchisors offering different franchise models or services provide additional competitive pressure in certain areas. To remain competitive in the sale of franchises and to retain our existing franchisees, we may have to reduce the fees we charge our franchisees, increase the amount of non-standard incentives we issue or take other actions or employ other models to be competitive with fees charged by competitors. In addition, the full-service traditional franchise model that we employ has experienced declines in market share over the past several years. If this trend continues or if we fail to successfully diversify our franchise offerings, we may fail to attract new franchisees and existing franchisees may not renew their agreements with us.

Table of Contents

- Our ability to succeed as a franchisor is largely dependent on the efforts and abilities of our franchisees to attract and retain independent sales agents, which is subject to numerous factors, including the sales commissions or other compensation they receive and their perception of brand value and the value of support services we provide. Competition for sales agents in the real estate services industry, including within our franchise system, is high, in particular with respect to more productive sales agents. Increasingly, independent sales agents have affiliated with brokerages that offer a different mix of services to the independent sales agents, allowing the independent sales agent to retain a greater percentage of the commission and purchase services from other vendors as needed. If our franchisees fail to attract and retain successful independent sales agents or they fail to replace departing successful independent sales agents with similarly productive independent sales agents, our franchisees' gross commission income may decrease, resulting in a reduction in royalty fees paid to us.

- Listing aggregators and other web-based real estate service providers may also begin to compete for part of our franchisor service revenue through referral or other fees and could disintermediate our relationships with our franchisees and our franchisees' relationships with their independent sales agents and buyers and sellers of homes.

*Our company owned brokerage business, like that of our franchisees, generally faces intense competition.* We compete with national and regional independent real estate brokerages and franchisors, franchisees of our brands and other real estate franchisors and discount and limited service brokerages for both business and independent sales agents. Real estate brokers typically compete for business primarily on the basis of services offered, reputation, utilization of technology, personal contacts and brokerage commission.

- Competition is particularly severe in the densely populated metropolitan areas in which we operate.

- In addition, the real estate brokerage industry has minimal barriers to entry for new participants, including participants pursuing non-traditional methods of marketing real estate, such as brokers who discount their commissions and companies that employ technologies intended to disrupt the traditional brokerage model or minimize or eliminate the role brokers and sales agents perform in the homesale transaction process. Other non-traditional models that operate outside of the brokerage industry, such as companies that leverage capital to purchase homes directly from sellers, having been gaining market attention in recent years. Certain of our competitors are also increasingly well-funded, which strengthens their competitive position and ability to offer aggressive or alternative compensation arrangements to top-performing sales agents. Moreover, a growing number of companies are competing in non-traditional ways for a portion of the gross commission income generated by homesale transactions. For example, listing aggregators and other web-based real estate service providers not only compete for our company owned brokerage business by establishing relationships with independent sales agents and/or buyers and sellers of homes, they also increasingly charge brokerages and independent sales agents new fees for existing and new services.

- Our average homesale commission rate per side in our company owned real estate services segment has remained relatively constant from 2002 to 2017, changing from 2.62% in 2002 to 2.44% for the year ended December 31, 2017. As with our real estate franchise business, a decrease in the average brokerage commission rate may adversely affect our revenues.

- We also compete for the services of qualified licensed independent sales agents. Some of the firms competing for sales agents use different models of compensation, which may be appealing to certain sales agents and hinder our ability to attract and retain those agents. The ability of our company owned brokerage offices to retain independent sales agents is generally subject to numerous factors, including the sales commissions they receive, their perception of brand value and provided support services, and markets served. Competition for sales agents could reduce the commission amounts retained by our Company after giving effect to the split with independent sales agents and possibly increase the amounts that we spend on marketing.

*In our relocation services business, we compete primarily with global and regional outsourced relocation service providers.* We have faced greater competition from firms that provide services on a global basis. Competition is expected to continue to intensify as an increasingly higher percentage of relocation clients reduce their global relocation benefits and related spend.

*The title and settlement services business is highly competitive and fragmented.* The number and size of competing companies vary in the different areas in which we conduct business. In certain parts of the country we compete with small title agents and attorneys while in other parts of the country our competition is the larger title underwriters and national vendor management companies.

27

Table of Contents

consistent with the legal framework for such classification, our company owned brokerage operations could face substantial litigation or disputes in direct claims or regulatory procedures, including the risk of court or regulatory determinations that certain groups of real estate agents should be reclassified as employees and entitled to unpaid minimum wage, overtime, benefits, expense reimbursement and other employment obligations. Significant reclassification determinations in the absence of available exemptions from minimum wage or overtime laws, including damages and penalties for prior periods, could be disruptive to our business, constrain our operations in certain jurisdictions and have a material adverse effect on the operational and financial performance of the Company. In addition, real estate agent reclassification could have a material adverse effect on the operational and financial performance of our franchisees and our competitors.

*The weakening or unavailability of our intellectual property rights could adversely impact our business.*

Our trademarks, trade names, domain names and other intellectual property rights are fundamental to our brands and our franchising business. The steps we take to obtain, maintain and protect our intellectual property rights may not be adequate and, in particular, we may not own all necessary registrations for our intellectual property. Applications we have filed to register our intellectual property may not be approved by the appropriate regulatory authorities. Our intellectual property rights may not be successfully asserted in the future or may be invalidated, circumvented or challenged. We may be unable to prevent third parties from using our intellectual property rights without our authorization or independently developing technology that is similar to ours. Also, third parties may own rights in similar trademarks. Any unauthorized use of our intellectual property by third parties could reduce our competitive advantages or otherwise harm our business and brands. If we had to litigate to protect these rights, any proceedings could be costly, and we may not prevail. Our intellectual property rights, including our trademarks, may fail to provide us with significant competitive advantages in the U.S. and in foreign jurisdictions that do not have or do not enforce strong intellectual property rights.

We cannot be certain that our intellectual property does not and will not infringe issued intellectual property rights of others. We may be subject to legal proceedings and claims in the ordinary course of our business, including claims of alleged infringement of the patents, trademarks and other intellectual property rights of third parties. Any such claims, whether or not meritorious, could result in costly litigation. Depending on the success of these proceedings, we may be required to enter into licensing or consent agreements (if available on acceptable terms or at all), or to pay damages or cease using certain service marks or trademarks.

We franchise our brands to franchisees. While we try to ensure that the quality of our brands is maintained by all of our franchisees, we cannot assure that these franchisees will not take actions that hurt the value of our intellectual property or our reputation.

Our license agreement with Sotheby's for the use of the Sotheby's International Realty® brand is terminable by Sotheby's prior to the end of the license term if certain conditions occur, including but not limited to the following: (1) we attempt to assign any of our rights under the license agreement in any manner not permitted under the license agreement, (2) we become bankrupt or insolvent, (3) a court issues a non-appealable, final judgment that we have committed certain breaches of the license agreement and we fail to cure such breaches within 60 days of the issuance of such judgment, or (4) we discontinue the use of all of the trademarks licensed under the license agreement for a period of twelve consecutive months.

Our license agreement with Meredith Corporation ("Meredith") for the use of the Better Homes and Gardens® Real Estate brand is terminable by Meredith prior to the end of the license term if certain conditions occur, including but not limited to the following: (1) we attempt to assign any of our rights under the license agreement in any manner not permitted under the license agreement, (2) we become bankrupt or insolvent, or (3) a trial court issues a final judgment that we are in material breach of the license agreement or any representation or warranty we made was false or materially misleading when made.

*Several of our businesses are highly regulated and any failure to comply with such regulations or any changes in such regulations could adversely affect our business.*

*The sale of franchises is regulated by various state laws as well as by the Federal Trade Commission (the "FTC").* The FTC requires that franchisors make extensive disclosure to prospective franchisees but does not require registration. A number of states require registration and/or disclosure in connection with franchise offers and sales. In addition, several states have "franchise relationship laws" or "business opportunity laws" that limit the ability of franchisors to terminate franchise agreements or to withhold consent to the renewal or transfer of these agreements.

34

Table of Contents

*Our company owned real estate brokerage business must comply with the requirements governing the licensing and conduct of real estate brokerage and brokerage-related businesses in the jurisdictions in which we do business.* These laws and regulations contain general standards for and limitations on the conduct of real estate brokers and sales agents, including those relating to licensing of brokers and sales agents, fiduciary, agency and statutory duties, administration of trust funds, collection of commissions, advertising and consumer disclosures. Under state law, our real estate brokers have certain duties and are responsible for the conduct of their brokerage business.

*Our company owned real estate brokerage business, our relocation business, our mortgage origination joint venture, our title and settlement service business and the businesses of our franchisees (excluding commercial brokerage transactions) must comply with the Real Estate Settlement Procedures Act ("RESPA").* RESPA and comparable state statutes prohibit providing or receiving payments, or other things of value, for the referral of business to settlement service providers in connection with the closing of real estate transactions involving federally-backed mortgages. RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between brokers and agents, fees splits between brokers, and market-based fees for the provision of actual goods or services. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA, however, has become a greater challenge in recent years for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretations of RESPA or similar state statutes by certain courts. With the passage of Dodd-Frank in 2010, primary responsibility for enforcement of RESPA has shifted to the CFPB. The CFPB has, in the recent past, taken a much stricter approach toward interpretation of RESPA and related regulations than the prior regulatory authority (the Department of Housing and Urban Development) and has become significantly more active in the use of enforcement proceedings. In the face of this changing regulatory landscape, various industry participants, while disagreeing with the CFPB's narrow interpretation of RESPA, have nevertheless decided to modify or terminate long-standing business arrangements to avoid the risk of protracted and costly litigation defending such arrangements. RESPA also has been invoked by plaintiffs in private litigation for various purposes. Moreover, a recent change in leadership at the CFPB, which is currently subject to legal challenge, has contributed further uncertainty with respect to RESPA interpretation and compliance. However, permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory authorities may also be aggressively pursued.

Our title insurance business also is subject to regulation by insurance and other regulatory authorities in each state in which we provide title insurance. Additionally, our relocation business operates certain insurance programs that are subject to certain regulations. State regulations may impede or impose burdensome conditions on our ability to take actions that we may want to take to enhance our operating results.

We are also, to a lesser extent, subject to various other rules and regulations such as "controlled business" statutes, which impose limitations on affiliations between providers of title and settlement services, on the one hand, and real estate brokers, mortgage lenders and other real estate providers, on the other hand, or similar laws or regulations that would limit or restrict transactions among affiliates in a manner that would limit or restrict collaboration among our businesses.

In all of our business units there is a risk that we could be adversely affected by current laws, regulations or interpretations or that more restrictive laws, regulations or interpretations could increase responsibilities and duties to customers and franchisees and other parties, the adoption of which could make compliance more difficult or expensive. There is also a risk that a change in current laws could adversely affect our business. In addition, any adverse changes in regulatory interpretations, rules and laws that would place additional limitations or restrictions on affiliated transactions could have the effect of limiting or restricting collaboration among our business units. We cannot assure you that future changes in legislation, regulations or interpretations will not adversely affect our business operations.

For example, in 2008, the Justice Department and the FTC entered into a settlement agreement with NAR related, in part, to the cooperative sharing of entries in traditional multiple listing services with online-only brokers. The 2008 settlement agreement expires in November 2018 and in response to Congressional inquiries, the Justice Department and the FTC will co-host a workshop on competition dynamics in the real estate services industry. There can be no assurances as to whether the Justice Department and the FTC will determine that certain industry practices or developments have an anti-competitive effect on the industry. Any such determination by the Justice Department and the FTC could result in industry investigations, legislative or regulatory action or other actions, any of which could have the potential to disrupt our business.

Regulatory authorities also have relatively broad discretion to grant, renew and revoke licenses and approvals and to implement regulations. Accordingly, such regulatory authorities could prevent or temporarily suspend us from carrying on

35