# EXHIBIT C

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2018

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 001-35674

# REALOGY HOLDINGS CORP.

*(Exact name of registrant as specified in its charter)*

**20-8050955**

*(I.R.S. Employer Identification Number)*

Commission File No. 333-148153

# REALOGY GROUP LLC

*(Exact name of registrant as specified in its charter)*

**20-4381990**

*(I.R.S. Employer Identification Number)*

**Delaware**

*(State or other jurisdiction of incorporation or organization)*

**175 Park Avenue**

**Madison, NJ 07940**

*(Address of principal executive offices) (Zip Code)*

**(973) 407-2000**

*(Registrants' telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

|  | Title of each class | Name of each exchange on which registered |
|---|---|---|
| Realogy Holdings Corp. | Common Stock, par value $0.01 per share | New York Stock Exchange |
| Realogy Group LLC | None | None |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Realogy Holdings Corp. Yes ☑ No ☐  Realogy Group LLC Yes ☐ No ☑

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.

Realogy Holdings Corp. Yes ☐ No ☑ Realogy Group LLC Yes ☑ No ☐

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Realogy Holdings Corp. Yes ☑ No ☐ Realogy Group LLC Yes ☐ No ☑

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).

Realogy Holdings Corp. Yes ☑ No ☐ Realogy Group LLC Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filer pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

Realogy Holdings Corp. ☑ Realogy Group LLC ☑

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

|  | Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company | Emerging growth company |
|---|---|---|---|---|---|
| Realogy Holdings Corp. | ☑ | ☐ | ☐ | ☐ | ☐ |
| Realogy Group LLC | ☐ | ☐ | ☑ | ☐ | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Realogy Holdings Corp. Yes ☐ No ☑ Realogy Group LLC Yes ☐ No ☑

The aggregate market value of the voting and non-voting common equity of Realogy Holdings Corp. held by non-affiliates as of the close of business on June 30, 2018 was $2.8 billion. There were 113,485,998 shares of Common Stock, $0.01 par value, of Realogy Holdings Corp. outstanding as of February 22, 2019.

*Market competition, the influence of independent sales agents (in particular, top performing independent sales agents and independent sales agent teams) and the continued execution of our strategic initiatives may continue to shift a higher proportion of homesale commissions to affiliated independent sales agents or otherwise erode our share of the commission income generated by homesale transactions, which could negatively affect our profitability.*

As noted in the prior risk factor, our integrated business strategy is focused on the attraction and retention of independent sales agents to our company owned and franchised brokerage operations. Intense industry competition for agents combined with our strategic emphasis on the recruitment and retention of independent sales agents has put, and is expected to continue to put, upward pressure on our commission expense, which has and could continue to negatively impact our profitability.

If independent sales agents affiliated with our company owned brokerages are paid a higher proportion of the commissions earned on a homesale transaction or the level of commission income we receive from a homesale transaction is otherwise reduced, the operating margins of our company owned residential brokerages could be adversely affected. Our franchisees face similar risks and continued downward pressure on the commission income recognized by our franchisees could negatively impact their view of our value proposition and we may fail to attract new franchisees, expiring franchisees may not renew their agreements with us, or we may be required to offer reduced royalty fee arrangements to new and existing franchisees, any of which would result in a reduction in royalty fees paid to us.

*Our company owned brokerage operations are subject to geographic and high-end real estate market risks, which could adversely affect our revenues and profitability.*

Our subsidiary, NRT, owns real estate brokerage offices located in and around large metropolitan areas in the U.S. Competition for independent sales agents and independent sales agent teams is particularly intense in these areas. Local and regional economic conditions in these locations could differ materially from prevailing conditions in other parts of the country. For the year ended December 31, 2018, NRT realized approximately 27% of its revenues from California, 20% from the New York metropolitan area and 9% from Florida, which, in the aggregate, totals approximately 56% of its revenues. A downturn in the residential real estate market or economic conditions that is concentrated in these regions could result in a decline in NRT's total gross commission income and profitability disproportionate to the downturn experienced throughout the U.S. and could have a material adverse effect on us. The effects of the 2017 Tax Act on average homesale prices may be more impactful in states where average home prices, state and local incomes taxes, and/or property taxes are high, including California and the New York tri-state area. In addition, given the significant geographic overlap of our title and settlement services business with our company owned brokerage offices, such regional declines affecting our company owned brokerage operations could have a disproportionate adverse effect on our title and settlement services business as well. During 2018, both California and New York City experienced negative homesale transaction growth in their respective housing markets, which negatively impacted both our company owned brokerage operations and our title and settlement services segments' operating results in 2018. A further downturn in the residential real estate market or economic conditions in California and New York (or market or general economic weakness in Florida) could result in a decline in our overall revenues and have a material adverse effect on us.

NRT has a significant concentration of transactions at the higher end of the U.S. real estate market. A shift in NRT's mix of property transactions from the high range to lower and middle range homes would adversely affect the average price of NRT's closed homesales. Such a shift, absent an increase in transactions, would have an adverse effect on our operating results. Due to NRT's concentration in high-end real estate, its business may also be adversely impacted by capital controls imposed by foreign governments that restrict the amount of capital individual citizens may legally transfer out of their countries. In addition, NRT continues to face heightened competition for both homesale transactions and high performing independent sales agents because of its prominent position in the higher end housing markets.

Moreover, NRT also has relationships with developers, primarily in major cities, to provide marketing and brokerage services in new developments. During 2018, there was a decrease in revenue related to our new development business in New York City as a result of lower closing volume due to long cycle times with irregular project completion timing. Deceleration in the building of new housing and/or timing of closings of new developments has led, and may continue to lead, to lower unit sales in the new development market, which has had, and could continue to have, a material adverse effect on the revenue generated by NRT and our profitability.

27

Table of Contents

*We may not successfully develop or procure technology, including Zap® product enhancements, that supports our strategy to grow the base of productive independent sales agents at our company owned and franchisee real estate brokerages or assist those agents in competing effectively and efficiently, which could adversely affect our results of operations.*

Our future success depends in part on our ability to continuously develop and improve our technology products and services or procure such technology, in particular for our company owned and franchisee real estate brokerages, affiliated independent sales agents and their customers as well as for our relocation and title and settlement services segments. We have expended, and expect to continue to expend, substantial time, capital, and other resources to identify the needs of our company owned brokerages, franchisees, independent sales agents and their customers and to develop technology and service offerings to meet those needs. In addition, we have made and may continue to make strategic investments in companies developing technologies that support our strategy and we may not realize the anticipated benefits from these investments and such technologies may not become available to us or may become available to our competitors.

We may incur unforeseen expenses in the development of enhancements to technology products (including $Zap^{®}$), or may experience competitive delays in introducing new technologies as quickly as we would like. In addition, the increasingly competitive industry for technology talent may impact our ability to attract and retain employees involved in developing our technology and systems. Furthermore, the investment and pace of technology development continues to increase across the industry, creating risk in the relative timing and attractiveness of our technology products and there can be no assurance that independent sales agents in our franchise system, including those affiliated with our company owned brokerages, or customers will choose to use the technology products we may develop. In addition, we are now building our agent- and franchisee-focused technology products with an open architecture in order to enable third-party vendors and products to access and interface with our products. We may not be able to accomplish this transition on a timely basis and there can be no assurance that third parties will integrate with our solutions in a timely or effective manner. Any of the foregoing could adversely affect our value proposition and the productivity of independent sales agents, which in turn could adversely affect our results of operations.

***Competition in the residential real estate and relocation business is intense and may adversely affect our financial performance.***

We generally face intense competition in the residential real estate services business.

Some competitive risks are shared among our business units, while others are specific to a business unit. For example, both the Company and our franchisees compete for consumer business as well as for independent sales agents with national and regional independent real estate brokerages and franchisors and discount and limited service brokerages as well as with franchisees of our brands. We are faced with the following related risks:

*Our ability to succeed both through our company-owned brokerages and as a franchisor is largely dependent on our and our franchisees' ability to attract and retain independent sales agents.*

The successful recruitment and retention of independent sales agents and independent sales agent teams are critical to the business and financial results of a brokerage—whether or not it is affiliated with a franchisor. Most of a brokerage's real estate listings are sourced through the sphere of influence of its independent sales agents, notwithstanding the growing influence of internet-generated leads. Competition for independent sales agents in our industry is high and has intensified particularly with respect to more productive independent sales agents and in the densely populated metropolitan areas in which we operate.

The successful recruitment and retention of independent sales agents is influenced by many factors, including remuneration (such as sales commission percentage and other financial incentives paid to independent sales agents), other expenses borne by independent sales agents, leads or business opportunities generated for independent sales agents from the brokerage, independent sales agents' perception of the value of the broker's brand affiliation, marketing and advertising efforts by the brokerage or franchisor, the quality of the office manager, staff and fellow independent sales agents with whom they collaborate daily, as well as technology, continuing professional education, and other services provided by the brokerage or franchisor.

We believe that a variety of factors in recent years have negatively impacted the recruitment and retention of independent sales agents in the industry generally and have put upward pressure on the average share of commissions earned by affiliated independent sales agents, including increasing competition, such as from brokerages that offer a greater share of commission income to independent sales agents, changes in the spending patterns of independent sales agents (as

28

more agents purchase services from third parties outside of their affiliated broker), and growth in independent sales agent teams. Certain of our privately-held competitors have investors that appear to be supportive of a model that pursues increases in market share over profitability, which exacerbates competition for independent sales agents and pressure on the share of commission income received by the agent, creating challenges to our and our franchisee's margins and profitability.

If we or our franchisees fail to attract and retain successful independent sales agents or we or they fail to replace departing successful independent sales agents with similarly productive independent sales agents, the gross commission income generated by our company owned brokerages and franchises may decrease, resulting in a reduction in our profitability. In addition, competition for sales agents could further reduce the commission amounts retained by the Company and our affiliated franchisees after giving effect to the split with independent sales agents, and possibly increase the amounts that we spend on marketing and the development of products and services that we believe will appeal to such agents.

*Some of the firms competing for sales agents use different commission plans, which may be appealing to certain sales agents, and we and our franchisees may be unable to adopt and implement alternative commission plans in a profitable and effective manner, which may hinder our ability to attract and retain those agents.*

Our company owned brokerage service has historically compensated affiliated independent sales agents using a traditional graduated commission model that emphasizes the value proposition offered to independent sales agents and independent sales agent teams, although we have utilized elements of other commission plan styles in certain geographic markets. The traditional graduated commission model has experienced declines in market share over the past several years. Increasingly, independent sales agents have affiliated with brokerages that offer a different mix of services to the agent, allowing the independent sales agent to select the services that they believe allow them to retain a greater percentage of the commission and purchase services from other vendors as needed. If this trend continues and we and our franchisees are unable to adopt and implement alternative commission plans that appeal to a broad base of independent sales agents in a profitable and effective manner, we and our franchisees may fail to attract and retain independent sales agents, which may have a material adverse impact on our ability to grow earnings.

*The real estate brokerage industry has minimal barriers to entry for new participants, including participants utilizing historic real estate brokerage models and those pursuing alternative variations of those models, as well as non-traditional methods of marketing real estate.*

The significant size of the U.S. real estate market, in particular the addressable market of commission revenues, has continued to attract outside capital investment in traditional and disruptive competitors that seek to access a portion of this market.

There are also market participants who differentiate themselves by offering consumers flat fees, rebates or lower commission rates on transactions (often coupled with fewer services). Although such competitors have yet to have a material impact on overall brokerage commission rates, this could change in the future if they use greater discounts as a means to increase their market share or improve their value proposition. Since 2014, we have experienced approximately a one basis point decline in the average broker commission rate each year. A decrease in the average brokerage commission rate may adversely affect our revenues.

While real estate brokers using historic real estate brokerage models typically compete for business primarily on the basis of services offered, reputation, utilization of technology, personal contacts and brokerage commission, participants pursuing non-traditional methods of marketing real estate may compete in other ways, including companies that employ technologies intended to disrupt historic real estate brokerage models or minimize or eliminate the role brokers and sales agents perform in the homesale transaction process.

A growing number of companies are competing in non-traditional ways for a portion of the gross commission income generated by homesale transactions. For example, listing aggregators and other web-based real estate service providers not only compete for our company owned brokerage business by establishing relationships with independent sales agents and/or buyers and sellers of homes, they also increasingly charge brokerages and independent sales agents additional fees for new and existing services. These services put pressure on the profitability of other industry participants, including agents and brokers, compete for part of our franchisor service revenue through referral or other fees and could dilute our relationships with our franchisees and our franchisees' relationships with their independent sales agents and buyers and sellers of homes. Other business models that have emerged in recent years consist of companies (including certain listing aggregators) that leverage capital to purchase homes directly from sellers, commonly referred to as iBuying. If iBuying gains market share in the residential real estate industry, it could disintermediate real estate brokers and independent sales agents from buyers and

29

Table of Contents

sellers of homes either entirely or by reducing brokerage commissions that may be earned on those transactions. In 2018, in collaboration with Home Partners of America, we launched the cataLIST program, a quick-cash sale program that shares some traits with the iBuying model. Although the cataLIST program is intended to keep the independent sales agent at the center of the transaction, there can be no assurance that the program will be successful or that it will operate as intended.

As a real estate brokerage franchisor, we are also subject to risks unique to franchising, including:

We franchise our brands to franchisees. While we try to ensure that the quality of our brands is maintained by all of our franchisees, we cannot assure that these franchisees will not take actions that hurt the value of our intellectual property or our reputation.

Our license agreement with Sotheby's for the use of the Sotheby's International Realty® brand is terminable by Sotheby's prior to the end of the license term if certain conditions occur, including but not limited to the following: (1) we attempt to assign any of our rights under the license agreement in any manner not permitted under the license agreement, (2) we become bankrupt or insolvent, (3) a court issues a non-appealable, final judgment that we have committed certain breaches of the license agreement and we fail to cure such breaches within 60 days of the issuance of such judgment, or (4) we discontinue the use of all of the trademarks licensed under the license agreement for a period of twelve consecutive months.

Our license agreement with Meredith Corporation ("Meredith") for the use of the Better Homes and Gardens® Real Estate brand is terminable by Meredith prior to the end of the license term if certain conditions occur, including but not limited to the following: (1) we attempt to assign any of our rights under the license agreement in any manner not permitted under the license agreement, (2) we become bankrupt or insolvent, or (3) a trial court issues a final judgment that we are in material breach of the license agreement or any representation or warranty we made was false or materially misleading when made.

38

Table of Contents

***Several of our businesses are highly regulated and any failure to comply with such regulations or any changes in such regulations could adversely affect our business.***

*Our company owned real estate brokerage business, our relocation business, our mortgage origination joint venture, our title and settlement service business and the businesses of our franchisees (excluding commercial brokerage transactions) must comply with the Real Estate Settlement Procedures Act ("RESPA").* RESPA and comparable state statutes prohibit providing or receiving payments, or other things of value, for the referral of business to settlement service providers in connection with the closing of real estate transactions involving federally-backed mortgages. RESPA and related regulations do, however, contain a number of provisions that allow for payments or fee splits between providers, including fee splits between title underwriters and agents, brokers and agents, and market-based fees for the provision of goods or services and marketing arrangements. In addition, RESPA allows for referrals to affiliated entities, including joint ventures, when specific requirements have been met. We rely on these provisions in conducting our business activities and believe our arrangements comply with RESPA. RESPA compliance, however, has become a greater challenge under certain administrations for most industry participants offering settlement services, including mortgage companies, title companies and brokerages, because of changes in the regulatory environment and expansive interpretations of RESPA or similar state statutes by certain courts. Permissible activities under state statutes similar to RESPA may be interpreted more narrowly and enforcement proceedings of those statutes by state regulatory authorities may also be aggressively pursued. RESPA also has been invoked by plaintiffs in private litigation for various purposes and some state authorities have also asserted enforcement rights. Similar laws exist in other countries where we do business.

*The sale of franchises is regulated by various state laws as well as by the Federal Trade Commission (the "FTC").* The FTC requires that franchisors make extensive disclosure to prospective franchisees but does not require registration. A number of states require registration and/or disclosure in connection with franchise offers and sales. In addition, several states have "franchise relationship laws" or "business opportunity laws" that limit the ability of franchisors to terminate franchise agreements or to withhold consent to the renewal or transfer of these agreements. Internationally, many countries have similar laws affecting franchising.

*Our company owned real estate brokerage business must comply with the requirements governing the licensing and conduct of real estate brokerage and brokerage-related businesses in the jurisdictions in which we do business.* These laws and regulations contain general standards for and limitations on the conduct of real estate brokers and sales agents, including those relating to licensing of brokers and sales agents, fiduciary, agency and statutory duties, administration of trust funds, collection of commissions, advertising and consumer disclosures. Under state law, our real estate brokers have certain duties and are responsible for the conduct of their brokerage business.

*Title and settlement services are highly regulated.* Our title insurance business also is subject to regulation by insurance and other regulatory authorities in each state in which we provide title insurance. Additionally, our relocation business operates certain insurance programs that are subject to certain regulations. State regulations may impede or impose burdensome conditions on our ability to take actions that we may want to take to enhance our operating results.

We are also, to a lesser extent, subject to various other rules and regulations such as "controlled business" statutes, which impose limitations on affiliations between providers of title and settlement services, on the one hand, and real estate brokers, mortgage lenders and other real estate providers, on the other hand, or similar laws or regulations that would limit or restrict transactions among affiliates in a manner that would limit or

restrict collaboration among our businesses.

*We participate in the mortgage origination business through our 49.9% ownership of Guaranteed Rate Affinity.* Private mortgage lenders operating in the U.S. are subject to comprehensive state and federal regulation and to significant oversight by government sponsored entities. Dodd-Frank endows the CFPB with rule making, examination and enforcement authority involving consumer financial products and services, including mortgage finance.  The CFPB has issued a myriad of proposed and final rules, including TILA-RESPA Integrated Disclosure rules, which could materially and adversely affect the mortgage and housing industries.  Dodd-Frank established new standards and practices for mortgage originators, including determining a prospective borrower's ability to repay its mortgage and restricting the fees that mortgage originators may collect and could establish new standards in the future which could be costly to comply with and present material operating risks.

*General.* In all of our business units there is a risk that we could be adversely affected by current laws, regulations or interpretations or that more restrictive laws, regulations or interpretations could increase responsibilities and duties to customers and franchisees and other parties, the adoption of which could make compliance more difficult or expensive. There is also a risk that a change in current laws could adversely affect our business. In addition, any adverse changes in regulatory interpretations, rules and laws that would place additional limitations or restrictions on affiliated transactions

39

Table of Contents

could have the effect of limiting or restricting collaboration among our business units. Additionally, all of our businesses are subject to federal and state law related to numerous topics, including contract, fair trade and competition, consumer protection and employment matters. We cannot assure you that future changes in legislation, regulations or interpretations will not adversely affect our business operations.

For example, in 2008, the Justice Department and the FTC entered into a settlement agreement with NAR related, in part, to the cooperative sharing of entries in traditional multiple listing services with online-only brokers, which expired in November 2018. In June 2018, the Justice Department and the FTC held a joint public workshop to explore competition issues in the residential real estate brokerage industry since the publication of the FTC and DOJ's 2007 Report on Competition in the Real Estate Brokerage Industry, including the impact of Internet-enabled technologies on the industry and potential barriers to competition. There can be no assurances as to whether the Justice Department and the FTC will determine that certain industry practices or developments have an anti-competitive effect on the industry. Any such determination by the Justice Department and the FTC could result in industry investigations, legislative or regulatory action or other actions, any of which could have the potential to disrupt our business.

Regulatory authorities also have relatively broad discretion to grant, renew and revoke licenses and approvals and to implement regulations. Accordingly, such regulatory authorities could prevent or temporarily suspend us from carrying on some or all of our activities or otherwise penalize us if our financial condition or our practices were found not to comply with the then current regulatory or licensing requirements or any interpretation of such requirements by the regulatory authority. Our failure to comply with any of these requirements or interpretations could limit our ability to renew current franchisees or sign new franchisees or otherwise have a material adverse effect on our operations.

Our international business activities, and in particular our relocation business, must comply with applicable laws and regulations that impose sanctions on improper payments, including the Foreign Corrupt Practices Act, U.K. Bribery Act and similar laws of other countries.

Our failure to comply with any of the foregoing laws and regulations may subject us to fines, penalties, injunctions and/or potential criminal violations. Any changes to these laws or regulations or any new laws or regulations may make it more difficult for us to operate our business and may have a material adverse effect on our operations.

## Other Business Risks

***We could be subject to significant losses if banks do not honor our escrow and trust deposits.***

Our company owned brokerage business and our title and settlement services business act as escrow agents for numerous customers. As an escrow agent, we receive money from customers to hold until certain conditions are satisfied. Upon the satisfaction of those conditions, we release the money to the appropriate party. We deposit this money with various banks and while these deposits are not assets of the Company (and therefore excluded from our consolidated balance sheet), we remain contingently liable for the disposition of these deposits. These escrow and trust deposits totaled $426 million at December 31, 2018. The banks may hold a significant amount of these deposits in excess of the federal deposit insurance limit. If any of our depository banks were to become unable to honor any portion of our deposits, customers could seek to hold us responsible for such amounts and, if the customers prevailed in their claims, we could be subject to significant losses.