NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| SASA TANASKOVIC, | : | |
| | : | **Civil Action No. 19-15053 (SRC)** |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| REALOGY HOLDINGS CORP. et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

**CHESLER**, District Judge

      This matter comes before the Court upon Defendants' motion to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Plaintiff has opposed the motion.  The Court, having considered the papers filed by the parties, proceeds to rule on the motion without oral argument, pursuant to Federal Rule of Civil Procedure 78.  For the reasons discussed below, the Court will grant Defendants' motion, thereby dismissing the entirety of the Amended Complaint with prejudice.

## I.  BACKGROUND[1]

### A.  The Parties

      Lead Plaintiff Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust ("the Trust" or "Plaintiff") brings this

---

[1] The background sets forth facts alleged in the Amended Complaint and contained in documents attached to or referenced in the Amended Complaint. The facts are taken as true for purposes of this motion to dismiss only.

putative class action on behalf of itself, and others similarly situated, against Defendant Realogy

Holdings Corp. ("Realogy" or "the Company"), and Defendants Smith, Schneider, Hull, and

Gustavson ("the individual Defendants"), who either currently hold or held at a relevant time a

high-level executive position at Realogy. Plaintiff alleges that between February 24, 2017 and

May 22, 2019, inclusive ("the Class Period"), it purchased Realogy shares, and that, during this

time, Defendants made materially false or misleading statements in violation of Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934. Plaintiff further asserts that, as a result of

these statements, it paid artificially inflated prices for its shares and was thus damaged when the

alleged truth was revealed.

Realogy is a provider of residential real estate services in the United States and is the

largest residential real estate brokerage firm in the country. Realogy has multiple segments, but

its company owned real estate brokerage services segment is known as NRT. Realogy derives a

substantial portion of its revenue from its NRT segment, and from commissions earned on home

sale transactions in particular.

**B.  Realogy Throughout the Class Period**

Under relevant law, all payments made to real estate agents must first pass through

brokers, like Realogy. The commission received by the broker is known as the Average Broker

Commission Rate ("ABCR"). Once the brokerage firm receives its gross commission income,

those funds are then used to compensate the real estate agents through what is known as a

commission split. The higher the commission split, the higher the percentage of the commission

that is given to the agent.

Starting in late 2016, Realogy abandoned its traditional compensation model in favor of a

new recruitment initiative. In an effort to keep up with competing brokerage firms with higher

2

commission splits, this new initiative primarily focused on recruiting and retaining top agents by increasing commission split amounts. In particular, in the beginning of 2017, the Company announced that its projected split guidance for the year was between 69.5% and 70%, up from 68.9% at the end of 2016. At this time, Realogy common stock sold at its highest point of the Class Period, at $34.98 per share. Then, although Defendants explained that they expected the split increases to taper off in the second half of 2017, the split rates continued to increase further, leading the Company to ultimately update its 2017 split guidance to be between 70.25% and 70.5%. The Company's EBITDA[2] decreased as well, causing it to lower its 2017 EBITDA guidance. Nevertheless, at this point, Defendants stated that they still expected to see the benefits of the split initiative in 2018, and that EBITDA for 2018 after the first quarter was projected to be in line with or better than the same periods in the previous year, as the split increases were expected to substantially moderate after the first quarter of 2018.

Relatedly, in the past, Realogy primarily focused on growing its business through "tuck-in" acquisitions, where it folded newly acquired businesses into its existing operations. However, at the start of 2018, Realogy announced that it would be moving away from these types of acquisitions and would instead focus on its organic growth strategy of trying to recruit and retain agents, explaining that the Company found that the prices for acquisitions had increased in recent years.

Then, also in 2018, as part of Realogy's efforts to improve agent recruitment and retention, Realogy began focusing on producing technology and data-driven products for its agents. While this initiative was also aimed at increasing profitability at Realogy, nevertheless,

---

[2] EBITDA is a financial metric that stands for "Earnings Before Interest, Taxes, Depreciation, and Amortization."

EBITDA at the Company continued to decline throughout the year. In particular, by the third quarter of 2018, the Company withdrew its guidance that EBITDA for the year would be in line with or better than the same periods in the previous year.

Further, in March of 2019, a class action lawsuit was brought against the National Association of Realtors ("NAR"), as well as many real estate brokerage firms, including Realogy, alleging anticompetitive behavior in relation to the ABCR. Another similar class action lawsuit was filed against NAR, Realogy, and other real estate brokerages in April of 2019, and then in May of 2019, the Department of Justice ("DOJ") initiated an investigation into potentially anticompetitive behavior within the residential real estate brokerage industry.[3] Finally, in May of 2019, at the end of the Class Period, NRT reported an operating EBITDA of negative four million and the price of Realogy common stock declined to $7.13 per share.

### C.  The Procedural History

This action first began when named Plaintiff, Sasa Tanaskovic, brought this putative class action against Defendants by filing a Complaint that primarily asserted that Defendants failed to disclose to investors that Realogy was allegedly involved in anticompetitive behavior. Then, in an order dated November 7, 2019, the Court appointed the Trust as Lead Plaintiff. Thereafter, the Trust filed the Amended Complaint, which then addressed much more than just Realogy's supposed anticompetitive behavior. In particular, in the Amended Complaint, Plaintiff asserts four categories of misstatements or omissions made by Defendants during the Class Period. First, Plaintiff alleges that Defendants gave investors the false impression that the Company's

---

[3] The Court notes that while Defendants' counsel brought to the Court's attention certain documents that show how the DOJ investigation culminated, as neither parties in this case are parties to the DOJ investigation, the Court will not consider the results of the DOJ investigation in coming to its decision on this motion.

consistent increases to commission splits would only have a short-term negative effect on the Company's profitability and would ultimately lead to sustainable growth. Second, Plaintiff asserts that Realogy's new products and technology offerings were actually outdated and ineffective, and that Defendants concealed this information from investors. Third, Plaintiff alleges that the Company's original tuck-in acquisition strategy created inefficient and non-integrated systems, and that Defendants failed to disclose this negative impact of the acquisitions. Lastly, like the initial claim brought in the original Complaint, Plaintiff asserts that Defendants concealed Realogy's allegedly anticompetitive behavior that was utilized to secure the ABCR, which opened Realogy up to increased risk of legal liability and regulatory scrutiny. Defendants subsequently filed a motion to dismiss the Amended Complaint in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.   DISCUSSION

### A.  Legal Standard

Defendants seek dismissal of the Amended Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To meet this pleading standard and avoid dismissal under Rule 12(b)(6), the Supreme Court has explained that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A complaint will meet this plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the complaint need not demonstrate that a defendant is probably

liable for the wrongdoing to meet the requisite pleading standard, allegations that give rise to the mere possibility of unlawful conduct are insufficient to withstand a Rule 12(b)(6) motion to dismiss. Id.; Twombly, 550 U.S. at 557. Further, while a complaint is not required to include highly "detailed factual allegations," it must include more than mere "labels and conclusions." Twombly, 550 U.S. at 555.  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 556 U.S. at 678.

Moreover, while a somewhat general claim for relief may survive the Twombly and Iqbal pleading standard, when a complaint alleges fraud, Federal Rule of Civil Procedure 9(b) imposes an even stricter pleading standard – that is, that the party alleging fraud "must state with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  The Third Circuit has explained that, to meet this particularity standard, the complaint must be detailed enough that it "place[s] the defendant on notice of the 'precise misconduct with which [he is] charged.'" Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (quoting Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004), abrogated on other grounds by Twombly, 550 U.S. 544 (2007)).

In addition to the stringent pleading standard set by Rule 9(b), claims for securities fraud brought pursuant to the Securities Exchange Act are also subject to heightened pleading requirements, as the Private Securities Litigation Reform Act ("PSLRA") "imposes another layer of factual particularity to allegations of securities fraud." In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002). Specifically, the PSLRA requires that, in these types of actions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). "This standard 'requires plaintiffs to

plead the who, what, when, where and how: the first paragraph of any newspaper story.'" OFI Asset Mgmt. v. Cooper Tire & Rubber, 834 F.3d 481, 490 (3d Cir. 2016) (quoting Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009)). These requirements set by the PSLRA are not merely discretionary. Rather, the PSLRA mandates that "the court shall, on the motion of any defendant, dismiss the complaint if [these] requirements . . . are not met." 15 U.S.C. § 78u–4(b)(3)(A). This is because these rules are necessary "[a]s a check against abusive litigation by private parties . . . ." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).

Finally, in evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court "must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which the court may take judicial notice." Id. at 322. In that respect, the Third Circuit has held that a district court may take judicial notice of documents "'integral to or explicitly relied upon in the complaint,'" SEC filings, and stock price data. In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).

**B.  The Securities Fraud Claim Under § 10(b) of the Exchange Act**

Under Section 10(b) of the Exchange Act, a person or entity may not "use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations . . . ." 15 U .S.C. § 78j(b). As a means to enforce § 10(b), SEC Rule 10b-5(b) makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5(b). "[A] misrepresentation or omitted fact 'is material if there is a substantial

likelihood that a reasonable shareholder would consider it important in deciding how to [act].'"

EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 872 (3d Cir. 2000) (quoting TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976)). The Supreme Court has recognized a private cause of action for damages sustained as the result of a violation of § 10(b) and Rule 10b-5 and held that such a claim requires a plaintiff to establish the following six elements:

> (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets . . . as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss.

Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (internal citations omitted). A failure to plead any one of these elements in accordance with the pleading standard applicable to a securities fraud claim prevents a plaintiff from stating a legally sufficient claim. Id. at 346-47. In their motion to dismiss, Defendants claim that Plaintiff has failed to establish three of the six necessary elements – an actionable misstatement or omission, scienter, and loss causation. As will be explained in greater detail, the Court finds that Plaintiff has failed to allege any actionable misstatements or omissions. Therefore, because the failure of this element by itself warrants dismissal of the Rule 10b-5 claim, the Court will not reach the sufficiency of the other elements challenged by Defendants in this motion.

In claiming that Plaintiff has not demonstrated the first element needed to establish a claim in this context—a material misrepresentation or omission—Defendants assert two related points. First, Defendants contend that Plaintiff fails to specify any material misstatements or omissions. Second, Defendants also assert that many of the misstatements or omissions challenged by Plaintiff are not actionable under certain relevant exceptions.

Plaintiff here has asserted four distinct categories of alleged misstatements or omissions—those related to (1) the commission split rates, (2) the technological offerings, (3) the Company's acquisition strategy, and (4) the ABCR. As such, the Court will first analyze each category separately to determine whether Plaintiff has properly alleged any material misstatements or omissions. In addition, the Court will then examine whether any of the challenged statements or omissions are not actionable under certain exceptions.

       1.   <u>Whether Plaintiff Has Properly Alleged with Particularity Any Material Misstatements or Omissions</u>

          *i.*     *The Commission Splits*

Although Plaintiff alleges four categories of misstatements or omissions, this first category is the main focus of Plaintiff's Amended Complaint. This category focuses on statements made relating to Realogy's commission split initiative, which was formed in the hopes of recruiting and retaining top agents. Plaintiff's key point here is that Defendants heavily emphasized the benefits of this initiative but unfairly downplayed its negative impact. In particular, Plaintiff avers that Defendants consistently gave investors the false impression that the Company's ongoing increases to commission splits would have only a near-term negative effect on the Company's profitability and EBITDA and would ultimately lead to sustainable growth.

While Plaintiff sets aside many pages in its Amended Complaint to statements made in connection with the commission split initiative, the relevant statements can be more summarily broken down into three sub-groups. First, Plaintiff avers that, on many occasions, Defendants gave investors the false impression that commission splits would not increase further, yet Defendants did ultimately continue to increase the split amounts. Second, Plaintiff claims that Defendants gave investors the false impression that any negative results would be only short-

9

term, with substantial moderation by 2018 and through 2019. Third, Plaintiff contends that Defendants falsely made it seem as if it would eventually be possible to reach a split amount that could both effectively recruit and retain top agents, while also leading to sustainable economic growth and increased profitability at the Company. The Court will analyze each of these sub-groups in turn.

### Sub-Category A: Whether Defendants Gave Plaintiff the False Impression That Commission Splits Would Not Increase

Beginning with the first group of statements made in relation to the commission splits, to support its contention that Defendants incorrectly made it seem as if the commission splits would not continue increasing, Plaintiff primarily points to the fact that Defendant Hull stated in early 2017 that the Company's commission split guidance for 2017 of between 69.5% and 70% was "right-sized" and "competitive." Am. Compl. ¶¶ 102, 110(b). Plaintiff also references Defendant Smith's statement a few months later that the split guidance was "appropriate and correct." Am. Compl. ¶¶ 119, 124(b). However, Plaintiff has taken both of these statements out of context. These statements were tempered by other language showing that they were not as certain as Plaintiff paints them to have been. Specifically, Defendants actually said: "I *think* we've *pretty much* right-sized the commissions and we're competitive in the markets that we serve," and that "*the early indications* are that the guidance we've given on the split is appropriate and correct." Realogy Earnings Call for Q4 2016 (Ex. C to Defs.' Br.), at 11 (emphasis added); Realogy Earnings Call for Q1 2017 (Ex. D to Defs.' Br.), at 14 (emphasis added). At this point, the Court notes that it may take judicial notice of these exhibits attached to Defendants' moving papers, as well as any of the other exhibits referenced throughout this opinion, as these documents were explicitly relied upon in the Amended Complaint. As such, by looking at the documents relied upon in full, the Court is able to "prevent . . . the situation in which a plaintiff is able to maintain

10

a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." Burlington, 114 F.3d at 1426.

Moreover, while Plaintiff may have pointed with particularity to these specific statements made by Defendants, by showing what was said, by whom, and when, Plaintiff has still not met the particularity standard set by the PSLRA, as it has not shown "*how* or *why* those statements are false." Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 142 (3d Cir. 2004). In an attempt to comport with the PSLRA's requirement that the complaint specify "the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1)(B), Plaintiff reproduces the same boilerplate language multiple times throughout the Amended Complaint, listing supposed reasons why statements identified in the Amended Complaint "were materially false and misleading." Am. Compl. ¶¶ 110, 124, 141, 147, 166, 181, 192, 207, 218, 233, 247.

However, these repetitive statements do nothing to advance Plaintiff's case, as Plaintiff fails to point to any relevant facts and instead relies solely on conclusory and speculative statements. One example of such a conclusory statement by Plaintiff is:

> In addition, Defendants also gave investors the false impression that Defendants had "right-sized" full year 2017 commission split guidance of 69.5% to 70% and that any "little bit of pressure on splits" for the rest of the year was already "built into [Realogy's] forecast." **In truth, commission splits were continuing to climb and Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve commission splits in the range of 69.5%-70% for 2017**.

Am. Compl. ¶ 110(b) (emphasis added).

Simply because a speaker's statement ultimately turned out to be incorrect does not mean that he acted in a fraudulent or misleading fashion. See Chubb, 394 F.3d at 158 (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999), abrogated on other grounds by Tellabs, 551 U.S. 308 (2007)) ("Fraud cannot be inferred merely because '[a]t one time the firm

bathes itself in a favorable light but later the firm discloses that things are less than rosy.'"). Rather, for a statement to constitute a material misrepresentation or omission, the plaintiff must show that the speaker was in possession of some contrary information at the time the statement was made – making it so that either the speaker was aware, or at least should have been aware, that his statement was false or misleading. See NAHC, 306 F.3d at 1330 (internal citations omitted) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events. [Defendants] are not obligated to predict future events unless there is reason to believe that they will occur."); Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)) (internal citations omitted) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."). Indeed, a purported claim of securities fraud based merely on information that became apparent after the fact, with no indication that the speaker was aware, or at least should have been aware of the information at the time of his earlier statement, is the exact type of "fraud by hindsight" argument that the Third Circuit has long rejected as improper. Chubb, 394 F.3d at 158.

The above statement excerpted from the Amended Complaint concludes that "Defendants had no reasonable basis to expect and did not in fact expect" that Realogy could meet its split guidance for 2017, Am. Compl. ¶ 110(b), but Plaintiff offers no factual support for this conclusion. Nowhere in the Amended Complaint does Plaintiff explain *why* Defendants had no reasonable basis to believe, at the time that these statements were made, that these statements would turn out to be untrue. Simply stating that "commission splits were continuing to climb" is

insufficient to show that the Defendants should have known that the 2017 split guidance would not be met – as the guidance was based on an *average* for the *entire year*, and Defendants stated at that time that they expected the split increases to drop significantly near the end of the year.

As a point of comparison, in <u>Chubb</u>, the plaintiffs claimed that the defendant company had falsified its financial results, and that the individual defendants concealed this information when a merger vote took place. 394 F.3d at 135-36. However, the Third Circuit found this conclusion to be unavailing, as the plaintiffs "fail[ed] to allege with any particularity . . . that Defendants knew of the [falsified financial] results *at the time the merger vote took place*." <u>Id.</u> at 154 (emphasis added). Further, the court held that "[t]he conclusory assertion that . . . 'the . . . defendants had access to these financial results far in advance of when they were announced, and before the . . . shareholders voted' [was] patently insufficient, as [was] the speculation that '[i]f defendants were paying any attention[,] . . . any serious problems . . . should have been glaringly apparent to them by the time of the . . . shareholder vote.'" <u>Id.</u> Moreover, the "vague, conclusory allegation that the . . . Defendants must have been aware of [the company's] falsified financials through partaking in due diligence [also did] not suffice." <u>Id.</u> at 160. Here too, over and over again, Plaintiff attempts to rely on the idea that Defendants "should have known" better, without offering any factual support as to *why* exactly Defendants should have known certain facts. Yet, as the Third Circuit explained in <u>Chubb</u>, that type of reasoning alone can never satisfy the requisite pleading standard.

### Sub-Category B: Whether Defendants Gave Plaintiff the False Impression That the Pressure from the Commission Splits Would Substantially Moderate and Would Only Be Short-Term

Next, with respect to the second group of statements regarding the commission split initiative, Plaintiff avers that Defendants gave investors the false impression that any negative

13

results from this initiative would only be short-term, with substantial moderation by 2018 and through 2019. In particular, Plaintiff quotes numerous instances in which Defendants stated that the program would put "near-term moderate pressure on margins." Am. Compl. ¶¶ 53-54, 56-57, 100-02, 105-06, 112, 114, 117, 121-22, 128, 130, 137. Plaintiff also points to the fact that Defendants often stated that the split increases were expected to taper off in the second half of 2017 and would continue to substantially moderate after the first quarter of 2018, culminating with reduced pressure on the split rates in 2019. However, here too, Plaintiff's allegations are replete with generic and conclusory statements. For example, in trying to explain why exactly Defendants' statements about the near-term effect of the split initiative were misleading, Plaintiff states:

- "Defendants' statements that any negative impact the commissions initiative would have on the Company's financial performance would be limited to only 'near term moderate pressure' on margins . . . gave investors the false impression that any negative impact on the Company's financial performance would be limited to the short term if at all, **when the truth was that the Company would continue to suffer the negative impact of increasing commission splits through the end of the Class Period**." Am. Compl. ¶ 124(b) (emphasis added).

- "Defendants' statements that any negative impact the commissions initiative would have on the Company's financial performance would 'start stabilizing,' that 'we're well on our way to our ultimate goal of increasing overall revenue and profitability of the company,' and that 'we're heading in the absolute right direction to increase revenue and EBITDA levels,' gave investors the false impression that any negative impact on the Company's financial performance would slow in 2018, **when the truth was that the Company would continue to suffer the negative impact of increasing commission splits through the end of the Class Period**. In addition, Defendants also gave investors the false impression that Defendants had 'accomplished' the 'balancing act between market share gains and splits.' **In truth, commission splits were continuing to climb**." Am. Compl. ¶ 166(b) (emphasis added).

- "Defendants' statements regarding the moderation of the Company's increasing commission splits misrepresented and concealed that any increased commission splits would continue to result in a long-term negative impact on the Company's earnings and EBITDA . . . . As a result, **Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve operating EBITDA for the balance of the**

year following 1Q18 to be **"in line with or better than" the same period in 2017**." Am. Compl. ¶ 181(b) (emphasis added).

- "Defendants' statements that any negative impact from increased commission splits on the Company's financial performance would 'substantially moderate over the rest of 2018,' gave investors the false impression that the negative impact was limited to 1Q18, **when the truth was that the Company would continue to suffer the negative impact of increased commission splits through the end of the Class Period. In truth, commission splits were continuing to climb and Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve commission splits in the range of 70.25% to 70.5% for 2018**." Am. Compl. ¶ 192(c) (emphasis added).

Thus, as the only support for its allegation that Defendants' statements misled investors as to the duration of the negative impact from the split increases, Plaintiff merely states multiple times that "the truth was that the Company would continue to suffer the negative impact of increasing commission splits through the end of the Class Period" and that "[i]n truth, commission splits were continuing to climb and Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve commission splits in the range of 70.25% to 70.5% for 2018" "or that Realogy could achieve operating EBITDA for the balance of the year following 1Q18 to be 'in line with or better than' the same period in 2017." Am. Compl. ¶¶ 181(b), 192(c). While the Company did ultimately continue to be negatively affected by the split increases, Plaintiff again offers no factual basis for its implicit conclusion that Defendants should have been aware at the time they spoke that the split increases would have a relatively long-term effect on the Company's finances. These types of "[g]eneric and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of 15 U.S.C. § 78u–4(b)(1)." Chubb, 394 F.3d at 155.

Further, even if Defendants were aware that the split initiative would have more than a near-term effect on the Company's profitability, Plaintiff has not shown that Defendants ever actually said anything to the contrary. Rather, Plaintiff has taken Defendants' comments out of

context in an attempt to create false statements where none are present. In particular, while Plaintiff alleges that Defendants' statements gave investors the impression that this initiative would "have *only* a near term negative effect on the Company's profitability and EBITDA," Am. Compl. ¶ 97 (emphasis added), not once did Defendants say that the negative impact of this initiative would be *limited* to the near-term. Instead, Defendants simply explained that the split increase would put near-term pressure on the Company's finances, without stating that this pressure would completely subside afterwards. Moreover, the facts indicate that many of Defendants' statements about the initiative's substantial moderation were also ultimately accurate – as the split increases did in fact substantially moderate as expected in 2018 and 2019. Specifically, in the first quarter of 2018, the commission splits increased 284 basis points year-over-year, while this number went down to 209 basis points year-over-year in the second quarter, then 143 basis points year-over-year in the third quarter, and 111 basis points in the fourth quarter. Finally, in the first quarter of 2019, the split rate increased only 45 basis points year-over-year. As such, Defendants' comments that the split increases would substantially moderate throughout 2018 were correct. Indeed, even Plaintiff appears to concede that the split amounts did ultimately moderate. See Pl.' Opp'n Br. at 15 ("While commission splits may have 'moderate[d . . .]'"). Nevertheless, Plaintiff states in its opposing papers that, despite the literal accuracy of Defendants' statements regarding moderation, these statements were still misleading "because [Defendants] failed to disclose that despite moderation, splits still needed to increase substantially and would negatively impact Realogy's financial performance." Pl.' Opp'n Br. at 15. Yet, this conclusion lacks support, as, in fact, Defendants often tempered their comments regarding moderation by stating that the Company was still facing upward pressure on commission split rates. See, e.g., Realogy Earnings Call for Q4 2017 (Ex. F to Defs.' Br.), at 3

("While we continue to face upward pressure on commission rates in 2018, we expect year-over-year rate increases will substantially moderate after Q1 of '18.").

However, some of Defendants' stated expectations did turn out to be inaccurate. In particular, in the conference call held for investors about the first quarter of 2017, Defendant Hull said that the split "increase year-over-year [was] going to be more prominent in the first half," but that he "expect[ed] it to taper off in the back half [of 2017] . . . ." Realogy Earnings Call for Q1 2017 (Ex. D to Defs.' Br.), at 8. Similarly, in the call held for the second quarter of 2017, Defendant Hull stated that "certainly, the increases in Q3 are expected to be less than the increases [that were seen] in Q2 year-over-year. And then . . . the increase really drops off in Q4 . . . ." Realogy Earnings Call for Q2 2017 (Ex. E to Defs.' Br.), at 8. These predictions—that the split increases would taper off in the second half of 2017, with the increases declining substantially in the fourth quarter of 2017—were ultimately incorrect. Instead of declining, the split amounts continued to increase through 2017, with the amount increasing 209 basis points year-over-year in the third quarter of 2017 and then another 204 basis points year-over-year in the last quarter of 2017, up from the 150 basis points year-over-year increase in the second quarter of 2017. Nevertheless, even here, where Plaintiff can show that Defendants' statements were incorrect, that alone is insufficient to allege fraud under the PSLRA, as Plaintiff has not shown that Defendants were aware that their predictions were inaccurate at the time they were made. Indeed, Plaintiff has not pointed to any factual support that demonstrates that Defendants knew or should have known that the split rates would continue to increase through 2017 before moderating in 2018.

**Sub-Category C: Whether Defendants Gave Plaintiff the False Impression That the Commission Split Initiative Would Ultimately Improve the Company's Profitability**

Finally, as to the third group of statements relating to the split increases, Plaintiff claims that Defendants misled investors to believe that the Company would eventually be able to reach a split amount that could effectively recruit and retain top agents, while also allowing for increased profitability. In support of this claim, Plaintiff points to many instances where Defendants stated that the Company was focused on generating "sustainable organic growth," and that the split increases were expected to have a "positive impact on revenue and EBITDA levels" over the longer term. Am. Compl. ¶¶ 115, 127, 142, 150. Additionally, Plaintiff highlights that when the program first started taking effect in early 2017, Defendants stated that the pressure from the split increases was expected to be "mitigated" by increased revenue and earnings and that the benefits of the program were being "immediately realized" "due to the expected higher resulting royalty revenue it earns from NRT." Am. Compl. ¶¶ 54, 130. Even as the split amounts increased and EBITDA declined, Defendants continued to reiterate that it was their belief that this initiative would ultimately drive higher revenue and profitability over the next several years. In particular, Defendants often stated that they believed that EBITDA for 2018 would in line with or better than the same period in 2017. Nevertheless, NRT's EBITDA ultimately declined to negative four million in 2019, in part due to the Company's split increases.

Here too, however, Plaintiff's explanations as to why these statements by Defendants were misleading are bereft of any factual support. For example, Plaintiff alleges in its Amended Complaint that:

- "Defendants' statements misrepresented and concealed that the Company's [agent recruitment and retention campaign] would result in a long term negative impact on the Company's earnings and EBITDA **because Realogy was unable to generate sustainable (i.e., profitable) organic earnings and EBITDA at commission split**

18

**levels necessary to increase agent recruitment and retention, transaction volume, and market share**. For example, Defendants labeled the commissions initiative as 'very smart' and a means to 'sustain[] or grow[] market share in various markets' while failing to disclose that **the commission split increases required to attract new agents would result in significantly higher expenses that could not be offset through volume and would, in fact, decrease the Company's operating EBITDA**." Am. Compl. ¶ 110(a) (emphasis added).

- "Defendants' statements misrepresented and concealed that NRT's [agent recruitment and retention initiative] would result in a long-term negative impact on the Company's earnings and EBITDA **because Realogy was unable to generate sustainable (*i.e.*, profitable) organic earnings and EBITDA, at commission split levels necessary to increase agent recruitment and retention, transaction volume, and market share growth. As a result, Defendants had no reasonable basis to expect, and did not in fact expect, that Realogy could achieve [its projected] FY17 operating EBITDA** . . . ." Am. Compl. ¶ 141(a) (emphasis added).

- "…Contrary to Defendants' statements, **these initiatives were not 'driving sustainable organic growth.'**" Am. Compl. ¶ 166(a) (emphasis added).

- "Defendants' statements touting NRT's increased homesale transaction volume and the successes of Realogy's recruitment initiatives, concealed that **any volume increases, or new agents, resulted from unsustainably increasing commission splits that would negatively impact EBITDA and the Company's profitability**." Am. Compl. ¶¶ 124(c), 141(c), 166(c), 181(e), 192(e), 207(e) (emphasis added).

Despite concluding that "Realogy was unable to generate sustainable . . . organic earnings" through the split initiative and that the "split increases required to attract new agents would result in significantly higher expenses that could not be offset through volume," leaving "Defendants [with] no reasonable basis to expect . . . that Realogy could achieve [its projected] FY17 operating EBITDA," Am. Compl. ¶¶ 110(a), 141(a), Plaintiff again offers no factual support demonstrating that these allegedly true facts were known to Defendants at the time the statements were made. Rather, Plaintiff attempts to assert that Defendants knew that the commission split initiative would have a long-term negative impact on Realogy's finances because "[a]t the time these statements were made, Realogy had to make up for '*3 years*' of below-market commissions splits . . . while also overcoming 'upward' pressure on splits

stemming from competitors willing to 'grossly overpay[]' agents." Pl.' Opp'n Br. at 14. This alone does not establish that Defendants knew or should have known, at the time of their statements, that the initiative was ultimately bound to fail. Simply because the Company had a long and difficult road ahead of it does not mean that Defendants would be unable to turn things around, or that they knew that they would not succeed. As well, while NRT's EBITDA did ultimately decline to negative levels, that also does not demonstrate that Defendants were aware that the split program would have that result when they stated their views that the program would be financially beneficial to the Company.

As a reference point, in <u>Chubb</u>, the plaintiffs pointed to a greater amount of factual support than Plaintiff has here – and the Third Circuit still found that the plaintiffs there did not meet the necessary pleading standard. 394 F.3d at 160. In particular, the defendant insurance company in that case had started a new rate initiative for some of its insurance plans and the plaintiffs later alleged that the defendants had misled investors regarding the success of this rate initiative. <u>Id.</u> at 135. In an effort to meet their pleading burden for this claim, the plaintiffs relied upon confidential sources and an internal report, but the court found all of that information insufficient. <u>Id.</u> at 146, 160. Specifically, because the plaintiffs failed to allege when any of the confidential sources were employed by the defendant, the dates that the sources acquired the information, or how the sources had access to the information, the court held that the sources were not "'described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" <u>Id.</u> at 146 (quoting <u>Novak</u>, 216 F.3d at 314). As to the internal report, this was also rejected as the "plaintiffs fail[ed] to identify who authored the alleged report, when it was authored, who reviewed the report, and what data its conclusions were based upon." <u>Id.</u> at 147. For these reasons, the court held that the

conclusion that the rate initiative was a failure was "wholly conclusory and lack[ed] data to support it." Id.

Here, Plaintiff has presented even less factual support than the plaintiffs did in Chubb. While the PSLRA does not require that Plaintiff point to specific confidential sources or an internal report, Plaintiff must nonetheless "supply sufficient facts to support [its] allegations." Id. For example, the Third Circuit held that this can be done "by providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." Id. However, Plaintiff here has offered no such factual support and merely relies on stock declines and conclusory allegations that Defendants should have known better. Yet, those points cannot support an allegation of falsehood, as that would allow Plaintiff to plead fraud by hindsight. As such, because Plaintiff fails to plead with particularity why any of Defendants' statements about the commission split program were misleading and instead relies on conclusory allegations, Plaintiff does not meet the pleading standard as to these statements, and thus the commission split claim must fail under the PSLRA.

### ii.        The Technology Initiative

Having determined that Plaintiff failed to plead with particularity any material misrepresentations or omissions relating to the split initiative, the Court will now examine whether Plaintiff has met this burden for the statements about the Company's technology initiative.  As part of Realogy's agent recruitment and retention initiative, in addition to increasing the split rates, the Company also focused on producing technology and data-driven products for its agents. Plaintiff's point then is that Defendants often emphasized the value that the Company's new technological offerings would bring to the Company, while failing to

disclose that these new products and offerings were supposedly outdated, thus making it difficult for Realogy to effectively catch up with its competitors on this front.

Here too, however, Plaintiff's Amended Complaint fails to allege with the requisite particularity facts sufficient to demonstrate that the statements about the technology offerings were false or misleading. Rather, Plaintiff again relies simply on conclusory allegations, such as: "Defendants' statements that Realogy's new data-driven initiative will 'enhance our value proposition' by 'quickly producing' new products, concealed that **the Company's technology and data were antiquated, and therefore, insufficient to counteract agent attrition**." Am. Compl. ¶ 192(a) (emphasis added). Plaintiff does not point to any facts that could allow one to even infer that the technology and data were antiquated. Indeed, as the only support for its claim that the Company's technology and data were outdated, Plaintiff points to statements made by Defendants after the Class Period that allegedly serve as admissions. However, a closer look at these purported admissions show that they are nothing of the sort and are, once again, actually examples of how Defendants' statements have been misinterpreted to suggest misrepresentations where none occurred. For example, Plaintiff states that Defendants admitted that "Realogy had been recklessly disregarding technological product improvements, [when Defendant Schneider] stat[ed], 'We are a big company, but I feel like we're a diesel engine kind of building momentum with these things' [and that] . . . Realogy needed to quickly 'get[] up to a very fast speed.'" Am. Compl. ¶ 95. Plaintiff also states that "Simonelli further stated that the Company did not take advantage of 'low-hanging fruit' that had been available to the industry for '20 years' and needed to 'prioritize' costs savings and 'better value proposition[s] to the agents.'" Am. Compl. ¶ 95. However, both of these statements have been taken out of context and in no way suggest that Defendants admitted to "recklessly disregarding technological product improvements." Am.

Compl. ¶ 95. In particular, the full statement in which Defendant Schneider mentioned Realogy running as a "diesel engine" reads as follows:

> We had thousands of agents signed up for [the Company's AI-driven product] in March when we first launched it at our conference and thousands more have kind of connected with the program already since then. So[,] we need to put more of these in the market, these are all part of what you need to be doing to make your agent more productive, efficient, that helps drive volume, that helps drive agent retention, agent recruiting. And in a world where there is a lot of competition, that's an increasingly important thing. We are a big company, but I feel like we're a diesel engine kind of building momentum with these things and we look forward to getting up to a very fast speed.

KBW Mortgage Finance & Asset Management Conference, Realogy Presentation (dated May 30, 2019) (Ex. N to Defs.' Br.), at 7. Seeing the full statement demonstrates that Plaintiff's conclusion here is ludicrous. Indeed, the full statement shows that Defendant Schneider's analogy to a "diesel engine" was not a reference to diesel technology being supposedly obsolete. Rather, Schneider was simply likening Realogy to a railroad train that was quickly gathering speed to achieve its objectives. Further, the statement in context shows that Schneider was actually discussing the benefit of a new technological product that the Company had produced and was explaining that the Company intended to continue to focus on creating strong technological offerings. As such, Schneider was not admitting to any deficiencies at Realogy – but instead was explaining that the Company was building momentum and making important progress.

Similarly, Simonelli's comment regarding the "low-hanging fruit" that had been around for "20 years" was not actually a criticism of Realogy in particular, nor was it even made in reference to the Company's technology program. Rather, what Simonelli actually said was:

> As far as being new coming in, my background is in consumer packaged goods. And just visually, you can see the difference of how [the real estate] business is run versus how consumer packaged goods companies are run. And some of the things that were low-hanging fruit to [the consumer packaged goods companies] 20 years ago have not yet happened in this industry . . . and specifically at Realogy.

KBW Mortgage Finance & Asset Management Conference, Realogy Presentation (dated May 30, 2019) (Ex. N to Defs.' Br.), at 7. As the full statement shows, Simonelli's comment about "low-hanging fruit" not being utilized was directed toward the real estate industry in general, not just Realogy. Simonelli was not suggesting in any way that Realogy was behind others in the industry. In fact, her point was that, while the *entire* real estate industry could benefit from taking advantage of some other strategies, as someone with experience in another industry, she actually brought additional value to Realogy in the form of a fresh perspective. As well, Simonelli's statement was not even directed at technological offerings in particular and was more of a general commentary on how Realogy, and the real estate business as a whole, can still improve. Plaintiff's other attempts at cobbling together "admissions" are just as unavailing. For example, while Plaintiff references Defendant Schneider's comment that "we need to do more and we need to do it rapidly," Am. Compl. ¶ 90, this does not demonstrate that the Company's offerings were antiquated, nor that Defendants were aware of or recklessly disregarded this supposed fact. This is merely a generic statement showing that Defendants intended to continue to focus on growth and improvement at Realogy, both on the technology front and in general. Therefore, Plaintiff has failed to properly allege that Realogy's technology was in fact outdated, and even assuming for argument's sake that the technology was antiquated, Plaintiff has also failed to show that Defendants had any reason to know of this at the time of their challenged statements. Thus, as was the case with the statements regarding the commission splits, Plaintiff has failed to show how or why any statements relating to the technology initiative were false or misleading, causing this claim to fail under the PSLRA's pleading standard.

iii.        *The Acquisition Strategy*

Moving on to the third category of misstatements alleged by Plaintiff, here Plaintiff

contends that, despite Defendants' comments about the benefits of the Company's original tuck-

in acquisition strategy, this strategy actually caused inefficiencies and negative financial effects

at Realogy and that Defendants misled investors by failing to disclose these alleged negative

results. Further, Plaintiff alleges that, in early 2018, when the Company announced its shift away

from this former acquisition strategy in favor of focusing on organic growth through its

recruitment initiative instead, Defendants gave investors the false impression that this change

was due to the rising costs for acquisitions, when "the truth" was that the Company was moving

away from tuck-in acquisitions because of the inefficiencies the acquisitions had created at the

Company. Am. Compl. ¶ 181(f). In support of this idea, Plaintiff points to statements by

Defendants such as:

- "Following the completion of an acquisition, we tend to consolidate the newly acquired operations with our existing operations. By consolidating operations, we reduce or eliminate duplicative costs . . . . By utilizing our existing infrastructure to coordinate with a broader network of independent sales associates and revenue base, we can enhance the profitability of our operations. We also seek to enhance the profitability of newly acquired operations by strategies that increase the productivity of the newly affiliated independent sales associates." Realogy Form 10-K for 2016 (Ex. L to Defs.' Br.), at 11.[4]

- "[W]e're well-versed in tuck-in acquisitions, so we'll continue doing that. We announced a couple this week. They're very synergistic. We have a very high threshold for return on invested capital. We can do that in our sleep. We continue to focus on those tuck-ins." Realogy Earnings Call for Q3 2017 (Ex. B to Defs.' Br.), at 15.

However, as with all the other alleged misstatements and omissions discussed thus far,

Plaintiff has also failed to plead this claim with the necessary particularity. Indeed, Plaintiff

merely repeats the same conclusory allegation throughout the Amended Complaint – that "[t]he

---

[4] The Court notes at this time that, as the Third Circuit explained in <u>NAHC</u>, 306 F.3d at 1331, it may take judicial notice of SEC filings throughout this opinion.

Company's 'tuck-in' acquisitions masked the full extent of the Company's decline in transaction volume market share by increasing new operations and agents that, unbeknownst to investors, **were not effectively consolidated with the Company's existing operations, resulting in inefficiencies that negatively impacted the Company's operations and financial performance**." Am. Compl. ¶¶ 110(d), 141(f), 147(c) (emphasis added). Yet, Plaintiff offers no factual support for this allegation that new operations were not consolidated properly, nor that the Company's acquisition strategy led to inefficiencies. Rather, in support of this conclusion, Plaintiff points to a purported admission by Defendants in late 2018, where Defendant Schneider stated that the Company had "complex and inconsistent plans." Am. Compl. ¶ 203.

Here too, looking at the full statement in context demonstrates that this comment was not an admission that the tuck-in acquisition strategy had caused any inefficiencies. The statement in context reads:

> If we can get enough growth with simpler, clearer, more data-driven commission plans, we'll take higher splits if that's what it takes to get a lot more growth because the economics on an integrated basis would be better. And that growth has got to come from more recruiting. . . . And the way our company has evolved with those hundreds of brokerages, we've got these kind of complex and inconsistent plans out there. And they make it really hard, actually, to explain to potential agents both what our pricing really is and what our value proposition really is. And we think if we can do better to simplify and standardize, have a much clearer and more consistent message, we can actually get a lot more growth with recruiting.

Realogy Earnings Call for Q2 2018 (Ex. H to Defs.' Br.), at 6-7. By looking at the full statement in context, it is clear that Schneider did not admit that some of Realogy's acquisitions were ineffectively integrated, thereby resulting in inefficiencies that negatively impacted the company's operations and financial performance. Rather, the only thing that Schneider acknowledged in this statement was that the Company's compensation structure was "complex and inconsistent," which did sometimes make it more difficult to recruit potential agents. But

Schneider did not suggest that there were any inefficiencies at Realogy. Nevertheless, Plaintiff attempts to rely on this discrete problem that Schneider identified with regard to the Company's compensation plans to support Plaintiff's grossly broader generalization that the tuck-in acquisitions were somehow inefficient. However, in doing so, Plaintiff again makes it abundantly clear that it cannot point to sufficient facts to meet its pleading burden. Moreover, Plaintiff's other attempts to concoct an admission by Defendants that the Company's tuck-in acquisition strategy had led to inconsistencies are equally ineffective. Further, even assuming for the moment that the tuck-in acquisitions did cause such negative results, Plaintiff also has not shown that Defendants were aware of this supposed information at the time of their challenged statements. As such, because Plaintiff has failed to show how or why any statements relating to the Company's acquisition strategy were false or misleading, this claim is also improper under the PSLRA's pleading standard.

*iv.*      The ABCR

Plaintiff's fourth and final claim is that Defendants regularly commented on the stability of the ABCR but concealed that they were actually engaging in anticompetitive behavior in an attempt to maintain the ABCR at an artificially inflated level, which opened Realogy up to increased risk of legal liability and regulatory scrutiny. More specifically, the alleged anticompetitive scheme involved the Multiple Listing Service ("MLS"), a database on which most homes sold in the United States are listed. MLSs are usually controlled by local NAR associations, and Realogy, as an MLS member, is required to list all of its properties on this MLS database. According to Plaintiff:

> Realogy's anti-competitive behavior centered around NAR's adoption and implementation of the requirement that when listing a property on the MLS, a broker (or agent) must make a blanket, non-negotiable offer of buyer broker compensation. . . . [Then,] sellers are incentivized when making the required blanket, non-negotiable offer

> to procure the buyer brokers' cooperation by offering a high commission. Absent this rule, brokers would be paid by their clients and would compete to be retained by offering a lower commission. However, the current rule restrains broker's price competition because the person retaining the broker, the buyer, does not negotiate or pay his or her broker's commission. This anti-competitive behavior has kept the ABCR stable, despite the clearly diminishing role of brokers.

Am. Compl. ¶ 78.

In an attempt to demonstrate that Defendants materially misled investors as to the ABCR,

Plaintiff states, for example, that:

> Defendants concealed that NRT's ABCR "[was] very stable and sustainable for the foreseeable future' and that NRT's ABCR ha[d] only "experienced a one basis point decline" each year since 2014, while reiterating that ABCR [would] only decline "modestly" in the "long term," despite the diminishing role of brokers, **due to Defendants' undisclosed anti-competitive behavior designed to artificially inflate and prevent disruption to the ABCR, and that such behavior subjected Realogy to a heightened risk of regulatory scrutiny and litigation**.

Am. Compl. ¶ 141(e) (emphasis added). However, Plaintiff fails to demonstrate with the requisite particularity that Defendants behaved in an anticompetitive manner. Rather, as its only support for this claim that Defendants colluded to inflate the ABCR, Plaintiff points to two class action lawsuits brought against Realogy, in addition to several other real estate brokerage firms, which allege violations of federal antitrust laws, as well as the fact that the DOJ subsequently initiated an investigation into anticompetitive practices in the residential real estate brokerage industry. Neither the lawsuits alleging antitrust violations, nor the DOJ investigation, indicate that Defendants behaved in an anticompetitive manner. And while Plaintiff need not prove at the pleading stage that Defendants actually acted this way, it nevertheless must plead facts supporting this conclusion with particularity. Yet, Plaintiff simply relies on these other lawsuits and the DOJ investigation without pleading with any specificity "the who, what, when, where and how" of Defendants' purported collusive behavior. OFI Asset Mgmt., 834 F.3d at 490 (quoting Avaya, 564 F.3d at 253). This is insufficient and, therefore, Plaintiff's claim about the

ABCR also fails under the PSLRA's pleading standard. As such, all of Plaintiff's claims fail to meet the particularity standard, and thus ought to be dismissed.

2.  Whether Any of Defendants' Challenged Statements or Omissions are Protected Under Certain Exceptions

In addition to the above-discussed deficiencies in Plaintiff's Amended Complaint, many of the statements identified by Plaintiff are also insulated from liability under certain exceptions.

i.  *Forward-Looking Statements*

For starters, even if a complaint otherwise alleges a material misrepresentation or omission, that statement or omission may nevertheless be foreclosed from serving as a basis for a § 10(b) claim if it falls under the PSLRA's safe harbor for forward-looking statements. By protecting these forward-looking statements, Congress sought to "enhance market efficiency by encouraging companies to disclose forward-looking information" to investors. S. Rep. No. 104–98, at 14-15 (1995). According to this safe harbor provision, a plaintiff generally cannot succeed on a § 10(b) claim merely based on a "forward-looking statement," where the forward-looking statement is either (a) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (b) the plaintiff fails to show that the forward-looking statement "was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u–5(c). "The term 'forward-looking statement' is broadly defined in the statute" Avaya, 564 F.3d at 255, and "includes, *inter alia,* projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational performance." In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 279 (3d Cir. 2010).

To satisfy the first avenue of the forward-looking statement safe harbor, which requires that the statement be joined with "meaningful cautionary statements," "'the cautionary

statements must be substantive and tailored to the specific future projections, estimates or opinions in the [documents] which the plaintiffs challenge.'" OFI Asset Mgmt., 834 F.3d at 491 (quoting GSC Partners CDO Fund v. Washington, 368 F.3d 228, 243 n.3 (3d Cir. 2004)). See also Aetna, 617 F.3d at 282 ("Cautionary language must be extensive, specific, and directly related to the alleged misrepresentation."). Additionally, "[c]autionary statements disclosed in SEC filings may be incorporated by reference . . . [T]hey 'do not have to be in the same document as the forward-looking statements.'" Id. (quoting In re Merck & Co. Sec. Litig., 432 F.3d 261, 273 n.11 (3d Cir. 2005)).

Similarly, with respect to oral forward-looking statements, the requirement of having "meaningful cautionary statements" can be met either when the oral statement itself is directly accompanied by such a disclaimer, or when the speaker directs listeners to another specific document that includes meaningful cautionary statements. 15 U.S.C. § 78u–5(c)(2).

Here, many of the statements challenged by Plaintiff are "forward-looking statements" within the broad meaning of the statute. Some examples of such forward-looking statements are:

- "So the increase year-over-year is going to be more prominent in the first half [of 2017], and then we expect it to taper off in the back half [of 2017], as we sort of start to lap some of these initiatives . . . and investments we have made. So that's the basis of our 69.5% to 70% estimate for the full year [2017]." Realogy Earnings Call for Q1 2017 (Ex. D to Defs.' Br.), at 8.

- "[The guidance given for split amounts is] going to be necessary to achieve our goals this year. And we see no reason to think it's any higher than that." Realogy Earnings Call for Q1 2017 (Ex. D to Defs.' Br.), at 14.

- "But certainly, the increases in Q3 [of 2017] are expected to be less than the increases we saw in Q2 [of 2017] year-over-year. And then they really drop off – the increase really drops off in Q4 [of 2017] because we started to have some of the higher split numbers start showing in our numbers in Q4 of last year from some of our targeted recruiting efforts and retention efforts. So[,] it sort of trails off pretty significantly in Q4." Realogy Earnings Call for Q2 2017 (Ex. E to Defs.' Br.), at 8.

- "We expect that splits will be approximately 70% for the full year 2017 as we continue to strategically invest in productive sales agents." Realogy Earnings Call for Q2 2017 (Ex. E to Defs.' Br.), at 6.

- "While we expect these recruiting efforts will put near-term pressure on NRT's margins, the benefit of these and other growth initiatives is being immediately realized in RFG's results due to the higher resulting royalty revenue it earns from NRT." Realogy Earnings Call for Q2 2017 (Ex. E to Defs.' Br.), at 6.

- "[T]his year, we've been playing catch up [with the split rates]. We fully expect that to start stabilizing." Realogy Earnings Call for Q3 2017 (Ex. B to Defs.' Br.), at 8.

- "While we continue to face upward pressure on commission rates in 2018, we expect year-over-year rate increases will substantially moderate after Q1 of '18. In the short term, however, the impact of this strategic approach will substantially affect our Q1 2018 results." Realogy Earnings Call for Q4 2017 (Ex. F to Defs.' Br.), at 3.

- "[W]e expect to benefit increasingly over 2018 from continued organic growth through recruiting success, realization of already planned and executed operating efficiencies and improving agent productivity from new data and technology products over time." Realogy Earnings Call for Q4 2017 (Ex. F to Defs.' Br.), at 4.

- "[W]e expect that over the long term the average brokerage commission rates will continue to modestly decline as a result of increases in average homesale prices and, to a lesser extent, competitors providing fewer services for a reduced fee." Am. Compl. ¶¶ 139, 163, 179, 190, 205, 215.

- "[W]e will be enhancing our value proposition for agents by producing new technology and data products." Am. Compl. ¶¶ 173, 181(a).

These statements are clearly forward-looking within the meaning of the PSLRA, as they involve projections of future performance, as well as the assumptions underlying these statements about future performance.

However, some of the statements that Defendants attempt to classify as forward-looking do not fit within the statute's definition. For example, Defendants state that the following statements are forward-looking under the safe harbor:

- "Following the completion of an acquisition, we tend to consolidate the newly acquired operations with our existing operations. By consolidating operations, we reduce or eliminate duplicative costs . . ." Realogy Form 10-K for 2016 (Ex. L to Defs.' Br.), at 11.

31

- "We announced a couple [tuck-in acquisitions] this week. They're very synergistic." Realogy Earnings Call for Q3 2017 (Ex. B to Defs.' Br.), at 15.

While Defendants claim that these statements are forward-looking because they "communicate[] Realogy's ongoing and future plans" about "project potential synergies," Defs.' Br. at 27, these statements do not contain any predictive language and are merely descriptions of present conditions or goals. Nevertheless, as explained above, many of the statements challenged by Plaintiff should, in fact, be classified as forward-looking under the PSLRA's safe harbor.

Further, while Plaintiff avers that some of the statements that Defendants identify as forward-looking actually concern then-present factual conditions or are mixed present/future statements, this claim is unavailing. It is true that the forward-looking statement safe harbor does not apply to "a 'mixed present/future statement . . . with respect to the part of the statement that refers to the present.'" Aetna, 617 F.3d at 279 (quoting Avaya, 564 F.3d at 255). However, as the Third Circuit has previously explained, parts of a forward-looking statement can only be actionable when they include "discernable references to the present" that can "'meaningfully be distinguished from the future projection of which they are a part[.]'" Id. at 280 (quoting Avaya, 564 F.3d at 255). For example, the Third Circuit agreed that, in In re Stone & Webster, Inc., Sec. Litig., "the statement that the defendant 'ha[d] on hand and ha[d] access to sufficient sources of funds to meet its anticipated . . . needs' was not forward-looking because '[t]he part of the statement that [spoke] of the quantity of cash on hand [spoke] of a [then-]present fact.'" Id. (quoting Stone & Webster, 414 F.3d 187, 207, 212 (1st Cir. 2005)). On the other hand, the Third Circuit found that forward-looking statements that included only imprecise present-tense statements within them, such as "*we are on track* to meet our goals for the year" and "*our first quarter results position us* to meet our goals for the year" were too vague to be actionable, as those statements did "not advert to a particular current act such as cash on hand, but represse[d]

32

only defendants' continuing comfort with the earlier . . . annual projection . . . . [T]hat is, [the statements] amount[ed] in essence to a reaffirmation of that projection," and thus, could not be meaningfully distinguished from the forward-looking aspect of the statement as a whole. <u>Avaya</u>, 564 F.3d at 254, 256 (emphasis added).

Here too, Defendants' forward-looking statements identified in this opinion do not include discernable references to then-present facts. For instance, Plaintiff contends that Defendants' statement "we see no reason to think [the split guidance is] any higher than that" actually includes a present-tense statement. Pl.' Opp'n Br. at 29. However, as in <u>Avaya</u> and <u>Aetna</u>, any present-tense aspect of this statement is too vague to be actionable and cannot actually be separated from the future projection. This "statement[] do[es] not justify the financial projections in terms of any particular aspect of the company's current situation; [it] say[s] only that, whatever that situation is, it makes the future projection attainable. Such an assertion is necessarily implicit in every future projection." <u>Avaya</u>, 564 F.3d at 255. This does not serve to turn this statement into one that is not covered under the forward-looking safe harbor.

Relatedly, Plaintiff also contends that some of Defendants' forward-looking statements contain omissions of then-present facts, which would not be protected by the PSLRA's safe harbor. <u>See</u> Pl.' Opp'n Br. at 30-31. However, this point is also weak. First, Plaintiff's only support for this rule is an unreported district court case, <u>Curran v. Freshpet, Inc.</u>, No. 16-2263, 2018 WL 394878, at *4 (D.N.J. Jan. 12, 2018), which then cites to other district court cases as support. Second, even if the Court were to apply this rule, Plaintiff has not actually shown that Defendants misled investors in any way by omitting any then-present facts from their forward-looking statements. Rather, Plaintiff again relies on conclusory statements – alleging that the Company's future projections, as well as "Defendants' statements limiting the future, negative

impact to the 'near-term,'" are actionable "because [these] statements omitted then-existing material facts regarding the long-term, negative impact of Realogy's rising commissions initiative . . . ." Pl.' Opp'n Br. at 31. However, as discussed earlier, Defendants never stated that the negative impact of the commission split program would be *limited* to the short-term and Defendants regularly stated that the Company was still facing upward pressure on commission split rates. Moreover, even if Plaintiff aims to show that Defendants should have been more forthright about how much of an impact the split initiative would actually have on the Company's finances, as previously explained, Plaintiff has not shown that Defendants had any contrary information available to them at the time of their statements.

      Thus, under the PSLRA safe harbor, none of Defendants' forward-looking statements will be actionable if they were either accompanied by meaningful cautionary statements, or if Plaintiff has failed to demonstrate that the statements were made with actual knowledge that they were false or misleading. Here, Plaintiff has failed on both fronts. First, the facts indicate that these forward-looking statements were accompanied by meaningful cautionary statements. For example, the Company's SEC filings provided that:

> Forward-looking statements included in this [filing] and [the Company's] other public filings or other public statements that [the Company] make[s] from time to time are based on various facts and derived utilizing numerous important assumptions and are subject to known and unknown risks, uncertainties and other factors that may cause [the Company's] actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.

See, e.g., Realogy Form 10-K for 2016 (Ex. L to Defs.' Br.), at 1; Realogy Form 10-Q for Q3 2017 (Ex. A to Defs.' Br.), at 1; Realogy Form 10-K for 2019 (Ex. P to Defs.' Br.), at 1. While this type of statement alone might have been considered an insufficiently "vague or blanket (boilerplate) disclaimer," OFI Asset Mgmt., 834 F.3d at 491, the Company consistently included

more specific and tailored cautionary statements as well. In particular, while the exact phrasing

changed slightly from one filing to another, the Company's SEC filings then listed risk factors

that could cause the actual results to differ from the Company's expectations, such as:

- "[C]ompetition for more productive sales agents and sales agent teams will continue to impact the ability of our company owned brokerage business and our affiliated franchisees to attract and retain independent sales agents . . . and will result in continuing pressure on the share of gross commission income paid by our company owned brokerages and our affiliated franchisees to their independent affiliated sales agents." Realogy Form 10-K for 2019 (Ex. P to Defs.' Br.), at 1-2.

- "Our inability to successfully develop or obtain new technologies and systems, to replace or introduce new technologies and systems as quickly as our competitors and in a cost-effective manner or to achieve the benefits anticipated from new technologies or systems." Realogy Form 10-K for 2019 (Ex. P to Defs.' Br.), at 2.

- "Our inability to leverage real-time data analytics to support our company owned and franchisee real estate brokerages, affiliated independent sales agents and their customers as well as our relocation and title and settlement services segments." Realogy Form 10-K for 2019 (Ex. P to Defs.' Br.), at 2.

These ideas were also substantially reiterated in the Company's regular earning releases and the

releases even referred investors to the "risks set forth under the headings 'Forward-Looking

Statements' and 'Risk Factors' in [the Company's] filings with the [SEC]." See, e.g., Realogy

Earnings Release for Q3 2018 (Ex. O to Defs.' Br.), at 3.

Moreover, as to any oral forward-looking statements made during the Company's

quarterly earnings calls, each call began with the Company reminding listeners that:

Forward-looking statements and projections are inherently subject to significant economic[,] competitive and other uncertainties and contingencies, many of which are beyond the control of management. Actual results may differ materially from those expressed or implied in the forward-looking statements. . . . Important assumptions and other important factors that could cause actual results to differ materially from those in the forward-looking statements [made during the call] are specified in [the Company's] earnings release . . . as well as in [its] annual and quarterly SEC filings.

Realogy Earnings Call for Q4 2016 (Ex. C to Defs.' Br.), at 2; Realogy Earnings Call for Q1

2017 (Ex. D to Defs.' Br.), at 2; Realogy Earnings Call for Q2 2017 (Ex. E to Defs.' Br.), at 2;

Realogy Earnings Call for Q3 2017 (Ex. B to Defs.' Br.), at 2; Realogy Earnings Call for Q4 2017 (Ex. F to Defs.' Br.), at 2; Realogy Earnings Call for Q1 2018 (Ex. G to Defs.' Br.), at 2; Realogy Earnings Call for Q2 2018 (Ex. H to Defs.' Br.), at 2; Realogy Earnings Call for Q3 2018 (Ex. I to Defs.' Br.), at 2; Realogy Earnings Call for Q4 2018 (Ex. J to Defs.' Br.), at 2; Realogy Earnings Call for Q1 2019 (Ex. K to Defs.' Br.), at 2.

Despite all of these disclaimers, Plaintiff still claims that these cautionary statements were "undermine[d]" by Defendants' other reassurances that the pressure on commission splits would moderate and that the Company would meet its projected guidance numbers. Pl.' Opp'n Br. at 34. However, as the Third Circuit explained in Avaya, as long as any assurances were accompanied by meaningful cautionary language, the cautionary language is sufficient to keep the assurances within the protection of the safe harbor. 564 F.3d at 258. As such, although Defendants may have reassured investors that the negative impact of the split initiative would moderate over the long-term, because these forward-looking statements were always accompanied by cautionary language, these statements are still protected by the PSLRA's safe harbor.

Second, Plaintiff has also failed to show that any forward-looking statements were made with actual knowledge that the statement was false or misleading. As previously explained, Plaintiff's Amended Complaint is completely devoid of any specific facts that support a reasonable inference that the Company or any of the Defendants had actual knowledge that their statements were false or misleading. Boilerplate conclusory allegations that Defendants "knew that [a] particular forward-looking statement was false," Am. Compl. ¶ 321, simply will not cut it. See Advanta, 180 F.3d at 535-36 ("[P]laintiffs' catch-all allegation that all speakers knew

their statements were false when made is too broad."). Thus, many of Defendants' challenged

statements are not actionable as forward-looking statements under the PSLRA's safe harbor.

ii.        <em>Opinion Statements</em>

Opinions are another category of statements that are usually not actionable for the

purposes of a § 10(b) claim. The Supreme Court has explained that a sincere statement of pure

opinion does not constitute an actionable misrepresentation or omission of fact, even if the belief

is later proven to be wrong. <u>Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension</u>

<u>Fund</u>, 575 U.S. 175, 182-88 (2015) (reaching this holding in the context of Securities Act § 11,

which, using language similar to § 10(b), forbids material misstatements and omissions by an

issuer of securities in its registration statements). Nevertheless, the Supreme Court there also

explained that there are two distinct instances in which an opinion can be actionable. <u>Id.</u> at 185-

86, 189. First, an opinion statement may give rise to liability under the securities laws if it is not

genuinely believed by the speaker (i.e., the statement was subjectively false), and it contains an

embedded assertion of incorrect or misleading facts (i.e., the statement was also objectively false

or misleading). <u>Id.</u> at 185-86. Second, even if an opinion is sincerely held, the opinion statement

may still be actionable if the speaker omitted facts concerning the basis for the opinion and those

facts "conflict with what a reasonable investor would take from the statement itself." <u>Id.</u> at 189.

In other words, even if a speaker genuinely believed his stated opinion, his statement of opinion

would be actionable if his belief was irrational, as he had no reasonable basis to support his

belief. <u>See</u> <u>In re Merck & Co. Sec., Derivative & "ERISA" Litig.</u>, 543 F.3d 150, 166 (3d Cir.

2008) (quoting <u>Herskowitz v. Nutri/System, Inc.</u>, 857 F.2d 179, 185 (3d Cir. 1988)) ("[F]or

'misrepresentations in an opinion' or belief to be actionable, plaintiffs must show that the

statement was 'issued without genuine belief or a reasonable basis.'").

37

Many of Defendants' challenged statements were opinions. Some examples of these opinion statements are:

- "I believe the personal Realogy catch-up is actually now over and we're now much more going to be a function of just what happens with kind of the market price out there. And so we think 2019 will be – won't look anything like that pressure in '17, '18. We think it'll look much more like the fourth quarter of '18 and better – and/or better kind of on a full year basis." Realogy Earnings Call for Q4 2018 (Ex. J to Defs.' Br.), at 8.

- "I think we've pretty much right-sized the commissions and we're competitive in the markets that we serve." Realogy Earnings Call for Q4 2016 (Ex. C to Defs.' Br.), at 11.

- "[W]e're seeing that the returns, we think, are going to be better for us on the organic growth side with recruiting for, example, as opposed to acquisitions . . ." Realogy Earnings Call for Q4 2017 (Ex. F to Defs.' Br.), at 8.

- "[G]oing forward, we are focused on driving sustainable organic growth across our enterprise by strengthening the services we provide to affiliated agents, which we believe will result in continued recruiting success and improved agent productivity." Am. Compl. ¶ 150.

- "We believe our adoption of a more data-driven strategy, together with strong product and services offerings, will further sharpen our productivity, recruitment and retention objectives." Am. Compl. ¶ 204.

Then, while Plaintiff references many such opinion statements in its Amended Complaint, it fails to show that these opinion statements are actionable. Plaintiff has neither shown that the speakers did not genuinely hold these beliefs, nor that they lacked a reasonable basis for these beliefs. Again, simply concluding that Defendants had "no reasonable basis" for these beliefs, "and did not in fact" hold these beliefs, see e.g., Am. Compl. ¶¶ 110(b), 124(b), is insufficient. To meet the pleading standard, Plaintiff must point to specific facts that demonstrate that Defendants lacked a reasonable basis for their opinions. See Omnicare, 575 U.S. at 194 ("The [plaintiff] must identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry the [speaker] did or did not conduct or the knowledge [he] did or did not have—whose omission makes the opinion statement at issue misleading as to a reasonable

person reading the statement fairly and in context."). Plaintiff points to no such facts; thus, any opinion statements by Defendants are not actionable.

### iii.        Puffery Statements

Finally, statements of "puffery" also cannot serve as the basis for a § 10(b) claim. Statements of puffery are "vague and non-specific expressions of corporate optimism" that "reasonable investors would not have relied" upon. Aetna, 617 F.3d at 284. As such, they are "'too vague to be actionable.'" Id. at 280 (quoting Avaya, 564 F.3d at 255). For example, in Aetna, the Third Circuit examined the following statement: "This is solid and balanced growth that is representative of our dedication to disciplined pricing . . . I will end my comments by reaffirming to you my personal commitment to continue to maintain discipline and rigor in everything we do at [defendant insurance company]." Id. at 276. There, the Third Circuit held that the defendant-insurer's statements about "'disciplined' pricing" were immaterial puffery, as they contained only "oblique references to [the defendant-insurer's] pricing policy." Id. at 284 As such, those "general statements . . . could not have meaningfully altered the total mix of information available to the investing public." Id.

Many of the statements challenged by Plaintiff also constitute mere puffery and are thus not actionable. Some examples are:

- "At NRT, we continue to make great progress on our recruiting programs and strengthening the agent value proposition, despite a very competitive market for sales agents." Realogy Earnings Call for Q1 2017 (Ex. D to Defs.' Br.), at 3.

- "[We will] remain focused on maintaining our business momentum and continuing to generate sustainable organic growth." Am. Compl. ¶ 127.

- "[W]e will be enhancing our value proposition for agents by producing new technology and data products." Realogy Earnings Call for Q4 2017 (Ex. F to Defs.' Br.), at 3.

- "[We are] moving quickly to make strategic changes to improve profitability over time, anchored in growing our base of independent sales agents at both NRT and RFG and

providing agents compelling service, data and technology products to allow them to
increase their productivity." Am. Compl. ¶ 194.

- "We are . . . enhancing our value to agents with new products and expanding our use of
technology and data." Realogy Earnings Release for Q3 2018 (Ex. O to Defs.' Br.), at 1.

- "We announced a couple [tuck-in acquisitions] this week. They're very synergistic."
Realogy Earnings Call for Q3 2017 (Ex. B to Defs.' Br.), at 15.

- "With our size, scale and healthy balance sheet, we believe we are well-positioned to
weather shifts in market conditions as we continue to invest in multiple avenues of
growth." Realogy Earnings Release for Q3 2018 (Ex. O to Defs.' Br.), at 1.

As in Aetna, no reasonable investor would have relied upon these statements, as they are too
vague and general to actually convey any relevant information. Therefore, these statements
constitute immaterial puffery and are not actionable. In conclusion, in addition to the fact that
Plaintiff failed to allege any material misrepresentation or omission by Defendants, many of the
statements referenced by Plaintiff are also not actionable as forward-looking statements,
opinions, and/or statements of puffery.

### C.  The Section 20(a) Control Person Claim

Section 20(a) of the Exchange Act "creates a cause of action against individuals who
exercise control over a 'controlled person,' including a corporation, that has committed a
violation of § 10(b)." Avaya, 564 F.3d at 252; see also 15 U.S.C. § 78t(a). A claim under Section
20(a) thus imposes secondary liability on the controlling person for the wrong committed by the
one who is controlled. In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 284-85 (3d Cir.
2006). In this case, Plaintiff's control person claim against the Individual Defendants is
predicated upon the primary liability of Realogy under Exchange Act § 10(b).

Defendants correctly argue that because the Amended Complaint fails to state an
actionable § 10(b) and Rule 10b-5 violation, the control person claim necessarily fails to state a
claim upon which relief may be granted. Id. at 285; Shapiro v. UJB Fin. Corp., 964 F.2d 272,

279 (3d Cir. 1992) (holding that "once all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based."). Accordingly, the control person claim will also be dismissed for failure to state a claim upon which relief may be granted.

### D.  Whether Plaintiff Should be Granted Further Leave to Amend

Finally, because there is no indication that allowing Plaintiff to amend its pleadings further would cure any of the deficiencies in the Amended Complaint, and Plaintiff has not proffered any information to the contrary, leave to further amend will not be granted. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002) (holding that upon granting a defendant's motion to dismiss a deficient complaint, a district court need not grant the plaintiff leave to amend if amendment of the complaint would be inequitable or futile).

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion and will dismiss the entirety of the Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). Moreover, because there is no indication that Plaintiff could allege facts curing the deficiencies in the Amended Complaint, leave to further amend will not be granted. An appropriate Order with be filed together with this Opinion.

  s/Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

Dated: January 21, 2021